# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**HUMAN RIGHTS DEFENSE CENTER**                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:17-CV-3070**

**BAXTER COUNTY, ARKANSAS;**
**JOHN MONTGOMERY, Sheriff, in his individual and official capacities;**
**BRAD LEWIS, Jail Administrator, in his individual and official capacities;**
**SGT. ERIC NEAL, in his individual and official capacities;**
**and DOES 1-10, in their individual and official capacities**

                                                   **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are two Motions and a multitude of briefs. First, Defendants Sheriff John Montgomery, Jail Administrator Brad Lewis, Sergeant Eric Neal, and Baxter County (collectively, "Defendants") have filed a Motion to Dismiss (Doc. 18) and Brief in Support (Doc. 19) asserting that Plaintiff Human Rights Defense Center ("HRDC") lacks standing to sue and that the individual capacity claims against these county officials should be dismissed on qualified immunity grounds. In addition to these two filings, the Court has also received HRDC's Response (Doc. 25), the Defendants' Reply (Doc. 31), and HRDC's Sur-Reply (Doc. 35). The second motion is HRDC's First Motion for a Preliminary Injunction and Brief in Support (Doc. 26). On that Motion, the Court has received the Defendants' Response (Doc. 33) and HRDC's Reply (Doc. 43).

The Court heard oral argument on both motions during a case management hearing held on November 28, 2017. As the Court explained in its rulings from the bench and as further explained below, the Motion to Dismiss (Doc. 18) is **GRANTED IN PART AND DENIED IN PART**, and HRDC's First Motion for a Preliminary Injunction (Doc. 26)

is **DENIED**. To the extent anything in this Order differs from the rulings the Court made from the bench during that hearing, this Order shall control.

# I. BACKGROUND

## A. Factual Background

HRDC is a 501(c)(3) non-profit organization with principal offices in Lake Worth, Florida. HRDC's purpose is to "educate prisoners and the public about the destructive natures of racism, sexism, and the economic and social costs of prisons to society." (Doc. 1, p. 3). HRDC communicates this message through Prison Legal News ("PLN"), which is the "publishing arm of the HRDC." *Id.*

HRDC, through PLN, publishes and distributes *Prison Legal News: Dedicated to Protecting Human Rights*, a monthly magazine which contains news about prisons, prisoners' rights, and prison facilities and conditions, among other things.[1] HRDC distributes its magazines to monthly subscribers and to prisoners in 2,600 correctional facilities across the country, including in Arkansas. In addition to *Prison Legal News*, HRDC also publishes and distributes different books about the criminal justice system, self-help books for prisoners, and informational packets that contain subscription order forms and a book list.

The named defendants in HRDC's complaint are Baxter County, Arkansas (the "County"), which operates the Baxter County Jail and Detention Center ("BCDC"), Baxter County Sheriff John Montgomery, Lieutenant Brad Lewis, and Sergeant Eric Neal. HRDC

---

[1] According to the Complaint, *Prison Legal News* is a 72-page magazine. A copy of one edition of the magazine submitted in this case shows that besides legal articles of interest to prisoners, *Prison Legal News* also contains advertisements for an assortment of products and services, including legal services and order forms by which prisoners can request nude/semi-nude photographs of men and women. *See, e.g.*, Doc. 26-1, p. 16.

alleges that Defendants implemented and adhered to an unconstitutional mail policy that prohibited the delivery of HRDC's publication materials to BCDC prisoners. Specifically, HRDC claims that Defendants refused to deliver issues and sample issues of *Prison Legal News*, *The Habeas Citebook*, informational packets, legal letters, and court opinions sent by HRDC to prisoners held in the BCDC. Since 2016, HRDC has identified at least one hundred ten (110) items of mail sent to BCDC prisoners that Defendants allegedly censored. This includes twenty-one (21) issues of *Prison Legal News*, eleven (11) sample issues of *Prison Legal News*, twenty-one (21) informational packets, and twenty-four (24) copies of *The Habeas Citebook*. *Id.* at 6. Defendants sent these items back to HRDC with "Refused" or "Return to Sender Post Cards Only" notations, *id.* at 7, and allegedly failed to return other mailings. HRDC alleges that Defendants' actions violated its constitutional rights, limited its ability to distribute its political message and obtain new customers, and thereby frustrated its organizational mission.

### B. Procedural Background

On August 21, 2017, HRDC filed suit in this Court. Principally, HRDC alleges that Defendants' mail policy unconstitutionally prohibits HRDC from delivering its materials to BCDC prisoners, thereby violating its First Amendment rights. HRDC also alleges that Defendants' policies violate its right to Due Process under the Fourteenth Amendment by not giving it adequate notice of Defendants' decisions or an opportunity to object to or challenge those decisions. As such, HRDC seeks declaratory and injunctive relief against all Defendants as well as damages.

On September 21, 2017, Defendants filed a Motion to Dismiss all of HRDC's claims (Doc. 18) and a Brief in Support (Doc. 19). Specifically, Defendants' motion argues that

HRDC lacks standing to bring this suit and that the individual capacity claims against these three officials should be dismissed on the basis of qualified immunity. After filing a response to Defendants' Motion to Dismiss, HRDC, on October 9, 2017, filed its First Motion for Preliminary Injunction (Doc. 26), where it requested that this Court prohibit Defendants from continuing to violate its First and Fourteenth Amendment rights. Responses and Replies, including a Sur-Reply, were submitted to the Court, and both of these motions are ripe for decision.

## II. DISCUSSION

### A. Motion to Dismiss

#### 1. Standing

Because standing goes to the heart of the Court's jurisdiction to hear a case, *Tarsney v. O'Keefe*, 225 F.3d 929, 934 (8th Cir. 2000), the Court will first take up Defendants' argument that the Complaint should be dismissed because HRDC lacks standing to sue over these alleged violations. Article III standing requires an "'injury in fact' to the plaintiff that is 'fairly traceable to the challenged act of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An injury in fact occurs when there "is an invasion of a legally cognizable right" and it "generally requires injury to the plaintiff's personal legal interests. *Id.* (citing *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771-72 (2000)).

The Supreme Court has recognized that "publishers who wish to communicate [with prisoners], through subscriptions . . . have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (discussing the

4

standard to use when reviewing prison regulations that limit access to prisoners). Thus, even though that First Amendment right is "qualified of necessity by the circumstance of imprisonment," *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989), "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." *Id.* at 417. Therefore, HRDC's allegations that it did not receive these minimum procedural safeguards, in violation of its First and Fourteenth Amendment rights, is sufficient to allege an injury that could be redressed were this Court to ultimately rule for it on the merits.

Defendants argue that HRDC lacks standing because some of its injuries may occur in the future and because it has no First Amendment right to distribute unsolicited materials to prisoners. *See* Doc. 19, pp. 7-8. Defendants' arguments impermissibly seek to graft merits-based considerations into the requirements for standing. *See, e.g.*, *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) ("[A] plaintiff need not prevail on the merits before he can establish his standing to sue.").

Here, HRDC alleges First and Fourteenth Amendment violations that flow directly from the BCDC's postcard-only policy, and it alleges that this policy damaged HRDC and will continue to cause damage unless enjoined. (Doc. 19, p. 9). Thus, even if the Court ultimately finds in favor of Defendants on the merits of this case, HRDC still has standing to bring this suit. To the extent Defendants' Motion to Dismiss is premised upon an argument that HRDC lacks standing, it will be **DENIED**.

### 2. Qualified Immunity

Defendants next argue that even if the entire lawsuit is not dismissed, the individual capacity damage claims against these three named officials should be dismissed

because they are entitled to qualified immunity. *See* Doc. 19, p. 3. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Government officials sued in their individual capacity are "entitled to qualified immunity unless the right asserted by [the plaintiff] was established 'beyond debate.'" *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th Cir. 2017) (quoting *Ashcroft*, 563 U.S. at 741). In short, qualified immunity "gives ample room for mistaken judgment by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (internal quotation marks and citation omitted); *see also Durham v. Horner*, 690 F.3d 183, 190 (4th Cir. 2012) ("[Q]ualified immunity protects public officials from bad guesses in gray areas.") (internal quotation marks and citation omitted).

Qualified immunity, however, does not serve as a defense to an equitable claim, such as a claim for injunctive relief. *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (citation omitted); *Grantham v. Trickey*, 21 F.3d 289, 295-96 (8th Cir. 1994) (citations omitted) ("There is no dispute that qualified immunity does not apply to claims for equitable relief . . . and that state officials may be sued in their official capacity for equitable relief[.]"). Therefore, the individually named officials may be compelled to act if the Court grants HRDC's request for a preliminary injunction. Thus, at the outset, it is important for the Court to note that the official capacity claims against these individuals will remain regardless of the Court's decision below on whether the individual capacity claims should be dismissed.

Turning to the qualified immunity analysis, "[t]he first step . . . is to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Cox v. Sugg*, 484 F.3d 1062, 1065 (8th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). HRDC sufficiently alleges that the individual Defendants violated its First and Fourteenth Amendment rights by limiting its ability to communicate with BCDC prisoners, so the first step is satisfied.

Next, the Court must decide whether HRDC's First and Fourteenth Amendment rights were clearly established when the BCDC rejected its attempts to communicate with prisoners. *See Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009). As the Court noted above, for a right to have been clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (quoting *Ashcroft*, 563 U.S. at 741). Because Defendants assert that they should be protected by qualified immunity on both HRDC's First and Fourteenth Amendment claims, the Court will consider each claim in turn.

### a. First Amendment

Regarding the First Amendment claim, the Court finds that the individually named defendants, Sheriff Montgomery, Jail Administrator Lewis, and Sergeant Neal, are entitled to qualified immunity. The law was not clearly established in August 2016 to the point that these officials knew or should have known that enforcing BCDC's postcard-only policy violated HRDC's First Amendment rights. As an initial matter, the Court has previously considered a nearly-identical policy that came to it on a Report and Recommendation of Judge Ford in *Brown v. Hickman*. In his Report and Recommendation, Judge Ford undertook a careful and thorough search for cases within the Eighth Circuit that

addressed the constitutionality of a postcard-only policy, finding none. 2015 WL 1097392, at *9 (W.D. Ark. Mar. 11, 2015). In addition, he noted that district courts outside of the Eighth Circuit had come to divergent opinions on the constitutionality of such a policy. *Id.* (collecting cases). This Court reviewed Judge Ford's opinion carefully, adopting it in its entirety and concluding that the officials were entitled to qualified immunity. *Id.* at *1.

As the Court stated during oral argument, this fact alone is sufficient in the Court's opinion to find that these officials are entitled to qualified immunity on HRDC's First Amendment claim. Nevertheless, the Court would additionally note that despite the fact that HRDC cherry-picked cases that had ruled against such policies, it ignored other cases from around the country that had been decided the other way. In short, HRDC has not demonstrated that it was clearly established at the time of the alleged rejections of HRDC's mailings that such a postcard-only policy violated HRDC's First Amendment rights.

As the Court noted previously, qualified immunity is meant to protect all but the plainly incompetent, *Hunter*, 502 U.S. at 228, and serves as a shield for officials who make "bad guesses in gray areas," *Durham*, 690 F.3d at 190. Given the Court's review of case law in this area, the constitutionality of this type of policy is certainly, at best, a gray area. Therefore, these individual defendants are entitled to qualified immunity on the First Amendment claim, and the individual capacity damage claims asserted against them on this basis are **DISMISSED**.

### b. Fourteenth Amendment—Due Process

These officials are also entitled to qualified immunity on HRDC's Fourteenth Amendment Due Process claim. A due process violation requires the denial of a protected

8

liberty or property interest. *See Senty-Haugen v. Goodno*, 462 F.3d 876, 885-86 (8th Cir. 2006). In its landmark decision in *Procunier v. Martinez*, the Supreme Court held that "the addressee as well as the sender of direct *personal* correspondence derives from the First and Fourteenth Amendments a protection against *unjustified* governmental interference with the intended communication." 416 U.S. 396, 408-09 (1974) (emphasis added). Since that opinion, appellate courts around the country have concluded that a certain level of due process "must accompany various decisions to exclude prison mailings." *Prisoner Legal News v. Livingston*, 683 F.3d 201, 222-23 (5th Cir. 2012) (noting that the Fourth, Ninth, Tenth, and Eleventh Circuits had extended *Martinez's* logic to other types of publications). However, the Fifth Circuit's decision in *Livingston*, which ultimately held that *initial* but not *subsequent* denials of identical publications required notice and an opportunity to appeal, suggested in dicta the precise problem the Court has with HRDC's argument here. Namely, neither *Livingston* nor any of these other cases answered the question of what type (if any) of process is due to publishers when jails reject a publication pursuant to routine enforcement of a content-neutral rule with general applicability.

In holding that these subsequent denials of identical publications did not require notice or an opportunity to appeal, the Court in *Livingston* stated that once a determination was made that a particular publication's contents violated prison policy, the routine enforcement of a rule with general applicability (subsequent denials for identical reasons), which was non-individualized (neither reconsidering the book's content nor deciding whether to accept or reject based upon the sender) did not even clearly implicate due process concerns. 683 F.3d at 223. These subsequent denials differed from the initial denial, which did require notice and an opportunity to appeal, according to the Court,

because "at the time of the initial denial, an individualized decision (with respect to the book's contents) must be made [and thus the prison's policies] . . . [a]t least arguably . . . fall short of the traditional requirements of due process because they do not give the appellant, whether the prisoner or the outsider, the right to participate in . . . consideration of the appeal." *Id.* at 223-24 (citation omitted). At the end of its discussion on due process, the Fifth Circuit noted that:

> The right to receive notice exists only to effectuate the right to be heard, and therefore is inapplicable where a party has no right to participate in the decision-making process. Giving notice to a sender that his communication has been rejected may be a reasonable courtesy, but such notice is not a requirement of due process.

*Id.* at 224 (holding that Prison Legal News was not entitled to notice of every denial of its publications).

In short, the reason why a publisher was entitled to notice and an opportunity to appeal to a different decision-maker within the prison system in *Livingston* had nothing to do with general due process protections afforded to senders of mail as of right; rather, it had everything to do with the fact that in that particular case, a decision was made to reject a publication because it qualified under one of the six enumerated reasons for rejection,[2] all of which required a prison official to make an individualized determination

---

[2] As the Fifth Circuit explained, the Texas Department of Criminal Justice allowed books to be rejected for the following reasons:
  1) It contains contraband that cannot be removed;
  2) It contains information regarding the manufacture of explosives, weapons, or drugs;
  3) It contains material a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the breakdown of prisons through offender disruption such as strikes, riots, or [security threat group] activity;
  4) A specific determination has been made the publication is detrimental to offenders' rehabilitation because it would encourage deviant criminal sexual behavior;

about the contents of the publication itself and whether these contents violated prison policies. This is exactly why a neutral, second prison official had to be available to hear an appeal of that initial censorship decision.

HRDC's citations to other cases where courts have required notice and an opportunity to appeal confirm the Court's concern that HRDC has glossed over certain key distinctions between those cases and the present case. For instance, in support of its position that notice and an opportunity to appeal to a second official are required, it cites the following cases: *Procunier v. Martinez*, 416 U.S. 396 (1974); *Murphy v. Mo. Dept. of Corr.*, 814 F.2d 1252 (8th Cir. 1987); *Trudeau v. Wyrick*, 713 F.2d 1360 (8th Cir. 1983); and *Martin v. Kelley*, 803 F.2d 236 (6th Cir. 1986). A review of these decisions confirms that they do not sweep as broadly as HRDC contends.

While all of these cited cases *did* require notice and some form of opportunity to appeal a rejection decision, they also all dealt precisely with the situation noted above where the specific pieces of challenged mail had been rejected pursuant to prison policies after an individualized, content-specific determination as to whether the publication was acceptable. For instance, in the Supreme Court's decision in *Procunier*, prison policies prohibited inmates from sending or receiving letters that pertained to criminal activity, were lewd, obscene or defamatory, or were otherwise inappropriate. 416 U.S. at 399. In *Murphy*, the policy censored mailings from "any organization that espoused the supremacy, purity or separation of the white race," 814 F.2d at 1254. In *Trudeau*, jail

---

5) It contains material on the setting up and operating of criminal schemes . . .;
6) It contains sexually explicit images.

*Livingston*, 683 F.3d at 208.

officials determined that a specific item of personal correspondence, which contained money that was thought to be a part of a prisoner's fraudulent scheme to extort money from good-hearted Samaritans, should be withheld. 713 F.2d at 1362-63. Finally, in *Kelley*, a letter was censored because Sgt. Kelley had determined that the letter, which was written on KKK letterhead and apparently mentioned the possibility of a KKK rally at the prison, was inflammatory. 803 F.2d at 237 (6th Cir. 1986).

Here, it is undisputed that no individualized determination has to be made of any of the content of the numerous unsolicited publications that HRDC sought to send to prisoners at the BCDC. The postcard-only policy applies in a neutral fashion, across the board, and without regard to content or the sender of the mailing. It does not take an individualized determination based upon the contents of the mailings to determine that books and 72-page editions of *Prison Legal News* are not postcards. This case is, at bottom, simply not analogous to the true censorship cases noted above where stringent due process protections have been afforded to publishers.

In the wake of these cases, the Court is left with a number of general postulates and several unanswered legal questions. First, it is clear that the Supreme Court has required a certain amount of minimal procedural safeguards that must accompany a decision to *censor* incoming mail. In addition, courts of appeals around the country have extended this decision to a number of different factual scenarios and types of mail, some dependent upon whether the prison regulation triggered an individualized review (i.e. based on its content) and others dependent upon whether the publication was subscribed to as opposed to bulk mail. For instance, where the specific government regulation concerned censorship because of the content of the publication, courts have generally

required a level of due process typical of other governmental decisions (i.e. notice and an opportunity to be heard). *See, e.g., Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996) (finding that publishers were entitled to notice and an opportunity to be heard where the prison regulation banned inmate access to publications that had been deemed by prison officials to be obscene). Courts have also required notice and an opportunity to be heard where the publication was subscribed to by prisoners. *See, e.g., Prison Legal News v. Cook*, 238 F.3d 1145, 1152-53 (9th Cir. 2001) (finding that subscription-based mail must be afforded the same procedural protections as other types of allowed mail).

But, neither in any of these cases nor in any other set of cases has the Court found a consensus position as to whether and how much process is due before a jail or prison may reject incoming unsolicited publications based on content-neutral, generally applicable regulations like a postcard-only policy. A short sampling of additional cases illustrates that there is no clearly established law on this precise legal question. *See, e.g., Prison Legal News v. Jones*, 2015 WL 12911752, at *25 (N.D. Fla. Oct. 5, 2015) (finding that a publisher must know the grounds upon which its publication has been rejected and must have a reasonable opportunity to protest); *Van Den Bosch v. Raemisch*, 2009 WL 4663134, at *3-*5 (W.D. Wis. Dec. 1, 2009) (questioning whether due process protections even apply, but nevertheless finding that receiving 35 notices of non-delivery out of 250 total rejected copies was not a due process violation); *Cox v. Denning*, 2014 WL 4843951, at *13 (D. Kan. Sept. 29, 2014) (finding no clearly established law on the constitutionality of a postcard-only mail policy as it applies to non-pre-approved, non-privileged mail); *Simpson v. Cnty. of Cape Girardeau*, 202 F. Supp. 3d 1062, 1071 (E.D. Mo. 2016) (finding

that a jail's postcard-only policy did not violate either the First or Fourteenth Amendments).[3]

In the present case, HRDC alleges that a number of its unsolicited mailings to prisoners at the BCDC were rejected or withheld by prison officials pursuant to the postcard-only policy. HRDC alleges that, since 2016, some 110 mailings have been returned to HRDC, "many with notations such as 'Refused' or 'Return to Sender Post Cards Only.'" (Doc. 1, p. 7). HRDC contends that still other mailings were not returned at all. *Id.* Although the Court was initially concerned by what appeared to be a haphazard way of notifying the sender of the reason for the rejection, the Defendants' counsel explained that the varied responses to the unsolicited mail were a function of the fact that some of these mailings were sent to prisoners who were no longer inmates at the jail at the time the mailings were received.

For the aforementioned reasons, the Court finds that these officials did not violate clearly established law at the time they refused to deliver unsolicited mailings that, by their very nature and irrespective of their content, were in contravention of the jail's postcard-only policy. It is undisputed that the BCDC put HRDC on notice of its postcard

---

[3] Adding to the legal uncertainty here is the fact that several decisions from the Eighth Circuit suggest that this circuit would take an even narrower view of the obligations that prison officials owe to individuals who have mail rejected pursuant to a neutral, generally applicable, officially-sanctioned policy. *See, e.g.*, *Holloway v. Pigman*, 884 F.2d 365, 367 (8th Cir. 1989) (upholding against constitutional challenge a regulation that allowed prison officials to return mail that violated prison regulations *without* allowing inmates an opportunity to protest); *Harris v. Bolin*, 950 F.2d 547, 550 (8th Cir. 1991) (holding that the failure to notify prisoner of withheld mail did not rise to deprivation of due process); *Knight v. Lombardi*, 952 F.2d 177, 179 (8th Cir. 1991) (finding that delayed notice of rejected mail was insufficient to make out a due process violation); *Kaden v. Slykhuis*, 651 F.3d 966, 968 (8th Cir. 2011) (holding that "prison officials may lawfully censor prison mail that is detrimental to the security, good order and discipline of the institution" if it advances a legitimate penological interest).

14

policy through the rejections it sent. As an additional matter, although it is not at all clear what—if any—type of objection or appeal process might be required, it is beyond dispute given HRDC's statements during oral argument that they did not inquire as to any available avenues to challenge the policy. As Defendants point out, Arkansas law also provides a mechanism by which any person having a demand against any county can present it to the county court. A.C.A. § 14-23-101. Whether this statutory section is sufficient to satisfy whatever challenge/appeal process the law may require is unclear. What is clear is that HRDC did nothing to pursue this option nor did it inquire as to any opportunities to appeal the rejections of its publications that it has been on notice of for over a year.

Thus, given all of the above, the Court finds that the only matter clearly established in this area of law is that no matter has been clearly established. The cases cited by both HRDC and Defendants provide little clarity as to the extent of the County's obligations under the law, are readily distinguishable based upon the facts of this case, and would not therefore have put these officers on reasonable notice that they were violating clearly established law. Moreover, it is particularly telling to the Court that even in circuits, like the Ninth, where cases have required more stringent notice and appeal procedures, courts frequently find individual officers entitled to qualified immunity even if in the same opinion they strike down the jail's policy. *See, e.g.*, *Prison Legal News v. Cook*, 238 F.3d 1145, 1152 (9th Cir. 2001).

For the foregoing reasons, the Court finds that these officials are also entitled to qualified immunity on the Fourteenth Amendment Due Process claim.[4] These claims asserted against these officials in their individual capacities will be **DISMISSED**.

## B. Motion for a Preliminary Injunction

Turning now to HRDC's Motion for a Preliminary Injunction, it is well established that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129-30 (2d ed. 1995)) (emphasis in original).

Although the factors to be considered when deciding whether this burden has been met are similar nationwide, in the Eighth Circuit, district courts should consider: (1) the threat of irreparable harm to the movant; (2) the balance between the harm and the injury that granting the injunction will inflict on the other party; (3) the movant's likelihood of

---

[4] HRDC argued at the case management hearing that it was too soon to make the determination as to whether these officials were entitled to qualified immunity, especially given the chance that discovery might reveal that Baxter County adopted this policy to frustrate HRDC's interest in sending mail to prisoners. This is, both legally and factually, incorrect. As a legal matter, the Eighth Circuit considered a similar challenge to a prison's withholding of mail in *Payne v. Britten*, 749 F.3d 697 (8th Cir. 2014), concluding that, notwithstanding certain outstanding factual questions, "[w]hen an official properly and timely files a motion for dismissal or for summary judgment asserting qualified immunity . . . the district court must issue a reviewable ruling—either granting or denying qualified immunity—before requiring the officials to progress further in litigation at the district court." 749 F.3d at 699. Additionally, as the Court's above discussion indicated, the law is far from clearly established on either of the two claims that HRDC asserts, entitling these officials to dismissal on qualified immunity grounds. Finally, as a factual matter, the Court would note that it would be impossible for a policy instituted in 2011 by Baxter County to have been designed to deliberately frustrate HRDC's mission when the Complaint alleges that rejections of its publications by BCDC did not begin until five years later.

16

success on the merits; and (4) whether the injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The Court will discuss each factor in turn, noting along the way where the analysis differs for HRDC's First and Fourteenth Amendment claims.

### 1. Threat of Irreparable Harm to the Movant

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable [harm]." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *see also Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1130 (8th Cir. 1996) ("If [the movants] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm."). In the instant case, the alleged deprivation of HRDC's right to communicate with BCDC prisoners might otherwise constitute irreparable harm. However, the Court notes that the allegations in the Complaint detail that some 110 pieces of HRDC materials have been rejected by Defendants since August of 2016. Despite these 110 different notices of rejection, HRDC waited an entire year before seeking some type of redress for rejections which it claims irreparably harmed it.

Thus, the Court discounts HRDC's assertions that it will be irreparably harmed in the absence of preliminary injunctive relief. *See, e.g.*, *Prison Legal News v. Cnty. of Cook, Ill.*, 2016 WL 6833977, at *11 (N.D. Ill. Nov. 21, 2016) (denying preliminary injunctive relief and finding that Prison Legal News' argument that its publications must be delivered quickly to prisoners lest the content become irrelevant was "severely undermined" by the fact that it waited over a year to file its complaint following the first notice of rejection it

received). As a result, the Court finds that this factor weighs against preliminary injunctive relief given HRDC's year-long delay in seeking redress.

## 2. Balance Between Harm to Movant and Non-Movant

The Court finds that this factor favors neither party. If this Court enjoined Defendants' postcard-only policy, the County would likely have to devote significant time, energy, money, and personnel to crafting and implementing a new mail policy when it has not even been decided that its current policy violates either HRDC's First or Fourteenth Amendment rights. HRDC argued during the case management hearing that the County could simply do what it did before it switched to the postcard-only policy in 2011. That argument severely underestimates the burden that preliminary injunctive relief would impose on the County and overestimates the judiciary's ability to craft regulations given the "difficult and delicate problems of prison management." *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989). Moreover, given the Court's concerns about just how unclear the law is both as to whether this type of policy violates the First Amendment and/or what kind and how much notice/opportunity, if any, must be given to a publisher, it feels compelled to decline HRDC's invitation to enjoin the County's practices, at least until a full decision on the merits, aided by a fulsome evidentiary record, can be made.

## 3. Likelihood of Success on the Merits

In the preliminary injunction context, strong consideration should be given to the probability of success on the merits. Notwithstanding this, the Court's approach should be flexible and consider the particular circumstances of each case, and no single factor is determinative. *Dataphase*, 640 F.2d at 113 ("In every case, [the likelihood of movant's success] must be examined in the context of the relative injuries to the parties and the

18

public."). Unlike the other factors, the Court must parse out its analysis on the likelihood of success prong into a First and Fourteenth Amendment section, as the analysis differs for the two claims. As an initial matter, however, the Court would reiterate the concern it expressed when it ruled from the bench on this motion that the fact that the law is so divergent on both of these issues weighs against a conclusion based on this record that HRDC is likely to succeed on the merits of either claim.

### a. First Amendment Claim

It is established law that "'[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution,' . . . nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside[.]'" *Thornburgh*, 490 U.S. at 407 (citing *Turner v. Safley*, 482 U.S. 78, 84, 94-99 (1987)) (other citations omitted). But, "these rights must be exercised with due regard for the 'inordinately difficult undertaking'" of operating a modern prison. *Id.* (citing *Turner*, 482 U.S. at 85). Put another way, publishers seeking to communicate with prisoners on the inside "enjoy the protections of the First Amendment except to the extent that prison regulations curtailing those protections are 'reasonably related to legitimate penological interests.'" *Livingston*, 683 F.3d at 213 (quoting *Turner*, 482 U.S. at 89).[5]

When assessing the reasonableness of Baxter County's current policy under *Turner*, the Court must consider (1) whether the regulation is rationally related to a legitimate penological goal; (2) whether alternative means of exercising First Amendment

---

[5] Defendants argued in their briefs and during the case management hearing that *Turner* does not apply to a case like this one where the publisher seeks to challenge a prison's mail policy. While there is language in the opinion supportive of that view, the Court notes that every decision it has found since that point *has* applied *Turner* to claims asserted by publishers. This Court sees no good reason to deviate from that trend.

rights remain available; (3) the effect that the asserted right will have on prison employees and other prisoners; and (4) whether there are obvious alternative means of accommodating the asserted right. *Turner*, 482 U.S. at 89-91.

### i. Legitimate Penological Goal

While federal courts have often given deference to prison officials concerning their administrative decisions and policies, *see Bell v. Wolfish*, 441 U.S. 520, 547 (1979), there must still be a legitimate government objective underlying the policy, *Beard v. Banks,* 548 U.S. 521, 535 (2006) ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective.").

Defendants here argue that the jail's policy is constitutional and related to legitimate penological goals. The County's website states that the policy was implemented in 2011 with two goals in mind: 1) as a security precaution as a proactive measure to decrease the amount of contraband coming into the Detention Center, and 2) as a cost-saving measure to the County, which has to supply postage for indigent inmates.[6] Based on the current evidence provided to the Court, it appears that the policy itself is applied neutrally to all incoming communications. However, HRDC alleges that the policy goes too far and is not rationally related to any underlying objective. Defendants argue that the policy furthers a legitimate penological interest, but their briefing does nothing to further prove that interest.

It is important for the Court to reiterate here that the burden is not on the Defendants to prove the rationality of the policy, but on HRDC to persuade the Court that

---

[6] Baxter County Sheriff, *New Rules for Jail Inmate Mail Starting January 2nd* (Dec. 7, 2011), https://www.baxtercountysheriff.com/press_view.php?id=827 (last visited on December 2, 2017).

injunctive relief is appropriate and that "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. In fact, "case law does not require defendant to introduce 'actual proof that a legitimate interest will be furthered by the challenged policy. The connection between the two need be only objectively rational.'" *Simpson v. Cnty. of Cape Girardeau*, 202 F. Supp. 3d 1062, 1069 (E.D. Mo. 2016) (quoting *Herlein v. Higgins*, 172 F.3d 1089, 1091 (8th Cir. 1999)). In *Herlein*, the Eighth Circuit held that a ban on music cassettes bearing a warning for explicit lyrics survived scrutiny under the *Turner* test despite the fact that *at trial* the Defendants had not put forward any evidence connecting prison security with banning these tapes. 172 F.3d at 1090-92.

Surely then, the Court is not in a position at this point, notwithstanding the expert affidavit submitted by HRDC, to conclude that the connection between the Defendants' postcard-only policy is so remotely connected to the County's asserted interests in efficiency and security as to be arbitrary or irrational. This is especially the case given HRDC's acknowledgement during oral argument that several other counties in Arkansas maintain similar postcard-only policies and in light of the fact that the State of Arkansas in August of 2017 implemented a new restrictive mail policy of its own due to increasing levels of contraband coming into facilities through prison mail.[7]

### ii. Alternative Means of Exercising the Right

The next *Turner* factor considers whether there are available alternative means to exercise the asserted right. Here, although the Defendants do not address it in their

---

[7] Arkansas Department of Correction, *Mail & Money*, http://adc.arkansas.gov/mail-money (last visited December 2, 2017).

briefing, there are alternative means of communication available to HRDC. First, HRDC could communicate with prisoners via postcards. In addition, nothing prevents HRDC from attempting to donate its materials to BCDC free of charge in order to disseminate its message. While these options might not be preferable to unfettered access to send its materials into the jail, case law suggests that "if [plaintiffs] have alternative means to exercise the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Simpson*, 202 F. Supp. 3d at 1070 (quoting *Turner*, 482 U.S. at 90) (internal citations omitted). At this stage, this factor weighs against granting preliminary injunctive relief.

### iii. The Impact of Accommodation

Next, the Court must consider the impact of accommodation, or the impact of allowing HRDC to send its various communications to BCDC prisoners. For this factor, the analysis focuses on "the impact . . . on guards and other inmates, and on the allocation of prison resources generally," *Turner*, 482 U.S. at 90. Where the accommodation sought by plaintiffs would have a "significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.*

Defendants assert that eliminating the postcard-only policy will allow limitless communication with prisoners. While HRDC certainly is not seeking unrestricted access to prisoners held at BCDC, enjoining the postcard-only policy while this litigation is pending would certainly cause a ripple effect as the jail would seemingly have no limitation on what type of mail could be sent to prisoners. HRDC argues, as it did on the balance of harm factor, that Defendants could merely revert to the policy they had in effect back in

22

2011 and that this would not lead to an onslaught of mailings. This is especially the case, it argues, given the small population of about 100 prisoners at BCDC. But, HRDC fails to appreciate the other side of the equation, which is that this county jail, unlike a prison, has a constantly changing population since many of these individuals are there only until their trials, and because it has a much smaller staff than a prison. These two factors lead the Court to conclude that enjoining the policy during the pendency of this litigation would potentially allow HRDC (and other publishers for that matter) to flood the jail with mailings, mailings that this small county jail may be ill-equipped to process in time to get them distributed to these individuals before they are moved elsewhere. HRDC on its own, for instance, alleges that it sends around 8 different types of mailings to prisoners.[8] Thus, the Court cannot conclude that preliminary injunctive relief would have the minimal burden that HRDC alleges.

### iv. Absence of Ready Alternatives

The final factor the Court considers is the absence of a ready alternative. "Ready alternatives may suggest an exaggerated response to a problem." *Jacklovich v. Simmons*, 392 F.3d 420, 432 (10th Cir. 2004). When a plaintiff can point to an alternative policy that fully accommodates a prisoner's or publisher's rights a court may consider that as evidence that the currently policy is not reasonable. *Livingston*, 683 F.3d at 219 (citing *Turner*, 482 U.S. at 90-91). HRDC points to several alternative policies that would permit communication and would not be detrimental to BCDC's security such as extra screening

---

[8] HRDC alleges that its materials include the 72-page *Prison Legal News* magazine, around 50 softcover books, legal reference books, self-help books, a *Habeas Citebook*, informational brochure packets, copies of judicial opinions, and legal letters. *See* Doc. 1, ¶¶ 17-19.

procedures, both visual and physical and inspections, and random searches. (Doc. 26, p. 17). Because HRDC has proposed several alternatives, even if they would ultimately prove too burdensome to actually implement, the Court finds that this factor favors HRDC.

On the whole, however, the Court cannot say that HRDC has met its burden to show that it is likely to succeed on the merits of its First Amendment claim. This is for two reasons. First, the case law on the First Amendment claim is too divergent for the Court to conclude that HRDC's First Amendment rights were likely violated. Second, at this stage in the litigation and with the scant evidence that it has before it, it cannot conclude that, on balance, the *Turner* factors favor injunctive relief at this point.[9]

### b. Due Process Claim

As HRDC correctly stated during oral argument, courts do not generally go back and repeat analysis of the *Turner* factors on the due process claim after already applying those factors to the asserted First Amendment claim. Therefore, the Court's starting, and finishing, point on this factor is that the cases in this area of law are entirely unclear about what type of process is due to a publisher like HRDC when several of its mailings to prisoners have been rejected not because of some individualized determination that their content violated prison regulations but rather because they did not fit on a postcard. While recognizing that other courts have required jails to provide notice, the Court does not have enough evidence before it on this point to conclude that Defendants' notices to

---

[9] *See, e.g.*, *Prison Legal News v. Babeu*, 552 Fed. Appx. 747, 748 (9th Cir. 2014) (finding no abuse of discretion when a district court judge took "the extraordinarily cautious step of seeking additional briefing and evidence on the motion" before making a determination about whether to exercise equity jurisdiction). While that case concerned a permanent injunction, it nevertheless recognized that the decision whether to grant injunctive relief is a matter committed to the sound discretion of the district court.

24

HRDC that HRDC's publications were being rejected due to the postcard-only policy was insufficient.

It also cannot conclude based on what has been submitted at this point that HRDC was entitled to appeal an official's conclusion that its magazines or books were not postcards to another official who, presumably, would have looked at the 72-page magazines or books and immediately confirmed that these were not 4" by 6" postcards. The Court certainly does not mean to demean HRDC's position with its last statement, but the futility of having a second official confirm that books and thick magazines are not postcards highlights the Court's conclusion that this is not, at bottom, analogous to the censorship cases that HRDC cites where courts have required a second official to confirm a prior determination to censor an incoming publication. Based on the current case law and the evidence it has before it, the Court finds that HRDC has not demonstrated that it is likely to succeed on the merits of its due process claim.

### 4. Public Interest

The public interest unequivocally favors protecting First Amendment liberties. *Emineth v. Jaeger*, 901 F. Supp. 2d 1138, 1143 (D.N.D. 2012) (quoting *Iowa Right to Life Comm. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999)). Also, because the protection of a constitutional right is always in the public interest, the grant of a preliminary injunction generally depends on the movant's likelihood of success on the merits. *Edwards v. Beck*, 946 F. Supp. 2d 843, 850 (E.D. Ark. 2013) (citing *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007)).

Accordingly, while protecting the public interest would favor protecting HRDC's assertions of its First Amendment liberties, the Court also notes that protecting the public

interest also favors upholding reasonable prison regulations that are logically connected either to protecting the public fisc or the people incarcerated in the County's jail from harmful contraband. In addition, because of the Court's previously stated concerns about HRDC's ability to succeed on the merits of either of its claims, it is not clear that injunctive relief at this point would be in the public interest.

While some of the *Dataphase* factors favor HRDC, the Court concludes that, on balance, HRDC has not met its burden of making a clear showing that preliminary injunctive relief is warranted at this point. But, this should not be taken as an indication of what HRDC ultimately may be able to establish when a decision on the merits is reached. Thus, the Court will **DENY** HRDC's First Motion for a Preliminary Injunction (Doc. 26).

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion to Dismiss filed by Defendants Baxter County, John Montgomery, Brad Lewis, and Eric Neal (Doc. 18) is **GRANTED IN PART AND DENIED IN PART** as described above.

**IT IS FURTHER ORDERED** that HRDC's First Motion for a Preliminary Injunction (Doc. 26) is **DENIED**.

**IT IS SO ORDERED** on this ___5th___ day of December, 2017.

                             _____

                             TIMOTHY L. BROOKS

                             UNITED STATES DISTRICT JUDGE