**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**


**HUMAN RIGHTS DEFENSE CENTER**                                        **PLAINTIFF**


**v.**                                        **CASE NO. 5:17-CV-3070**

**BAXTER COUNTY, ARKANSAS**                                        **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are the parties' cross-motions for summary judgment. Plaintiff Human Rights Defense Center's ("HRDC") Motion for Summary Judgment (Doc. 67) contends that Defendant Baxter County's ("the County") adoption of a postcard-only mail policy violates its rights under the First Amendment. It additionally contends that the County's failure to send individual notices each time one of its unsolicited mailings was rejected by the County jail pursuant to this policy and its failure to allow HRDC to challenge each individual rejection amount to due process violations under the Fourteenth Amendment. The County's Motion for Summary Judgment (Doc. 70) contends that the First Amendment challenge asserted by HRDC should be dismissed based upon a recent ruling of the Eighth Circuit upholding a similar policy and that HRDC was not denied due process when the County rejected its unsolicited mailings.

For the reasons explained below, the Court concludes that this is a classic case where both parties have moved for summary judgment as to all claims and where neither party is entitled to complete judgment as a matter of law based on the present record. Nevertheless, it will **GRANT IN PART AND DENY IN PART** HRDC's Motion (Doc. 67) and **GRANT IN PART AND DENY IN PART** the County's Motion (Doc. 70).

# I. BACKGROUND

## A. Factual Background

HRDC is a 501(c)(3) non-profit organization with principal offices in Lake Worth, Florida. HRDC's purpose is to "educate prisoners and the public about the destructive natures of racism, sexism, and the economic and social costs of prisons to society." (Doc. 1, p. 3). HRDC "accomplishes its mission through litigation, advocacy, and publication and/or distribution of books, magazines and other information concerning prisons and prisoner rights." (Doc. 26-1, p. 1).[1] HRDC publishes and distributes *Prison Legal News: Dedicated to Protecting Human Rights*, a monthly magazine which contains news about prisons, prisoners' rights, and prison facilities and conditions, among other things.[2] In addition to *Prison Legal News*, HRDC also publishes and distributes different books about the criminal justice system, self-help books for prisoners, and informational packets that contain subscription order forms and a book list. As part of its mission, HRDC distributes these mailings to monthly subscribers (civilians and prisoners alike) and to prisoners in 2,600 correctional facilities across the country, including in Arkansas.

HRDC alleges that Defendants[3] implemented and adhered to an unconstitutional mail policy that prohibited the delivery of HRDC's publication materials to prisoners at the

---

[1] The testimony in the record is that HRDC's activities are split roughly 60% litigation, 40% publishing/advocacy. (Doc. 74-1, p. 5).

[2] According to the Complaint, *Prison Legal News* is a 72-page magazine. A copy of one edition of the magazine submitted in this case shows that besides articles of interest to prisoners, *Prison Legal News* also contains advertisements for an assortment of products and services, including legal services and order forms by which prisoners can request nude/semi-nude photographs of men and women. *See, e.g.*, Doc. 26-1, p. 16.

[3] As initially filed, the Complaint included claims against the County and designated officers. As explained in greater detail below, the County is the sole remaining Defendant.

County's jail. In 2012, the County adopted a new mail policy that requires all incoming mail to be limited to postcards. As a result of this policy, HRDC claims that Defendants refused to deliver issues and sample issues of *Prison Legal News*, *The Habeas Citebook*, informational packets, legal letters, and court opinions sent by HRDC to prisoners held in the Jail.[4] Defendants allegedly sent these items back to HRDC with "Refused" or "Return to Sender Post Cards Only" notations, *id.* at 7, and allegedly failed to return other mailings.

HRDC alleges that it sent several "waves" of unsolicited mailings to the Jail. Paul Wright,[5] the founder and Executive Director of HRDC, stated in his Declaration that:

- On August 5, 2016, HRDC mailed books, magazines, and enveloped letters to eleven prisoners in the Jail. Those mailings included a copy of *The Habeas Citebook*, a sample copy of *Prison Legal News*, an informational brochure containing a list of other HRDC publications and an order form, and a paper copy of a 2004 decision of the Ninth Circuit (Doc. 69-17, ¶ 19). Most[6] of the books, magazines, and letters sent on this date were returned to HRDC. Wright alleges that all of the returned items contained one of two markings: either a hand-written note stating "Refused" or a United States Postal Service ("USPS") sticker stating "Return to Sender Refused." *Id.* at ¶ 21.

---

[4] Formally, it appears that the Jail is known as the Baxter County Jail and Detention Center. For the sake of brevity, the Court will continue to refer to this institution as "the Jail."

[5] There is a pending liminal motion to exclude any reference of the fact that Paul Wright was formally incarcerated as a convicted murderer. Nevertheless, his former conviction and the status of the pending motion does not alter the Court's ability to rely on his declaration in ruling on the pending motions for summary judgment.

[6] There is no information about the total number of mailings on this date nor information about how many of these mailings *were not* returned.

- Between September 2016 and January 2017, HRDC also sent monthly subscription issues of *Prison Legal News* and an annual fundraiser issue to prisoners at the Jail. *Id.* at ¶ 34. Many of these issues were returned to HRDC.[7]

- On January 6, 2017, HRDC tried again, this time sending the same mailings to seven prisoners in the Jail. Six days later, HRDC mailed follow-up enveloped letters to those same seven prisoners. *Id.* at ¶¶ 23, 24. This time, however, only some[8] of the mailings sent on January 6 and January 12 were returned to HRDC. All of these returned items had a USPS sticker stating "Return to Sender Insufficient Address." *Id.* at ¶ 26.

- On May 12, 2017, HRDC tried yet again. This time, the same mailings were sent to twelve prisoners at the jail. *Id.* at ¶ 28. HRDC followed-up on these mailings by sending enveloped letters to those same twelve prisoners on May 18. *Id.* at ¶ 29. Most[9] of these mailings were allegedly returned to HRDC. Of those that were returned, all of the mailings were stamped "RETURN TO SENDER POSTCARDS ONLY." *Id.* at ¶ 31. HRDC alleges that these stamps were affixed regardless of whether the inmate was still in the Jail at the time of rejection or not.

---

[7] As to these mailings, not only is there no information about the total number sent and/or returned, but HRDC does not specify how many prisoners these mailings were sent to and whether the returned items bore any description detailing the reason they were not distributed to their intended recipients.

[8] Again, there is no indication in the record about the total number of items mailed on this date or the proportion of those items that were returned to HRDC.

[9] Again, there is no information in the record about the total number of individual mailings sent by HRDC on this date or the proportion of those items that were returned to HRDC.

Since 2016, HRDC has identified at least one hundred ten (110) items of mail sent to prisoners that Defendants allegedly censored. *Id.* at ¶ 36. This includes twenty-one (21) issues of *Prison Legal News*, eleven (11) sample issues of *Prison Legal News*, twenty-one (21) informational packets, and twenty-four (24) copies of *The Habeas Citebook*. (Doc. 26, p. 4). HRDC alleges that Defendants' actions violated its constitutional rights, limited its ability to distribute its political message and obtain new customers, and thereby frustrated its organizational mission.

## B. Procedural Background

HRDC initially sued the County alongside individual officers of the County who were instrumental in enacting the policy or in rejecting HRDC's repeated mailings. It also sought a preliminary injunction enjoining continued enforcement of the policy. However, in ruling on the Defendants' Motion to Dismiss (Doc. 18) and HRDC's Motion for a Preliminary Injunction (Doc. 26), the Court determined that the individual capacity damage claims against these individuals should be dismissed on the basis of qualified immunity because the law governing HRDC's First and Fourteenth Amendment claims was not sufficiently clear to put these officials on notice that their actions were unconstitutional. *See* Doc. 49. In addition, and in part because of the unsettled nature of the law, the Court also denied HRDC's Motion for a Preliminary Injunction in that same order. A little less than a month after the Court issued its ruling on these two motions, the Eighth Circuit upheld a very similar postcard-only policy against a First Amendment challenge in *Simpson v. County of Cape Girardeau, Missouri*. 879 F.3d 273 (8th Cir. 2018). That decision prompted the Defendants to file a renewed motion to dismiss (Doc. 50), wherein they contended that the Eighth Circuit's decision in *Simpson* sufficiently

clarified the law to the point that the Defendants were now entitled to dismissal of the Complaint. The Court construed that "motion to dismiss" as a motion for judgment on the pleadings, ultimately granting it in part and denying it in part. *See* Doc. 53. As a result of that opinion, the remaining official capacity claims were dismissed as duplicative of the claim against the County, and those individual officials were dismissed from the action.

The parties filed the present cross-motions for summary judgment on November 2, 2018. After responses and replies were filed, both motions became ripe for decision on November 26, 2018.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, cross-motions for summary judgment are filed, each motion should be reviewed in its own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). The Court must view the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of any logical inference that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting then-Fed. R. Civ. P. 56(e)) (emphasis removed). These facts

must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## III. DISCUSSION

### A. First Amendment Claim

Both parties contend that they are entitled to summary judgment on HRDC's First Amendment claim against the County.[10]

As the Court noted in its opinion on HRDC's Motion for a Preliminary Injunction, "'[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution,' . . . nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside[.]'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Nevertheless, because these rights must in some cases yield to the decisions of officials who have the difficult undertaking of operating a modern prison, publishers seeking to communicate with prisoners on the inside "enjoy the protections of the First Amendment except to the extent that prison regulations curtailing those protections are

---

[10] HRDC also argues that if it is not entitled to summary judgment on this claim, then there are at least genuine disputes of material fact that would preclude the grant of summary judgment to the County.

'reasonably related to legitimate penological interests.'" *Prison Legal News v. Livingston*, 683 F.3d 201, 222-23 (5th Cir. 2012) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Thus, in assessing a First Amendment challenge to the reasonableness of a prison's policy, the Supreme Court has indicated that courts must consider: (1) whether the regulation is rationally related to a legitimate penological goal; (2) whether alternative means of exercising First Amendment rights remain available; (3) the effect that the asserted right will have on prison employees and other prisoners; and (4) whether there are obvious alternative means of accommodating the asserted right. *Turner*, 482 U.S. at 89-91. As the Eighth Circuit aptly noted in *Simpson*, a "*Turner* analysis is a fact-intensive inquiry requiring careful examination of the policies and institutions at issue in each case." *Simpson*, 879 F.3d at 282.

HRDC contends that the undisputed facts in this case clearly suggest that the Jail's postcard-only policy does not satisfy the *Turner* test and is therefore unconstitutional. The County, on the other hand, contends that the Eighth Circuit's *Simpson* decision *de facto* legitimized its postcard-only policy because it is identical to the policy upheld by the Eighth Circuit. Neither party is correct.

Despite the best protestations of the parties, there remain numerous genuine disputes of material fact that preclude the Court from granting either party summary judgment on this claim. As noted above, the *Turner* test is a fact-specific inquiry that turns on a careful examination of the policies and institutions in each case. In looking at the four *Turner* factors, it is clear why unresolved factual questions preclude a grant of summary judgment on the current record.

For instance, the resolution of whether the postcard-only policy is rationally related to a legitimate penological goal (*Turner* factor 1) depends upon an examination of the County's reasons for enacting the policy. Those reasons have been variously described throughout this case but are essentially three-fold: 1) as a security precaution as a proactive measure to decrease the amount of contraband coming into the Jail, 2) as a cost-saving measure to the County, and 3) to promote efficient jail operations. *See* Aff. of Sheriff Montgomery, Doc. 71-1, pp. 1-2. Thus, the parties have vigorously disputed whether the postcard-only policy is rationally related to those goals by developing testimony during depositions as to whether adoption of a postcard-only policy would in fact be cheaper, whether it would more efficiently enable this specific Jail to conduct its operations (including estimates of the time saved by not having to open envelopes or search thick books for contraband), and whether it is objectively and rationally related to the Jail's interest in safety and security and contraband reduction[11] (*i.e.*, by reducing the number of pieces of paper prisoners have in their cells, thereby preventing the use of this paper to clog the plumbing, by preventing prisoners from gaining access to paper clips, staples, or other items that could present a security problem, etc.).

---

[11] HRDC argues repeatedly in its Motion for Summary Judgment that the County has put forward no evidence showing that contraband was a problem before enactment of this policy and no evidence that the Jail's goals would be (or have been) furthered by the adoption of the policy. However, as the Court informed HRDC during its ruling on the preliminary injunction motion, that is not the County's burden. Indeed, notwithstanding the authority that HRDC purports to rely on from *other* circuits, the **binding** law in *this* circuit is that the institution in question is "not required to provide evidence of previous incidents of contraband reaching inmates through the mail in order to adopt a postcard-only incoming mail regulation," "does not even have to show that its interests will actually be furthered by the policy," and "does not have to show that efficiency was or will actually be furthered." *Simpson*, 879 F.3d at 280.

Many of those same factual disputes bear directly on *Turner* factor 3 (the burden that accommodating HRDC's interests would have on jail officials, other inmates, or allocation of resources). Here, too, the Court finds numerous questions incapable of being resolved on the summary judgment record. For instance, unlike a large prison with a stable population, the testimony here reveals that the Jail is a smaller institution, housing a majority of individuals who are there only temporarily and very few individuals who are there for longer than a couple of months. It also has a smaller staff size (how small is another unresolved factual question) which necessitates an "all-hands-on-deck" approach, meaning that there are no officers of the Jail whose primary duties include mail acceptance, review, and distribution. Rather, the testimony is that the officials responsible for sorting, approving, and distributing the mail to the prisoners change constantly, with officers stepping in to perform those functions as they are able.

Thus, given the smaller staff and resources of this Jail, whether the postcard-only policy could rationally be expected to make those sorting and distributing duties more efficient is a key unresolved question as it bears directly on the reasonableness of the County's stated goals in making operations more efficient and in improving security (as a more efficient inspection means that officials could return to monitoring prisoners sooner).[12] Indeed, the bench trial order that was affirmed by the Eighth Circuit in *Simpson*

---

[12] This conclusion is unaffected by HRDC's evidence from the videotaped inspection of the mail facility. The parties agree that, on average, around thirteen pieces of mail come into the Jail each day. Therefore, HRDC argues, there is no rational basis to believe that with such a small quantity of mail that any of the County's asserted justifications for adopting the postcard-only policy would have an aggregate effect on the Jail's resources or operations. Of course, that argument ignores that we are talking about the *status quo*, *i.e.*, with the postcard-only policy. Should HRDC prevail, those restrictions would be held invalid, thereby authorizing any sender to begin sending non-postcard mail into the Jail. That could, objectively, increase the burden on the Jail's staff, requiring officers to spend

devoted substantial time and attention to these variables in assessing the first and third *Turner* factors. *See, e.g.*, *Simpson v. Cnty. of Cape Girardeau*, 202 F. Supp. 3d 1062, 1069-1071 (E.D. Mo. 2016). This Court is obligated by binding law to do the same.[13] Therefore, because analysis of the *Turner* factors depends upon factual disputes that are inappropriate for the Court to resolve on summary judgment, the competing cross-motions for summary judgment as to the First Amendment claim will be **DENIED**.

## B. Due Process Claim

The parties also contend that they are entitled to summary judgment on the Fourteenth Amendment due process claim. HRDC contends that the law is clear that any

---

more time processing the mail than they do currently. Such an inference is not irrational, for HRDC *alone* contends that it sends approximately *eight* different types of mailings (some that are 72 pages or book-length in nature) to *each* prisoner as part of its outreach.

[13] The County argued at the pretrial conference that there appear to be no *material* facts (*i.e.*, ones that would change the outcome) in dispute. Moreover, it contended that the Eighth Circuit's *Simpson* case declared that the institution's decisions are accorded deference and that the institution is not required to put forth any evidence showing that its asserted justifications have actually been advanced by the policies. True enough. In that way, the decision at summary judgment on this claim is a bit unlike a traditional analysis where the Court evaluates whether there is conflicting evidentiary proof in the record to justify a trial. However, the conclusion that there are *no* facts in dispute here that would alter the decision on this claim is not true. The Court will be required to make the ultimate determination under *Turner* whether the postcard-only policy is reasonably related to the advanced penological goals of the institution. In this way, differences in the policies (sender, scope, coverage) or institutions (size, resources, efficiency, alternatives, etc.) bear heavily on the ultimate determination as to whether this *particular* policy is reasonably related to *those specific* asserted penological goals. That is ultimately why the Court believes the Supreme Court in *Turner* spent time pointing to the testimony in the record when it struck down the prison's marriage regulation and why the Eighth Circuit carefully limited its opinion in *Simpson* when it noted that "our holding in this case is narrow, as a *Turner* analysis is a fact-intensive inquiry requiring careful examination of the policies and institutions at issue in each case." *Simpson*, 879 F.3d at 282. Because of unresolved factual questions related to the policy and institution here, many of which might ultimately factor into the Court's overall decision as to the reasonableness of this particular policy, the Court is not able to complete the *Turner* analysis on the basis of the present record.

rejection by a Jail of a publisher's mail must be accompanied by certain minimal procedural safeguards. Namely, HRDC argues that it is entitled to notice of each rejection of one of its mailings as well as the opportunity to challenge each rejection to a neutral official (*i.e.*, a person different from the one who made the initial decision to reject the mail). In support of its position, HRDC rightly begins with the Supreme Court's landmark decision in *Procunier v. Martinez*, which held that "the addressee as well as the sender of direct *personal* correspondence derives from the First and Fourteenth Amendments a protection against *unjustified* governmental interference with the intended communication." 416 U.S. 396, 408-09 (1974) (emphasis added), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). In affirming the district court's decision, the Supreme Court expressed approval for the following procedural safeguards: (1) that the "inmate be notified of the rejection of a letter written by or addressed to him," (2) that "the author of that letter be given a reasonable opportunity to protest that decision," and (3) "that complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Martinez*, 416 U.S. at 418-19. Since that opinion, appellate courts around the country have concluded that a certain level of due process "must accompany various decisions to exclude prison mailings." *Livingston*, 683 F.3d at 222-23 (noting that the Fourth, Ninth, Tenth, and Eleventh Circuits had extended *Martinez's* logic to other types of publications).

In ruling on the motion to dismiss based on qualified immunity, the Court undertook an extensive review of the decisions in this area, ultimately holding that the law was not clearly established that rejections pursuant to a postcard-only policy required the same

procedural protections as HRDC urged.[14] The reason for the Court's holding on that front was because most of the decisions that HRDC cited, including *Martinez*, were cases involving classic examples of censorship.[15] In those cases, prison officials had to examine each mailing to determine whether it had objectionable content. That is why it made perfect sense to allow the sender to appeal that decision and to require that appeal to be reviewed by a second official who had not participated in the initial censorship decision. The few cited cases that do not fit this mold involved regulations which facially discriminated against particular types of mailings or particular types of senders. In short, none of the cited cases involved routine rejection of mail because it did not comply with a generally applicable, content-neutral policy that applies to *all* types of mailings, regardless of content and regardless of sender. In addition, none of the cited cases clearly involved the type of unsolicited bulk mailing to prisoners that is involved here.[16]

Indeed, all of the cases cited by HRDC fall into one of these categories:

<u>Cases Involving Censorship</u>

- *Procunier v. Martinez*, 416 U.S. 396 (1974): The prison policy prohibited inmates from sending or receiving letters that pertained to criminal activity, were lewd, obscene or defamatory, or were otherwise inappropriate. 416 U.S. at 399.

---

[14] *See* Doc. 49, pp. 8-15.

[15] Though HRDC continues to claim that the County is "censoring" its publications through application of the postcard-only policy, that's not technically accurate. *See, e.g.*, Black's Law Dictionary, which defines the act of censoring as: "To officially inspect (esp. a book or film) and delete material considered offensive." *Black's Law Dictionary* (10th ed. 2014).

[16] This distinction was not lost on the Supreme Court, which even back in *Martinez* expressly refused to extend its logic to "mass mailings," for which "[d]ifferent considerations may come into play." *Martinez*, 416 U.S. at 408 n.11.

- *Murphy v. Mo. Dep't of Corr.*, 814 F.2d 1252 (8th Cir. 1987): The prison policy censored mailings from "any organization that espoused the supremacy, purity or separation of the white race." 814 F.2d at 1254.

- *Trudeau v. Wyrick*, 713 F.2d 1360 (8th Cir. 1983): Jail officials withheld an item of personal correspondence because it contained money that was thought to be a part of a prisoner's fraudulent scheme to extort money from good-hearted Samaritans. 713 F.2d at 1362-63.

- *Martin v. Kelley*, 803 F.2d 236 (6th Cir. 1986): The jail censored a letter because a jail official had determined that the letter, written on KKK letterhead and mentioning the possibility of a KKK rally at the prison, was inflammatory. 803 F.2d at 237.

- *Montcalm Pub. Corp. v. Beck*, 80 F.3d 105 (4th Cir. 1996): The policy allowed prison authorities to deny inmates access to publications deemed obscene, even to those inmates who had subscribed to them. The Court held that "publishers are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate subscribers." 80 F.3d 105, 106. That opportunity to be heard could be satisfied by providing notice of the decision to a publisher and allowing that publisher to respond in writing. *Id.* at 110. However, the Court noted that its holding might not apply to mass mailings. *See, e.g.*, *Prison Legal News v. Nw. Reg'l Jail Auth.*, 2017 WL 4415659, at *12 (W.D. Va. Sept. 29, 2017).

- *Prison Legal News v. Stolle*, 319 F. Supp. 3d 830 (E.D. Va. 2015): Jail censored publications for violating its "sexually explicit materials policy," which prohibited

photos and writings deemed offensive or materials dealing with scantily clothed individuals. 319 F. Supp. 3d at 837.

<u>Cases Involving Targeted Regulations at Particular Types of Mailings/Senders</u>

- *Jacklovich v. Simmons*, 392 F.3d 420 (10th Cir. 2004): The policies in question: (1) limited inmates to $30 a month for books, newspapers, and periodicals; (2) required that all inmate purchases of books, newspapers and periodicals be made by special purchase order through the institution-itself (prohibiting gift subscriptions); and (3) censored other books, newspapers, and periodicals that did not meet those requirements. 392 F.3d at 422.

- *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001): The prison system "refuse[d] to deliver subscription non-profit organization standard mail." 238 F.3d at 1147. Thus, the regulation in question discriminated on its face against standard mail—mail sent "under special rates fixed by the Postal Service." *Id.* at 1148. The Ninth Circuit held that none of the Jail's asserted rationales justified "tying the receipt of subscription non-profit newsletters to postal service rate classifications." *Id.* at 1149-50.

- *Prison Legal News v. Northwestern Regional Jail Authority*, 2017 WL 4415659 (W.D. Va. Sept. 29, 2017): The new mail policy explicitly prohibited inmates from "receiving *books* or *magazines* through the mail, '*directly from the publisher, or from a distribution source*.'" 2017 WL 4415659, at *2 (emphasis added).

Thus, a holistic review of the authority that HRDC purports to rely on suggests numerous differences between the cases above (which have required typical due process protections) and the case *sub judice*. One, this case does not involve a government

15

regulation that requires officials to conduct a thorough review of the contents of the mailing. In fact, the 76-page mailings and books sent by HRDC could be completely blank and entirely devoid of *any* content and still be rejected as non-compliant with the postcard-only policy. Two, this case does not involve a regulation which on its face discriminates against particular types of mail. Finally, the postcard-only policy applies across-the-board, without regard to the content or sender of the mailing. In short, the cases relied on by HRDC are simply not analogous to the present case.

However, in reviewing the cited cases and the recent decisions in this area of the law, the Court has come across numerous other cases, *most* of which are ignored entirely by the parties, which suggest the correct way to analyze HRDC's Due Process claim. By and large, those cases cast considerable doubt on whether the *Martinez* test governs the due process inquiry for prison regulations which cause publications to be rejected not based on their content or the type of mail but rather because of routine enforcement of a generally applicable policy.

For instance, in *Prison Legal News v. Livingston*, the Fifth Circuit was tasked with reviewing a Texas Department of Criminal Justice ("TDCJ") rule which fits neatly into the category of "censorship" cases listed above. Indeed, as the Fifth Circuit noted, the policy:

set forth the following *content-based* reasons that a book should be rejected:

1) It contains contraband that cannot be removed;

2) It contains information regarding the manufacture of explosives, weapons, or drugs;

3) It contains material a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the breakdown of prisons through offender disruption such as strikes, riots, or [security threat group] activity;

4) A specific determination has been made the publication is detrimental to offenders' rehabilitation because it would encourage deviant criminal sexual behavior;

5) It contains material on the setting up and operation of criminal schemes . . .;

6) It contains sexually explicit images.

*Livingston*, 683 F.3d at 207 (emphasis added).  The TDCJ policy upon initially reviewing a work was to send a written notice to the prisoner and the book's sender that the work had been denied for violating one or more of the conditions listed above. *Id.* at 208. That notice also provided an explanation as to how the inmate or the sender could appeal that decision. On appeal, neither the inmate nor sender was given the right to formally participate in the review. *Id.* Thus, "the right to appeal is only the right to request additional review from TDCJ." *Id.* At the end of the appeal, TDCJ sent the appellant(s) written notice of the decision. Once that decision was made, it was inputted into a state-wide database so that all future officials reviewing the same book could immediately determine whether the book had been rejected or approved. If an official subsequently rejected a second copy of a work that was already in the database as a publication to be refused, TDCJ "[did] not send a denial notice to the senders of [those] subsequent copies." *Id.* at 209.

The *Livingston* court reviewed the applicable cases and ultimately held that a sender was entitled to notice and an opportunity to appeal to a different decision-maker upon the *initial* (but not *subsequent*) denial of the work. This was so, the Court held, because "at the time of the initial denial, an individualized decision (with respect to the book's contents) must be made [and thus the prison's policies] . . . [a]t least arguably fall short of the traditional requirements of due process because they do not give the appellant, whether the prisoner or the outsider, the right to participate in . . . consideration

of the appeal. . . ." *Id.* at 223-24. That differed from subsequent denials, however, because:

> *subsequent* denials of identical publications amount to the routine enforcement of a rule with general applicability. [They] are non-individualized—they neither reconsider the content of the denied book nor depend on the particular sender or addressee—**so it is not even clear that due process is implicated by such decisions**.

*Id.* at 223 (emphasis added). As the Fifth Circuit noted, "TDCJ must be permitted to pass rules of general application, even ones that limit prisoner rights, without subjecting such rules to repetitive challenges every time they are applied." *Id.* Finally, the Fifth Circuit rejected Prison Legal News's argument that it was entitled to notice of all denials, holding instead that "[t]he right to receive notice exists only to effectuate the right to be heard, and therefore is inapplicable where a party has no right to participate in the decision-making process." *Id* at 224. It concluded by declaring that "[g]iving notice to a sender that his communication has been rejected may be a reasonable courtesy, but such notice is not a requirement of due process." *Id*.

The same decision was reached recently by the Eleventh Circuit in *Prison Legal News v. Secretary, Florida Department of Corrections*. There, the Eleventh Circuit considered the constitutionality of a policy, "the Admissible Reading Material Rule," that resulted in various publications being impounded because they contained ads for certain services (three-way calling, pen pal solicitation, cash-for-stamps, exchange services, etc.). 890 F.3d 954, 960 (11th Cir. 2018). Before a publication could be impounded, an official had to make a determination that "the advertisement [was] the focus of, rather than being incidental to, the publication[,] or the advertising [was] prominent or prevalent throughout the publication." *Id.* (citing the Florida Administrative Code). Thus, the official

needed to make a content-based decision about whether the publication satisfied the requirements of the Department of Corrections. In considering the policy, the Eleventh Circuit affirmed the district court's finding that Prison Legal News was deprived of due process because it was not given notice of each impounded issue. *Id.* at 976. The Eleventh Circuit, citing the *Livingston* decision, rejected Prison Legal News's argument that "copy-by-copy" notice of each rejection was required and held that such notice was not required "for PLN to learn the reason(s) for the impoundment as long as all copies are impounded for the same reason(s)." *Id.* at n.20. In making its determination, the Court specifically noted that "there is a lower due process standard for mass mailings (that is, bulk correspondence)." *Id.* at n.19 (citing *Perry v. Sec., Fla. Dep't of Corr.*, 664 F.3d 1359, 1368 (11th Cir. 2011)). Nevertheless, because the impounded publications had been specifically ordered by inmate subscribers, they were not mass mailings and typical due process protections applied.

The question in the wake of these two cases is what due process protections, if any, are to be given to a publisher where even the *first* denial of its publication is pursuant to the "routine enforcement of a rule with general applicability" and where, unlike in the cases HRDC cites, no individual determination based upon the book's contents (or sender) need ever be made.[17] That is the ultimate question in this case with respect to

---

[17] As the Court noted in ruling on HRDC's motion for a preliminary injunction, it does not take an individualized determination based upon the contents of the mailings to determine that books and 72-page editions of *Prison Legal News* are not postcards. Nor can the Court fathom what success HRDC could reasonably expect to achieve in challenging a first official's conclusion that a book is not a postcard to a second official. Perhaps it envisions that such an avenue of appeal would allow it to try to persuade a second prison official to completely scrap the policy. But, such a result seems futile and, frankly, an inefficient use of the scarce resources HRDC claims to have. For, unlike with prisoners, HRDC does not have to exhaust all administrative remedies by challenging a policy "up

the due process claim. Unfortunately, it is also a question that HRDC brushes to the side and to which the County has no good answer. Not surprisingly, district courts confronted with this same question have reached differing conclusions. *See, e.g.*, *Prison Legal News v. Jones*, 2015 WL 12911752, at *25 (N.D. Fla. Oct. 5, 2015) (finding that a publisher must know the grounds upon which its publication has been rejected and must have a reasonable opportunity to protest); *Van Den Bosch v. Raemisch*, 2009 WL 4663134, at *3-*5 (W.D. Wis. Dec. 1, 2009) (questioning whether due process protections even apply, but nevertheless finding that receiving 35 notices of nondelivery out of a total of 250 total rejected copies was not a due process violation); *Cox v. Denning*, 2014 WL 4843951, at *13 (D. Kan. Sept. 29, 2014) (finding no clearly established law on the constitutionality of a postcard-only mail policy as it applies to non-pre-approved, non-privileged mail).

After considering these cases, the Court concludes that *Martinez's* rule does not categorically apply to the present case. In short, as the Supreme Court has suggested and as the Fifth and Eleventh Circuits have explicitly held, altogether different considerations come into play when a publication is rejected not because it was censored based on its content or the status of the sender but rather because it was a mass mailing rejected pursuant to the routine enforcement of a rule with general applicability. In short, this case is much closer to the cases dealing with "mass mail" than it is to the cases HRDC cites involving censorship. Thus, the Court adopts the Eleventh Circuit's statement in *Perry* that:

> *Martinez* created a three-part test to decide whether there are proper procedural safeguards for correspondence of a personal nature. Here, Appellants' only send bulk correspondence to advertise their services to

the ladder" to the Sheriff (who instituted the policy) before it can initiate legal proceedings to have the policy declared unconstitutional.

> inmates. Thus, while *Martinez* may still control for due process claims where
> a prison limits personal correspondence, it is not necessary to require such
> a high standard for mass mailings.

*Perry*, 664 F.3d at 1368. Nevertheless, the finding that *Martinez* does not control does

not necessarily end the inquiry, nor does it necessarily mean that *no process* is due. As

*Perry* did, this Court will analyze what process is due by utilizing the Supreme Court's test

established in *Mathews v. Eldridge*. To evaluate a due process claim under the *Mathews*

test, a court should consider:

> First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail.

424 U.S. 319, 335 (1976).

Applying that test here, the Court concludes that the County did owe *some* process

to HRDC. First, HRDC clearly has a private interest in communicating with prisoners to

spread its message and try to disseminate more of its publications. Nevertheless, the

Court concludes that there is little risk of an erroneous deprivation of that interest through

the procedures used here. While it is clear from the Supreme Court's decisions that HRDC

has a protected liberty interest in communicating with prisoners, rejection of its unsolicited

publications does not completely deprive it of the opportunity to achieve that goal. Indeed,

HRDC can still reach out to prisoners through postcards; it can visit the prisoners; and it

can inquire about whether the County would voluntarily accept its publications to augment

the County's admittedly small (and outdated) "legal library." All of these avenues remain

open to HRDC. Moreover, given that the regulation in question is more clear-cut than a

regulation prohibiting "obscene" or "racially-motivated" materials, there is little likelihood

that prison officials would mistakenly deny distribution of an HRDC mailing that complied with its regulations (*i.e.*, an HRDC postcard would clearly be acceptable).

Additionally, as the Court has noted before, it finds little value would be added by the type of extensive procedural safeguards HRDC requests. First, the creation of a formal appeal process to challenge the rejection of a mailing because it does not comport with the postcard-only requirement is unwarranted. To the extent that HRDC contends that its appeal could include asking a second official to pontificate on the constitutionality of such a program, such an argument is misplaced. What HRDC would actually be asking for in that case would be for this small County jail to create an entirely new appellate review system that would, likely, have to start with the official who happened to be in charge of mail inspection on a particular day and would end with the Sheriff (who instituted the policy). Such an administrative burden is an important factor in determining how much process HRDC was due. Based on this record, the Court concludes that such an extensive appeal procedure is not required by the Due Process Clause. This conclusion is only strengthened by the Fifth Circuit's statement in *Livingston* that a county must be free "to pass rules of general application, even ones that limit prisoner rights, without subjecting such rules to repetitive challenges every time they are applied." 683 F.3d at 223. Finally, the Court's decision is reinforced by the undisputed fact in the record that HRDC has at least eight distinct types of mailings that it desires to send to prisoners as part of its mission. Given the small resources of this particular jail, HRDC's demands are inconsistent with the requirements of due process.

Nevertheless, after considering the *Mathews* factors, the Court concludes that HRDC is entitled to sufficient notice that its mailings are being rejected and the reason

for such rejection. Such a requirement would not impose a substantial burden on the County. As the *Livingston* and *Florida Department of Corrections* cases held, however, that notice does not have to be repeated for duplicate editions of the same publication. So, when HRDC sent copies of identical publications to several different prisoners during its waves of mailings, the County was not required to explain why the same publication was rejected for a different prisoner when HRDC was already on notice of its rejection. However, this is where the Court parts company with those two decisions. While those decisions did not require "copy-by-copy" notice, they did require that the institutions provide separate notice for each different type of publication. The reason? Unlike in this case, the regulations in those cases required a new content-specific evaluation for each different type of publication. In essence, while one edition of *Prison Legal News* might have obscene content or material consisting primarily of advertising content (and therefore be against regulations), next month's issue might not. Thus, each month, review of the contents of the publication was required. Not so here. Every item that was rejected by the County was rejected because it was not a postcard, and, in fact, every rejected item was indisputably *not* a postcard. Thus, once the County put HRDC on notice that its mailings were being rejected because of a content-neutral rule of general applicability, it was not required to continue providing such notice each and every time a different publication was rejected for the same reason.

As to the opportunity to be heard, the Court concludes that due process does not require the traditional *Martinez*-style opportunity to appeal an initial censorship decision to a second official. Such an appeal would not only be futile given that the mailings were indisputably not postcards but would not enable HRDC to seek redress from the official

who instituted the policy in the first place.[18] Therefore, the Court follows *Perry* in holding that where an individual publisher remains free (*i.e.*, is not prohibited) from challenging a rejection decision, due process has been satisfied. *Perry*, 664 F.3d at 1368 ("Appellants are free to correspond with FDOC officials to challenge the denial of their advertisements."). Allowing frequent (and repetitive) appeal of the routine enforcement of a generally applicable policy would "put an extra burden on the [County] without necessarily adding any extra protections for [HRDC]." *Id.*

Applying these standards to the underlying facts in this case, the Court concludes that the County is entitled to summary judgment on the due process claim as it pertains to the wave of unsolicited mailings sent by HRDC on January 6th and 12th of 2017.[19]

---

[18] Unless, of course, HRDC contemplates that due process requires the County to institute an appeal system which would allow every rejection of every piece of mail to be appealed to the Sheriff. Such an appeal system is unwarranted, however, for several reasons. First, the cases requiring an institution to allow a publisher to appeal an initial censorship decision involved publishers attempting to convince a second official that the initial decision to censor (because of obscenity, racially or sexually charged material, etc.) was incorrect and that its publications were not obscene, racially-motivated, etc. This fundamentally differs from what HRDC asks here, especially since there is no indication that a second official would have any authority whatsoever to scrap the policy (unless, of course, he was the Sheriff who had first instituted it). But that leads right into the second problem with HRDC's argument, which is that the Court has already indicated that allowing the sender of every piece of mail to challenge every rejection all the way to the Sheriff would greatly burden the County. Therefore, under the *Mathews* balancing test, such an appeal system is not required by due process.

[19] The fact that HRDC alleges that at least some mail sent by HRDC on each day in question was never returned does not lead to the conclusion that there are unresolved factual disputes that would preclude summary judgment. First, there is absolutely no evidence in the record (such as a certified mail receipt, etc.) that the mailings ever were received by the Jail in the first place. Additionally, even if these mailed items *did* reach the Jail, the Court has already found that it is not a due process violation if a sender does not get notice of every rejection of its mailings. In fact, some courts have even found no due process violation where the sender received notices for a substantial *minority* of the total pieces of mail sent. *Van Den Bosch*, 2009 WL 4663134, at *3-*5.

According to the undisputed evidence in the record, all of the mail returned by the County from these two days was marked with a USPS sticker that said "Return to Sender Insufficient Address." (Doc. 69-17, ¶ 26). As a result, there is no evidence in the record that any County employee was responsible for affixing those labels (as opposed to a USPS employee who attached the label because (s)he was unable to complete delivery to the Jail). There can be no due process violation if the mail never reached the Jail in the first place because of an insufficient address. Nevertheless, to the extent that some as-yet-unproduced evidence would suggest that it was a County official who affixed these stickers, the stickers would clearly have put HRDC on notice of the reason why the mailings were not delivered to their intended recipient. Given the Court's discussion above, that is all the process HRDC was due.

 The County is also entitled to summary judgment on the Due Process claim as it relates to the mailings sent on May 12th and May 18th of 2017. The testimony is that HRDC was clearly put on notice that these items of mail were returned due to the County's postcard-only policy. Additionally, HRDC remained free to (but never did) send any kind of letter challenging this policy to the Sheriff of the County. Coupled with the County's website, which provides that any persons having questions about the policy should contact supervisory personnel at the Jail,[20] the Court finds no procedural due process violation, for the reasons noted above.

However, the Court concludes that HRDC is entitled to summary judgment on its claim of a due process violation for the County's rejections of the August 5, 2016 mailings,

---

[20] Baxter County Sheriff, *New Rules for Jail Inmate Mail Starting January 2nd* (Dec. 7, 2011), https://www.baxtercountysheriff.com/press_view.php?id=827 (last visited on January 17, 2019).

which provided no notice as to the reason for rejection, simply stating "Refused" or "Return to Sender Refused." Even the most basic due process protection includes the requirement that the sender, who has a liberty interest in sending such publications, learn the reason(s) why his/her publications were rejected. The undisputed facts are that the County never provided any formal reason for these rejections. Thus, the Court finds that there was a technical due process violation.[21]

Finally, the Court is presently unable to rule on the summary judgment motions with respect to mailings that HRDC sent between September 2016 and January 2017. There simply is no evidence in the record as to whether the rejection notices were accompanied by any reason for rejection. Without such evidence, there remains a question of fact about whether the County put HRDC on notice of the reason(s) for rejection of these mailings. Such facts cannot be resolved by the Court but must instead be decided by the trier of fact.

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that HRDC's Motion for Summary Judgment (Doc. 67) is **GRANTED IN PART AND DENIED IN PART**. Specifically, it is **GRANTED** with respect to the Due Process claim as to the mailings sent to the Jail on August 5, 2016. It is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 70) is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** with respect to the

---

[21] Of course, any "damages" caused by such a technical violation would, by necessity, be limited because HRDC still received notice that its mailings from these dates had been rejected. It just was not provided with the reason for the rejection.

Due Process claim as to the mailings sent to the Jail on January 6, January 12, May 12, and May 18 of 2017. It is **DENIED** in all other respects.

    **IT IS SO ORDERED** on this _22nd_ day of January, 2019.

                                        _____
                                        TIMOTHY L. BROOKS
                                        UNITED STATES DISTRICT JUDGE