**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**

**HUMAN RIGHTS DEFENSE CENTER**                                              **PLAINTIFF**

**v.**                                              **CASE NO. 5:17-CV-3070**

**BAXTER COUNTY, ARKANSAS**                                              **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

On January 30, 2019, the above-captioned matter came on for a bench trial before the Court. Over the next three days, the Court heard testimony from witnesses and received exhibits into evidence. At the conclusion of the trial, the Court directed the parties to submit post-trial briefing. Plaintiff Human Rights Defense Center's ("HRDC") post-trial brief was submitted on February 15, 2019. *See* Doc. 101. Defendant Baxter County's ("the County") post-trial brief was submitted on March 1, 2019. *See* Doc. 102. At the same time that HRDC submitted its post-trial brief, the County also filed a motion seeking partial reconsideration of the Court's Opinion on the parties' cross-motions for summary judgment. *See* Doc. 99. HRDC's response in opposition to that motion was submitted on March 1, 2019. *See* Doc. 103. Having received and reviewed the evidence and briefs submitted in this case, the Court issues the following Memorandum Opinion and Order resolving the County's new motion and setting out its findings of fact and conclusions of law on the remaining claims.

**I. BACKGROUND**

**A. FACTUAL BACKGROUND**

HRDC is a 501(c)(3) non-profit organization with principal offices in Lake Worth, Florida. HRDC's purpose is to "educate prisoners and the public about the destructive

natures of racism, sexism, and the economic and social costs of prisons to society." (Doc. 1, p. 3). HRDC "accomplishes its mission through litigation, advocacy, and publication and/or distribution of books, magazines and other information concerning prisons and prisoner rights." (Doc. 26-1, p.1).[1] To accomplish its mission, HRDC publishes and distributes *Prison Legal News*, a monthly legal magazine which contains news about prisons, prisoners' rights, and prison facilities and conditions, among other things. In addition to its 72-page magazine *Prison Legal News*, HRDC also publishes and distributes *The Habeas Citebook*, books about the criminal justice system, self-help books for prisoners, and informational packets that contain subscription order forms and a book list. HRDC distributes these mailings to monthly subscribers (civilians and prisoners alike) and to prisoners in 2,600 correctional facilities across the county, including in Arkansas.

HRDC alleges that the County[2] implemented and adhered to an unconstitutional mail policy that prohibited the delivery of HRDC's publication materials to prisoners at the Baxter County Jail and Detention Center ("the Jail"). In 2012, the County adopted a new mail policy that requires all non-privileged, non-legal incoming mail to be limited to postcards. As a result of this policy, HRDC alleges that the County refused to deliver issues and sample issues of *Prison Legal News*, *The Habeas Citebook*, informational packets, order forms, and court opinions sent by HRDC to prisoners held in the Jail. HRDC alleges that the County's actions violated its constitutional rights, limited its ability

---

[1] The testimony is that HRDC's activities are split roughly 60% litigation, 40% publishing/advocacy. *See, e.g.*, Doc. 74-1, p. 5.

[2] As initially filed, the Complaint included claims against the County and designated officers. As explained in greater detail below, the County is the sole remaining defendant.

to distribute its messages and obtain new customers, and thereby frustrated its organizational mission.

## B. PROCEDURAL BACKGROUND

HRDC initially sued the County alongside individual officers who were allegedly instrumental in enacting the policy or in rejecting HRDC's repeated mailings. It also sought a preliminary injunction to enjoin continued enforcement of the policy. However, in ruling on the Defendants' Motion to Dismiss (Doc. 18) and HRDC's Motion for a Preliminary Injunction (Doc. 26), the Court determined that the individual capacity damage claims against these individuals should be dismissed on the basis of qualified immunity because the law governing HRDC's First and Fourteenth Amendment claims was not sufficiently clear to put these officials on notice that their actions were unconstitutional. *See* Doc. 49. In addition, because of the unsettled nature of the law in this area, the Court denied HRDC's motion for a preliminary injunction.

A little less than a month after the Court issued its ruling on these two motions, the Eighth Circuit upheld a very similar postcard-only policy against a First Amendment challenge in *Simpson v. County of Cape Girardeau, Missouri*. 879 F.3d 273 (8th Cir. 2018). That decision prompted the Defendants to file a renewed motion to dismiss (Doc. 50), wherein they contended that the Eighth Circuit's decision in *Simpson* sufficiently clarified the law to the point that the Defendants were entitled to dismissal of the Complaint. The Court construed the "motion to dismiss" as a motion for judgment on the pleadings, ultimately granting it in part and denying it in part. *See* Doc. 53. As a result of that opinion and order, the remaining official capacity claims were dismissed as

duplicative of the claim against the County, and those individual officers were dismissed from the action.

On November 2, 2018, HRDC and the County filed cross-motions for summary judgment. HRDC contended that *Simpson* was readily distinguishable and that the law as applied to the facts of this case clearly demonstrated that the County's adoption and enforcement of the postcard-only policy violated its First Amendment rights. In addition, it contended that the County's failure to send individual notices each time one of its unsolicited mailings was rejected by the Jail pursuant to this policy and its failure to allow HRDC to challenge each individual rejection to another neutral official amounted to due process violations under the Fourteenth Amendment. The County, relying principally on *Simpson*, contended that its postcard-only policy, like the one upheld there, was constitutionally permissible under the First Amendment. As to the Fourteenth Amendment claim, the County contended that little or no process was due when it rejected these unsolicited mailings. To the extent that any process was due, the County contended that its rejection notices were more than sufficient to put HRDC on notice and that there was a statutory mechanism for bringing claims against a county that HRDC should have used.

On January 22, 2019, the Court granted in part and denied in part each party's motion for summary judgment. In particular, the Court denied the cross-motions for summary judgment as to the First Amendment claims. Relying on the language at the end of *Simpson* that its holding was narrow and that each policy would have to be judged based on the unique facts of each case, the Court found that there were genuine disputes of material fact that would prevent the Court from making a decision as to the constitutionality of the policy at the summary judgment stage. As to the Fourteenth

Amendment claim, the Court surveyed the extensive body of case law in this area governing what procedures must accompany decisions to censor[3] mail, beginning with the Supreme Court's landmark decision in *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). It then ultimately concluded, in light of persuasive decisions of the Fifth and Eleventh Circuits and dicta[4] from the Supreme Court, that *Procunier*-style due process protections (*i.e.* notice and an opportunity to appeal to a neutral decision maker who was not involved in the initial decision to censor) do not strictly apply when the rejection in question results not from classic censorship (rejecting a book based on something objectionable about its content), but rather from the routine enforcement of a content-neutral rule with general applicability.[5] *See, e.g.*, *Prison Legal News v. Livingston*, 683 F.3d 201, 223-24 (5th Cir. 2012).

---

[3] Despite HRDC's best protestations to the contrary, the regulation in question is not, technically speaking, censorship at all, since censorship has a particular definition in the law. *See, e.g.*, *Black's Law Dictionary* (10th ed. 2014) (defining the act of censoring as: "To officially inspect (esp. a book or film) and delete material considered offensive."); *Farmers Educ. & Co-op Union of Am., N.D. Div. v. WDAY, Inc.*, 360 U.S. 525, 528 (1959) ("The term censorship, however, as commonly understood, connotes any examination of thought or expression in order to prevent publication of 'objectionable' material.").

[4] As the Court noted in its opinion on summary judgment, the Supreme Court, as far back as *Procunier*, expressly refused to extend the protections it had just approved to "mass mailings," for which "[d]ifferent considerations may come into play." *Procunier*, 416 U.S. at 408. n.11. The Court at summary judgment found that HRDC's unsolicited mailings were more akin to mass mailings than they were to the direct personal correspondence involved in *Procunier*.

[5] Indeed, the Court spent nine pages of its summary judgment opinion analyzing the cited cases, showing how *Procunier*-style due process protections have been required in two broad categories of cases: cases involving actual censorship and where regulations targeted or singled out for greater regulation particular types of mail (*i.e.* bulk-rate mail, etc.). *See* Doc. 89, pp. 11-20. In cases not involving either of these types of regulations, courts have split as to what amount of due process applies, with some adhering to *Procunier* without any discussion of whether it applies to generally applicable, content-

Of course, just because *Procunier*-style due process protections do not apply does not mean that no process is due. Adopting the Eleventh Circuit's approach of using the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine how much process was due, this Court held that in the case of the rejection of an unsolicited mailing pursuant to a content-neutral, generally applicable regulation like a postcard-only policy, the County must provide notice of the rejection to the sender along with the reason why the mailing was being rejected. The Court declined to hold that due process allowed HRDC to appeal each decision that its mailings (*i.e.* the 72-page magazines) were not postcards to a second official, finding that the justifications for such protection in the context of censored mailings simply did not apply in this case and that the burdens of imposing such a formal system far outweighed the nature of the private interest that was affected. *See* Doc. 89, pp. 20-24 (applying the *Mathews* test).

Applying this law to the undisputed facts, the Court granted summary judgment in HRDC's favor for the mailings sent to prisoners in the Jail on August 5, 2016. The Court found a technical due process violation because although HRDC was given notice that those items had been rejected, it was given no reason for the rejection. The rejection notices merely said "Refused." However, the Court granted summary judgment to the County for the mailings sent on January 6th and 12th of 2017. Because these rejection notices came with a reason for rejection (a USPS sticker that said "Return to Sender Insufficient Address"), HRDC received all of the process it was due. For similar reasons, the Court granted summary judgment to the County for the mailings sent on May 12th

---

neutral policies and others questioning whether due process even applies in this area *at all*. *See* Doc. 89, pp. 18-20.

and May 18th of 2017, because the rejection notices accompanying these mailings indicated to HRDC that they had been refused because they were not postcards. As a result of those rulings, all of the due process claims in this case were resolved, save for the mailings sent between September 2016 and January 2017. For these items, there was no indication in the record as to the reason why they were rejected. However, after the Court entered its order on summary judgment, HRDC advised that, in light of the Court's ruling, it would no longer pursue its due process claims as to any other items of mail that had not already been ruled on by the Court. *See* Doc. 103, p. 3 ("Both parties agreed that the Fourteenth Amendment claims, other than damages, had already been ruled upon or abandoned. . . .").

The effect of all of these procedural events is that the matters remaining for trial were 1) HRDC's First Amendment claim and 2) damages for the limited, technical due process violation the Court found regarding the August 5 mailings. Immediately following the pre-trial conference, the parties indicated to the Court that they wished to try these remaining issues to the bench. As noted previously, a three-day bench trial was held from January 30—February 1, 2019. The parties then each submitted post-trial briefs, and the County submitted a motion for partial reconsideration of the aforementioned order on the cross-motions for summary judgment.

For the sake of clarity, the Court below will first turn to the County's post-trial motion for reconsideration. It will then set forth its findings of fact and conclusions of law on the First Amendment claim. Finally, it will consider damages.

## II. DISCUSSION

### A. The County's Motion for Partial Reconsideration of the Court's Ruling on Summary Judgment

Two weeks after the bench trial ended and almost a month after the Court issued its decision on the cross-motions for summary judgment, the County moved for partial reconsideration of the Court's ruling granting HRDC summary judgment as to the due process claims for the August 5, 2016 mailings. It based its motion for reconsideration on three arguments: 1) that there can be no due process violation unless and until the Court has found a First Amendment violation, 2) that there was no violative policy, practice, or custom that can be charged to the County, and 3) that HRDC has conceded that it received notice that its mailings were being rejected because of the postcard-only policy.

As an initial matter, the Court agrees with HRDC that the County's motion is procedurally improper. Summary judgment is a pre-trial tool used to decide whether claims should go to trial. It is not meant to be a post-trial motion to rehash arguments that could have (and should have) been raised earlier. That is why Rule 56 has a default rule setting the time to file such a motion "at any time until 30 days after the close of all discovery." F.R.C.P. 56(b). It is also why this Court set the deadline to file such dispositive motions for November 2, 2018. *See* Doc. 60.

The County's motion is also an improper motion for reconsideration of that opinion. For, while the Court has found cases where a court *sua sponte* or upon motion of the parties reconsidered an earlier ruling denying summary judgment, those cases, without fail, have been ones where the grounds for reconsideration had already been asserted in the earlier motion. *See, e.g.*, *Conkling v. Turner*, 18 F.3d 1285, 1295-96 (5th Cir. 1994). They were not, as they are here with the County's motion, almost entirely new reasons for why the party believes that it is entitled to summary judgment. Indeed, the County's original brief in support of its motion for summary judgment as to the due process claims

spanned only a page. In that page, the County asserted that HRDC had received all of the process it was due when it was notified in subsequent mailings that the reason for the rejection of the mail was due to the postcard-only policy. *See* Doc. 72, p. 7. In addition, it asserted that Arkansas law provided a separate and sufficient method to assert claims against the County. *Id.* It never asserted, until now, that it believed that the Court could not find a due process violation if it didn't first find a First Amendment violation. Nor did it assert, as it does now, that there was no policy, practice, or custom that could be charged to the County. It would be one thing to bring the present motion had trial testimony revealed new facts[6] that had made these theories previously unknown. But, that simply is not the case.

As such, the Court recognizes, in light of long-standing authority in this circuit, the improper nature of the County's new motion. *See, e.g.*, *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988) (stating that motions for reconsideration cannot be used to introduce new evidence or legal theories that "could have been adduced during pendency of the summary judgment motion." (citation omitted)); *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 923 (8th Cir. 2015) ("A motion for reconsideration is not a vehicle to identify facts or legal arguments that could have been, but were not, raised at the time the relevant motion was pending."); *SPV-LS, LLC v. Transamerica Life Ins. Co.*, 912 F.3d 1106, 1111 (8th Cir. 2019) (citing *Julianello*, 791 F.3d at 922). For that reason alone, the County's motion (Doc. 99) is **DENIED**.

---

[6] To this point, it is also quite telling that Defense counsel did not even attempt to make these arguments during its Rule 52(c) motion for judgment on partial findings at the close of HRDC's case-in-chief.

But even if the Court thought it was procedurally proper to consider the County's motion now in light of what transpired at trial, it would nevertheless still deny the motion because the County's new[7] asserted reasons for reconsideration are without merit. The County's first argument is that due process rights are derivative in nature and depend in part upon the recognition of a valid liberty interest that has been deprived by the municipality's conduct. Under the County's theory, the Court would first have to find that the County's policies were unconstitutional under the First Amendment (*i.e.* that HRDC had a protected liberty interest in communicating with prisoners on something larger than a postcard) before it would need to consider the due process claim.

It is true that a viable due process claim generally requires the denial of a liberty interest without due process of law. However, the County's argument misconstrues the law and minimizes HRDC's liberty interest. The liberty interest at issue here is the First Amendment right to communicate with prisoners, an interest that has been consistently recognized since the Supreme Court held in *Procunier* that "the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication." 416 U.S. at 408-09. But, it is incorrect to say that the Court must first find that the restriction in question violates the sender's First Amendment rights before it can consider whether the interference with the protected liberty interest was accompanied by adequate procedural safeguards.[8] The two are related, yet separate, concepts. That

---

[7] With the exception of the County's third asserted reason for reconsideration (*i.e.* that HRDC conceded that it received notice), the County's reasons for reconsideration are new theories that should have been asserted in the initial motion for summary judgment.

[8] Indeed, the Supreme Court seems to have flatly rejected that theory some forty years ago. *See, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("Because the right to

is why numerous courts around the country have found that due process protections apply even when the underlying regulation is upheld under the First Amendment. *See, e.g.*, *Prison Legal News v. Sec'y, Fla Dep't of Corr.*, 890 F.3d 954, 957 (11th Cir. 2018) ("After a bench trial, the district court ruled that the impoundments do not violate the First Amendment but the failure to give proper notice of them does violate the Fourteenth Amendment. We agree."); *Martin v. Kelley*, 803 F.2d 236, 243-45 (6th Cir. 1986) (upholding a mail policy against a First Amendment challenge but nevertheless finding a Due Process clause violation).

The County next argues that there was no policy, custom, or practice that can be charged against the County. The root of the County's argument is that the Jail's official policy during the duration of this case was that mail rejected pursuant to the postcard-only policy would be stamped to reflect that this was the reason for its denial. Indeed, the Sheriff testified that this was the policy,[9] and the video footage of the Jail inspection showed a Jail official stamping rejected mail with a "Return to Sender Postcards Only" message. Nevertheless, the undisputed evidence is that despite the apparent policy, the custom and practice of the Jail was NOT to uniformly mark rejected items with this insignia. We know this because the parties stipulated that all of the items of mail sent by HRDC were refused because of the postcard-only policy. Nevertheless, the first batch of rejected mailings did not in any way indicate that their rejection was due to the postcard-

---

procedural due process is 'absolute' in the sense that it *does not depend upon the merits of a claimant's substantive assertions* . . . .").

[9] Formally speaking, it appears that this was more properly characterized as a practice or custom of the Jail, since the postcard-only policy itself did not require the stamping of rejected mail with this message.

only policy. Moreover, Corporal Maple testified during the trial that front office staff at the Sheriff's main office would sometimes reject packages before they even arrived at the Jail, where they could be stamped. Thus, despite what the formal policy apparently dictated, the evidence, both at summary judgment and during the bench trial, was that the custom or practice of the Jail, at least for the period in question until they began stamping items of mail with the "Return to Sender Postcards Only" stamp, was NOT to indicate the reason for the rejection.

A custom or practice is enough under existing law to trigger municipal liability. *See, e.g.*, *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978) (noting that "although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for the deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person' by the very terms of the statute, may be sued for constitutional deprivations pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels"). HRDC has also established that this custom or usage was "persistent and widespread." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 659 n.7 (8th Cir. 2007). Indeed, the evidence at trial indicated that, for months,[10] the Jail rejected HRDC mailings, without giving any reason for the rejection and by marking the packages only with "Refused," all apparently in contravention of official policy. Because

---

[10] In fact, there is no evidence that Jail officials ever began marking items to indicate that they were rejected pursuant to the postcard-only policy until May 12, 2017, five years after the policy was implemented, nine months after HRDC began sending items to the Jail, and months after it first contacted officials to question why its mailings were being rejected.

there is no indication that anyone other than a Baxter County official[11] made the decision to reject these mailings, such evidence is sufficient to charge the underlying violation (failure to give a reason for the rejection decision) to the County. Indeed, in order to show a "custom or usage," HRDC need only prove:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Harris v. City of Pagedale*, 821 F.2d 499, 504-07 (8th Cir. 1987)).

In addition to the evidence establishing the widespread custom of County officials to return sent items without indicating why they were being rejected, HRDC also adduced evidence that the County tacitly authorized such conduct. From Sheriff's office officials rejecting mail before it even arrived at the Jail to the evidence that HRDC put the County on notice of its complaints about the rejections, HRDC has demonstrated tacit authorization of such unconstitutional conduct by the County. Finally, the Court found that

---

[11] To the extent that the County's argument is that some errant official negligently failed to comply with official policy for all this time before reasons for the rejection were finally given, the evidence is to the contrary. First, the evidence establishes that many officials, not just one, were involved in the rejection of mailings (whether they were rejected at the Sheriff's office before being carried over to the Jail or were rejected by whichever Jail official happened to be sorting the mail that day). Second, these rejections were not mere negligent decisions—a conscious decision was made to reject the mailing and to mark the mailing "Refused." *Prison Legal News*, 890 F.3d at 977 ("The Department asserts that PLN should find the mailroom workers who are responsible for the failure to provide notice and sue them. No.").

the violation in question (not giving a reason for the rejection) was directly caused by the custom or practice of not marking returned items of mail with the reason for their return. Thus, the proof established all three elements necessary for *Monell* liability.

Finally, the County contends that summary judgment is now appropriate because HRDC conceded that it had notice of the reason for rejection all along. The County contends that this is so because the postcard-only policy had been posted on the Sheriff's website and was therefore visible to all and because Paul Wright, the Executive Director of HRDC, testified that he had been on the Sheriff's website.

The Court finds no evidence supporting the County's position on this point. First, HRDC is correct that there is no evidence in the record indicating that the text of the postcard-only policy appeared on the Sheriff's website back in August of 2016 when the County was rejecting HRDC's mailings without giving reasons for the rejection. Exhibit 18, a copy of the County's website where the postcard-only policy is posted, also contains press releases from 2018 and clearly therefore is not an accurate depiction of how the website looked in August 2016. Moreover, while Paul Wright indicated that he and his staff visited the County's website, the testimony revealed that their visits were to check the inmate rosters to ensure that the person was still in custody before they mailed unsolicited copies of their publications to those individuals. There is no evidence that these rosters contained any reference to the postcard-only policy, much less a link that would take visitors to the specific portion of the webpage where the policy was described. Finally, HRDC is also correct that the press release announcing the new policy on the Sheriff's website is ambiguous about the scope of the new postcard-only policy. Indeed, while the policy says that "inmates of the Detention Center will only be allowed to send

and receive post cards," it later says that "[a]ll personal mail to and from relatives and friends will only be allowed by means of a post card." Thus, while the first sentence arguably encompasses all senders, the later reference to personal mailings could give senders such as publishers like HRDC reason to doubt whether the policy would be applied to them. Therefore, even if the Court assumes that HRDC had specific knowledge of the postcard-only policy in August of 2016 (a dubious prospect, at best), the wording of this policy was not sufficiently clear to relieve the County of its obligation to tell the sender of rejected mail the specific reason why its mailings were being rejected. For all of the aforementioned reasons, even if the Court thought it procedurally proper to reconsider its prior order, it would reject the County's arguments.

## B. The First Amendment Claim

As noted at the outset of this Opinion, trial of this matter was limited to the First Amendment claim and to damages. Having heard the evidence and considered the relevant law and the parties' post-trial briefs, the Court now issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[12]

### i. Findings of Fact

### HRDC and Its Mailings

1.  HRDC is a not-for-profit, IRS section 501(c)(3) organization incorporated in the state of Washington and with principal offices in Lake Worth, Florida.

---

[12] To the extent that any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

2.   HRDC's Executive Director, Paul Wright, founded Prison Legal News[13] as a prisoner within the Washington Department of Corrections.

3.   HRDC publishes a 72-page monthly magazine entitled *Prison Legal News*, which provides information about legal issues affecting prisoners, including self-help and self-improvement, access to courts, disciplinary hearings, prison and jail conditions, excessive force, and religious freedom. A copy of one edition of the magazine submitted in this case shows that besides these legal articles of interest to prisoners, *Prison Legal News* also contains advertisements for an assortment of products and services, including legal services and order forms by which prisoners can request nude/semi-nude photographs of men and women. *See, e.g.*, Doc. 26-1, p. 16.

4.   In addition to *Prison Legal News*, HRDC publishes and distributes legal and self-help softcover books, including an over 200-page book entitled *The Habeas Citebook: Ineffective Assistance of Counsel* ("*The Habeas Citebook*"). It also distributed around 50 softcover books, legal reference books, informational brochure packets, copies of judicial opinions, annual fundraisers, and letters.

5.   HRDC distributes its publications to civilian and prisoner inmate subscribers throughout the United States. It also sends unsolicited mailings to prisoners in jails and prisons across the country, along with an order form. When HRDC identifies that there might be a problem with its unsolicited mailings getting to the intended prisoner, it sends follow-up letters to verify that there is a "problem" at the jail.

6.   The purchase price of a single issue of *Prison Legal News* is $5.

---

[13] The organization's name was changed from Prison Legal News to the Human Rights Defense Center in 2009.

7.  The purchase price of *The Habeas Citebook* is $49.95.

8.  HRDC incurred production, postage, and handling costs for the items that the Jail refused to deliver because of the postcard-only policy.

**The Postcard-Only Policy**

9.  On December 7, 2011, the Jail advertised that, effective January 2, 2012, "inmates of the Detention Center will only be allowed to send a receive post cards." (Pl. Ex. 15). The postcard-only policy contained an exception for legal mail, which was defined as mail to and from the courts, attorneys, officers of the court, and government agencies. Mail from these excepted sources would still be permitted using envelopes. Incoming envelopes were required to be pre-printed with the return name and address of the court, attorney, officer of the court, or government agency.

10. The County's website indicated that the postcard-only policy was being implemented for two reasons. First, it was intended as a security precaution "as a proactive measure to decrease the amount of contraband coming into the Detention Center." Second, it was intended as a cost savings measure to the County, which supplied postage and postage materials for indigent inmates. (Pl. Ex. 15).

11. Sheriff John Montgomery, who was instrumental in enacting the policy, testified that the policy was also designed to conserve resources more generally in that it would make inspection and processing of the mail more efficient and thereby allow the limited staff of the Jail to be free to carry out their other duties.

12. The idea to implement the policy came from the Jail's former jail administrator who attended a conference where there was discussion of this policy. After returning from the conference, the jail administrator discussed the policy with the Sheriff, and the Sheriff recommended that she bring it up during the next staff meeting with the

different supervisors of the areas of the Jail. After discussing the policy during a staff meeting, the decision was made to implement the policy.

13. Prior to implementation of the postcard-only policy, Jail staff would process the mail by: sorting the mail by the inmate recipient's pod; recording the name of the recipient, sender, sender's address, and type of mail in the Jail's electronic database; rubbing the stamp to determine if there was anything underneath; removing the letter from the envelope, shaking it around to loosen any hidden contraband, visually inspecting the envelope, and skimming the contents of the mailing to determine if there was any security threat posed by the mailing.

## The Jail and Its Resources

14. While the exact number fluctuates, the Jail houses on average over 100 inmates at any one time. Last year, the lowest number of inmates was 116 and the highest was 141. The Jail population consists of, *inter alia*, pretrial detainees, convicted misdemeanants, and convicted felons awaiting transport to the Arkansas Department of Corrections. The Jail also holds up to eight "Act 309" trustees who are serving time in the Arkansas Department of Corrections and who, as part of their incarceration, are released periodically to work release programs and/or to perform duties in the Jail.

15. In 2017, the County's budget to operate the Jail was a little over $1.1 million. (Pl. Ex. 16).

16. Because of resource limitations, there are no more than two staff members downstairs at any given time to monitor the inmates. Other officers upstairs in the control tower handle opening the automatic doors and monitoring the camera

footage from around the Jail. One of the officers upstairs also handles dispatches of Sheriff's deputies when calls come in that have been forwarded from 9-1-1 calls.

17. The two officers downstairs are tasked with cell checks every hour, distributing meals to the inmates, delivering medications, processing the mail, responding to incidents, walking inmates to and from visitation, and booking and processing inmate arrivals and transfers.

### ii. Conclusions of Law

As noted previously, the Supreme Court has made clear that "the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication." *Procunier*, 416 U.S. at 408-09. Indeed, "'[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution,' . . . nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside[.]'" *Thornburgh*, 490 U.S. at 407 (citing *Turner v. Safley*, 482 U.S. 78, 84, 94-99 (1987)) (other citations omitted). Nevertheless, because of the unique institutional setting of a prison, "these rights must be exercised with due regard for the 'inordinately difficult undertaking'" of operating a modern prison. *Id.* (citing *Turner*, 482 U.S. at 85). As a result, "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (upholding prison ban on newspapers, magazines, and photographs). Thus, a considerable amount of deference is due to the decisions of those who run today's prisons. Because of the interaction between the publisher's First Amendment rights and these institutional considerations, publishers seeking to communicate with prisoners on

the inside "enjoy the protections of the First Amendment except to the extent that prison regulations curtailing those protections are 'reasonably related to legitimate penological interests.'" *Livingston*, 683 F.3d at 213 (quoting *Turner*, 482 U.S. at 89).

When assessing the constitutionality of the challenged regulation, the Court must consider (1) whether the regulation is rationally related to a legitimate penological goal; (2) whether alternative means of exercising First Amendment rights remain available; (3) the effect that accommodation of the asserted right would have on prison employees, other prisoners, and prison resources; and (4) whether there are obvious alternatives to the regulation. *Turner*, 482 U.S. at 89-91. In conducting the *Turner* test and in making the overall assessment as to whether prison regulations are reasonably related to legitimate penological interests, the Supreme Court and the Eighth Circuit have re-iterated that "the burden . . . is not on the State to prove the validity of prison regulations but on the [challenger] to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003).

**1) The Postcard-Only Policy is Rationally Related to the County's Legitimate Penological Interests.**

While the *Turner* test affords considerable deference to prison officials, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), there must still be a legitimate government objective underlying the policy, *Beard*, 548 U.S. at 535 ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."). As the Supreme Court noted in *Turner*, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. Because the burden remains on HRDC to show the irrationality of the challenged policy, "case law does not require defendant to introduce 'actual proof that a legitimate interest will be

furthered by the challenged policy. The connection between the two need be only objectively rational.'" *Simpson v. Cnty. of Cape Girardeau*, 202 F. Supp. 3d 1062, 1069 (E.D. Mo. 2016) (quoting *Herlein v. Higgins*, 172 F.3d 1089, 1091 (8th Cir. 1999)).

The reasons the County instituted the postcard-only policy have been variously described throughout this case and referenced in several different mediums (*i.e.* on the County's website, through the testimony of Sheriff Montgomery, etc.). Essentially, however, three justifications for the policy have emerged: 1) as a proactive security precaution to decrease the amount of contraband coming into the Jail, 2) as a cost-saving measure to the County, and 3) to promote efficient jail operations.

The first part of the *Turner* analysis requires the Court to determine whether the County's stated justifications are in fact "legitimate penological goals." This test is readily met. The Eighth Circuit has recognized "institutional security as the most compelling government interest in a prison setting." *Simpson*, 879 F.3d at 279 (citing *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004)). In addition, "institutional efficiency is also a legitimate penological objective." *Id.* As to the asserted justification of reducing costs, the Court agrees in part with HRDC that such an interest is usually not sufficient, standing alone, to justify the curtailment of constitutional rights. Nevertheless, it must be remembered that one of the factors identified by the Supreme Court to be used in assessing the reasonableness of the prison regulation is the effect that accommodation of the asserted interest would have on prison resources. As a result, the Court finds that in this context, cost-savings can be a legitimate penological objective.[14]

---

[14] Of course, even if cost-savings were not interpreted as a legitimate penological goal, *Turner* does not require the institution to advance multiple legitimate goals in support of its policy. The fact that it has done so surely strengthens its case.

Since the County has asserted legitimate penological objectives, the Court must now determine whether the postcard-only policy is rationally related to achieving those goals. The Court's natural starting point here is *Simpson*. There, the Eighth Circuit upheld a postcard-only policy against a similar First Amendment challenge. In assessing this *Turner* factor, the Court held that "[t]here is a common sense connection between the goal of reducing contraband in the jail and Cape Girardeau's postcard-only incoming mail policy." *Simpson*, 879 F.3d at 279-80. Because "it is reasonable to believe that contraband could be smuggled into the jail via mail," "it is a rational concept that limiting non-privileged mail to postcards could reduce the risk of contraband being introduced into the jail through the mail." *Id.* at 280. As a result, the Eighth Circuit concluded that the county's postcard-only policy was rationally connected to the penological goal of promoting jail safety. *Id.* It made very similar findings as it relates to the jail's interest in promoting efficiency when it concluded that "[r]emoving the need to open envelopes and shuffle through pages of letters could reasonably allow officers to spend less time and energy checking the mail for contraband." *Id.*

On the basis of *Simpson*, the Court has little hesitation concluding that the postcard-only policy is rationally related to the County's asserted objectives in reduction of contraband and improving jail efficiency. However, before moving to the final asserted penological goal, the Court feels the need to address HRDC's arguments that the County's justifications for the policy relating to safety and security were undermined by several practices at the Jail. In short, it contended that it was illogical or irrational for the County to say it implemented the postcard-only policy to reduce contraband or increase safety when it simultaneously allowed certain things to occur in the Jail which it argued

posed a greater threat to these two penological goals. Two of those activities are especially worth discussion: the policy of giving inmates paper when they use the law library and the Jail's treatment of Act 309 inmates.

The Court finds that neither of these policies undermine the County's asserted rationale to the point of rendering the policy arbitrary or irrational. As to the law library, it is true that the Jail provides inmates with pieces of paper so that they can use the facility's law library to take notes. Contrary to HRDC's assertions, this does not undermine the County's policy but merely indicates that the Jail has taken care to assist inmates in exercising their fundamental constitutional right of access to the courts. *See, e.g.*, *Beaulieu v. Ludeman*, 690 F.3d 1017, 1046 (8th Cir. 2012) (noting the Supreme Court's decision in *Bounds v. Smith* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers . . . ."). As to the Jail's handling of Act 309 inmates, the Court does find it somewhat curious that the Jail has decided that these individuals need not be searched for contraband when entering the Jail after previously being out in the general public. It presumes the difference in treatment lies in the fact that these individuals, unlike the general population of the Jail, have been trusted enough to be let out on work release programs in the first place. Whatever the reason, the Court does not find that the Jail's differential treatment of Act 309 inmates demonstrates that the County's decision to reduce contraband by implementing the postcard-only policy was arbitrary or irrational.

On the contrary, the evidence at trial seems to confirm the wisdom of the County's decision. For instance, HRDC introduced evidence during the bench trial about an incident that occurred in the Jail following the implementation of the postcard-only policy.

In particular, an incident report indicates that during mail inspection, a County official noticed two suspicious postcards where the affixed stamps had a bulge and were positioned in a way where they could be easily peeled back and removed. (Pl. Ex. 17). Subsequent testing indicated that the substance found underneath the stamps was opiate based. It appears that HRDC's intended purpose for introducing this evidence was to undercut the County's asserted rationale in contraband reduction. But, this incident only supports—not undermines—the objectively rational connection between a postcard-only policy and the goal of reducing contraband. Indeed, it confirms the Eighth Circuit's conclusion in *Simpson* that it is reasonable to believe that individuals would attempt to smuggle contraband into jails via mail.

Moreover, HRDC's argument overlooks what the Court finds to be the central conclusion to be drawn from this event—the interception of the postcards. Because the officers inspecting mail pursuant to a postcard-only policy do not have to search through mountains of paper, it makes it more—not less—likely that they *will* find contraband that is sent to the Jail since the postcard-only policy by its nature reduces the surface area that must be inspected and limits the locations where contraband may be hidden. The fact that it worked only confirms the logic behind the regulation. Therefore, the Court finds that, notwithstanding these two practices (*i.e.* providing inmates paper and its treatment of Act 309 inmates), the postcard-only policy is rationally related to the legitimate penological goals of reducing contraband and increasing efficiency.

As to the reduction of costs, the Court finds an objectively rational connection between this goal and limiting correspondence to postcards. The evidence revealed that implementation of the postcard-only policy has in fact saved the County money, as it is

cheaper to provide postcards and a postcard stamp versus paper for letters, envelopes, and stamps for regular letter mail. In fact, HRDC seems not to dispute that the cost savings are legitimate, as their own expert concluded that the evidence shows a savings of approximately $200. HRDC makes much of this number, calling it purely *de minimis* savings, as if it is somehow a mark against the County in a *Turner* analysis that there is evidence that the County's asserted justification for the policy has actually borne fruit. Perhaps its argument that such savings would not justify a restriction on First Amendment communications would be stronger were this the only rationale asserted for the postcard-only policy. But, that is not the case. Therefore, the Court agrees with the district court's and the Eighth Circuit's opinions in *Simpson* that a postcard-only policy is rationally related to the achievement of legitimate penological objectives.

HRDC tries to distinguish the facts of this case from the facts in *Simpson* on several grounds, But, as the Court will now explain, these reasons fail to distinguish this case from *Simpson* and do not persuade the Court that its conclusions should deviate from the conclusions reached in that case.

First, HRDC argues now, as it did when moving for a preliminary injunction and at summary judgment, that there is simply no evidence that the Jail ever experienced problems with contraband entering the facility before it decided to implement the policy and no evidence that any contraband reduction or efficiency gains have in fact occurred. This argument simply mischaracterizes the County's burden. For, the Eighth Circuit has made clear that the institution in question is "not required to provide evidence of previous incidents of contraband reaching inmates through the mail in order to adopt a postcard-only incoming mail regulation," "does not even have to show that its interests will actually

be furthered by the policy," and "does not have to show that efficiency was or will actually be furthered." *Simpson*, 879 F.3d at 280. Moreover, while HRDC is correct that this case is distinguishable from *Simpson* on one aspect related to this argument, it reaches the wrong conclusion to be drawn from that distinction. HRDC is right that in *Simpson*, no effort was made to present any evidence that the County's asserted justifications had actually manifested in contraband reduction or in efficiency gains. Here, however, the parties agreed that implementation of the postcard-only policy would make processing of the mail more efficient and would save the County money. In short, while the County was not required to present evidence in this case that its objectives would be realized by implementation of the challenged regulation, the fact that it has done so *strengthens*, not weakens, the Court's conclusions that such a policy is rationally related to the achievement of the County's asserted goals.

HRDC next tries to distinguish *Simpson* on the grounds that the postcard-only policy upheld there applied only to letters and did not apply to other types of mail such as newspapers, magazines, etc. As an initial matter, HRDC cites no authority for this distinction, and the district court's bench trial order and the Eighth Circuit's *Simpson* opinion seem to flatly contradict it. For instance, the district court explained that the policy stated that "[a]ll nonprivileged correspondence entering the jail must be written on 'standard white postcards' . . . ." *Simpson*, 202 F. Supp. 3d at 1065. The Eighth Circuit's opinion indicated the same. *See, e.g.*, *Simpson*, 879 F.3d at 279 ("Cape Girardeau implemented the postcard-only policy based on jail security and efficiency, not based on the content of the mail itself, and the policy applied to **all non-legal, incoming mail**.")

(emphasis added). Thus, it seems that the postcard-only policies are identical when it comes to regulating incoming mail.[15]

Moreover, HRDC's reading of *Simpson* (that *Simpson* only applied to letters) also makes less sense under *Turner*. Under HRDC's interpretation of *Simpson*, it is constitutionally permissible under the First Amendment to limit personal correspondence to postcards on the basis of legitimate concerns that senders could include contraband within/on the pages of such letters while simultaneously allowing in types of mail that, by their nature, contain more hiding spots for contraband than personal letters. Such a policy, unlike the one involved here, would *actually* seem illogical in light of the asserted justifications and simply cannot be what the Eighth Circuit fathomed.

Finally, HRDC argues that *Simpson* is distinguishable because the senders of the mail involved in the two cases are different. It bases the import of this distinction on language from the Supreme Court's opinion in *Bell v. Wolfish* that "there is relatively little risk that material received directly from a publisher or book club would contain contraband." 441 U.S. 520, 549 (1978). As an initial matter, the quoted language came not from the Supreme Court's holding but from an affidavit of the warden of the institution involved in that case. And, while the Court can appreciate that there might be some

_____

[15] It does appear from these two sources that there is a difference between these two policies that went unmentioned: Baxter County's policies also limited outgoing mail to postcards. However, while this difference likely explains why Baxter County, not Cape Girardeau County, was able to assert as a justification the additional rationale of cost savings (since it was saving money purchasing these postcards for inmates' use), it does not affect the Court's present analysis. Simply put, this case has never been about outgoing correspondence, but about HRDC's attempts to send unsolicited incoming mail into the Jail. Whether the *Turner* analysis would be different if an inmate had challenged his ability to send mail is not before the Court.

wisdom in that view, the effect of adopting it as the position on the constitutional question before the Court would seemingly pose greater problems than it would solve. For, under HRDC's view, an institution would be required to accept publications from any entity claiming itself to be a publisher. Such a system seems loaded with administrative enforcement headaches. Moreover, the overall effect of HRDC's position is also untenable. Indeed, accepting HRDC's argument at face-value requires finding that a mother attempting to communicate with her child in prison would have fewer First Amendment freedoms than a publisher who sends unsolicited mailings into a prison in order to (at least in part) sell subscriptions to its magazines. That position seems squarely at odds both with case law subjecting to greater scrutiny regulations which discriminate against the type of mailing, *see supra* at n.5, as well as with the history of the Supreme Court's treatment of First Amendment questions in general, which usually provide more, not less, protection to the type of communication involved in *Simpson*.[16] After all, even the Supreme Court hinted in *Procunier* that its holding involved direct, personal correspondence, and did not explicitly extend to "mass mailings." 416 U.S. at 408 n. 11.

In sum, the Court agrees with the *Simpson* court's resolution of this issue and concludes that there is a rational relationship between the County's adoption of the postcard-only policy and the asserted goals. This factor favors the County.

### 2) HRDC has sufficient alternative means to disseminate its message.

The second *Turner* factor asks "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. If so, "courts should

---

[16] For instance, the County argues that at least some of what HRDC desired to send into the Jail constituted commercial speech, which historically has been subject to greater governmental regulation. The Court need not, and does not, make a finding on this issue.

be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Id.* (alteration in the original) (internal citations omitted). "Alternatives to the type or amount of speech at issue 'need not be ideal . . . they need only be available.'" *Holloway v. Magness*, 666 F.3d 1076, 1080 (8th Cir. 2012) (alteration in the original) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 125 (2003)).

HRDC argues that it has no viable alternatives to communicate its intended messages to inmates. The Court disagrees. HRDC can still communicate with inmates (and inmates with them) through postcards. In addition, HRDC can visit prisoners in the Jail to convey its messages. HRDC can also, though it apparently has never done so, attempt to donate its materials to the Jail to supplement the County's small law library.[17] The fact that HRDC argues that there is no reasonable way it can condense its present literature to postcards does not help it, for alternative means need not be ideal. The Court can readily accept the assertion that the alternative means available to the mother in *Simpson* were more ideal than the alternative means available here. But, given the number of different means available to HRDC to communicate with prisoners in the Jail, the Court finds that this factor also favors the County.

---

[17] There was testimony from Paul Wright that an employee of HRDC contacted the County Jail after its publications began being rejected to inquire about how it could mail its materials to the Jail. It was informed that it could not mail its materials directly to prisoners unless the mailings were on postcards. However, there was no testimony that HRDC ever inquired about donating its materials to the Jail. The likely reason, of course, is that at least part of HRDC's mission is to increase paid subscriptions to its publications.

### 3) The Impact of Accommodating HRDC's Demands Would Cause A Significant Ripple Effect

The third *Turner* factors "considers what impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Simpson*, 879 F.3d at 281 (quoting *Turner*, 482 U.S. at 90) (internal quotation marks omitted). When accommodation would cause a significant ripple effect on prison staff, courts are to give "particular deference to the informed discretion of corrections officials." *Id.* (quoting *Turner*, 482 U.S. at 90).

While HRDC admits that implementation of the postcard-only policy has in fact benefitted the Jail,[18] it argues that allowing it to send its publications into the Jail without restriction would pose no more than a *de minimis* increase on the Jail's resources. To support its argument, it points to several parts of the record, including the average daily mail volume at the Jail, the videotaped inspection, and the testimony from Sergeant Beck and Corporal Maple. HRDC's essential argument is that it would not significantly increase the demand on staff members at the Jail if they were inspecting 30 letters as opposed to 30 postcards. The Court does not agree with the premise or the conclusion of HRDC's argument.

First, although no testimony as to any actual efficiency gains need be offered at trial under the Eighth Circuit precedent, the County did in fact establish that it is more

---

[18] Indeed, its proposed findings of fact and conclusions of law and post-trial brief readily admit that inspecting postcards would save jail officials time. In fact, it argued that inspection of 30 letters versus 30 postcards would "add[] a few more minutes to the inspection process each day." (Doc. 101, p. 9). As the Court will explain below, however, striking the County's postcard-only policy would immediately allow the unlimited sending of books and magazines from HRDC and other publishers. In short, the true comparison is not between 30 letters and 30 postcards; it is between 30 postcards and 30 exemplar publications from HRDC, some of which span over 200 pages in length.

efficient and less of a burden on staff to inspect postcards versus letters. Inspection of a letter requires jail staff to open the envelope, look over the envelope and letter, shake out the letter to make sure that any loose contraband is discovered, discard any staples or paper clips, and skim over the contents to ensure that there is nothing written that would pose a threat to the Jail or its inmates. Inspection of a postcard merely requires the skimming of the contents and the examination of the card and stamp to ensure that there is no hidden contraband. Such an inspection process would clearly be more efficient than inspecting letters, books, magazines, etc.

HRDC next argues that even if inspection of items such as non-postcards would increase the burden on staff officials, such an increase amounts to only a few minutes each day. (Doc. 101, p. 9). The evidence at trial indicated that, while the number varied, approximately 15-30 pieces of mail were received at the Jail each day. HRDC takes that number and essentially contends that it would only increase the staff-time necessary to inspect 15-30 letters by about a few minutes compared to the time necessary to inspect the same number of postcards. Of course, that comparison misses the mark and ignores both the type and scope of the different mailings that HRDC *alone* sends, much less the type and scope of the mailings that would be permitted to be received from other entities should the Court invalidate the postcard-only policy. For instance, HRDC has alleged throughout this case that it sends approximately nine different types of mailings to prisoners, including the 72-page magazine *Prison Legal News*, the 200+ page *The Habeas Citebook*, around 50 softcover books, legal reference books, self-help books, informational brochure packets, copies of judicial opinions, fundraising issues, and legal letters. Even looking at the main publications of HRDC, the 72-page magazine and *The*

*Habeas Citebook*, it is clear that inspection of such materials would significantly increase the amount of time needed to inspect the mail. Speaking hypothetically, each copy of the *Prison Legal News* magazine is the equivalent of 36 2-page letters, and each copy of *The Habeas Citebook* is the equivalent of 100 2-page letters. In short, it does not take a leap of logic to realize that inspection of even *one* of HRDC's mailings would increase the burden on staff. Thus, without even accounting for other entities who would be permitted to send lengthy mailings into the Jail and considering the nature of HRDC's publications *alone*, the Court finds that elimination of the postcard-only policy would increase the burden on prison staff.

It is also of no moment that HRDC contends that it would only temporarily send its materials to the Jail. Indeed, HRDC argues that any burden on staff resources caused by its mailings is limited because its mailings consist of an initial set of mailings sent to each prisoner followed by follow-up letters. Only if the prisoner responds (*i.e.* by purchasing a subscription) would HRDC's mailings continue. HRDC's argument might be more persuasive if the jail in question had a relatively stable inmate population. But, the evidence indicates that the Jail's population consists mainly of inmates who are on average only there for months, not years. Although there are exceptions, very few prisoners are there for an extended period. Thus, the unique nature of the Jail's population means that HRDC would likely be sending more—not less—initial mailings to the Jail, since the inmate population turns over regularly. In addition, HRDC's argument also ignores that the invalidation of the postcard-only policy would permit senders other than HRDC to begin sending their mailings. As a result, the Court does not find that accommodation of HRDC's demands would pose a *de minimis* burden on the institution.

To the contrary, the Court finds that there would be a tremendous additional burden on staff resources were the postcard-only policy invalidated.

This additional burden would be especially pronounced given the resources of this particular Jail, since the evidence at trial established that only two officers are working "on the ground" at any one time to respond to inmate concerns. The testimony also indicated that these two officers were also responsible for responding in person to security incidents, for monitoring prisoners, for preparing inmates for transport, for accepting inmates into the facility, and for distributing meals, medicines, and mail. Thus, HRDC's citations to cases involving established prisons with dedicated mailroom staffs, larger staffs in general, and expanded budgets simply have no relevance to determining whether accommodation of its interests at *this particular jail* would cause a ripple effect. For all of the reasons noted above, the Court concludes that it would.

**4) There are no obvious, easy alternatives to the postcard-only policy.**

The final *Turner* factor "asks whether there are any ready alternatives to the policy." *Turner*, 482 U.S. at 90-91. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation" while "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* Thus, "if a [plaintiff] can point to an alternative that fully accommodates the [claimant's] rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.*

HRDC's argument is that the County could (and should) simply revert back to its policy before the postcard-only ban was implemented. Again, the Court finds the

reasoning in *Simpson* to be an excellent starting place. There, the Eighth Circuit, noting the jail's interest in preventing the introduction of contraband, found that "[t]he risk of contraband entering the facility alone is more than a *de minimis* cost, and returning to a letter mail policy would force Cape Girardeau to incur that cost." *Simpson*, 879 F.3d at 282. Because institutional security is the most compelling government interest in this type of setting, the Eighth Circuit concluded that "as the jail officials are better positioned to understand the institutional security needs of Cape Girardeau County Jail, we defer to their judgment." *Id.*

HRDC argues that the logic of *Simpson* does not control because that case concerned a mother trying to send a letter to her son. Here, it argues, there is less risk that any contraband would be introduced if the materials to be sent were required to be sent by a publisher. The Court finds a number of problems with this argument. First, as it noted above, the full effect of HRDC's argument would be to give more protection to a publisher who desires to send unsolicited mailings to prisoners and less protection to a mother who desires to communicate with her child. That result seems plainly at odds with the history of First Amendment jurisprudence. In addition, HRDC has advocated that the County return to its previous policy—and has not argued that it should adopt a modified policy that requires books, magazines, etc. to be sent directly by the publisher. That old policy, of course, did not have the publisher-only restriction for publications. Nevertheless, even had that been HRDC's argument from the beginning, it comes with the attendant administrative headaches of deciding who does and does not qualify as a publisher. It also ignores the fact that case law does not require evidence of contraband entering the facility through a publication sent by a publisher before the Jail can proactively implement

measures to reduce the introduction of contraband. Thus, the County is not required to point to evidence of contraband entering the prison from a publisher before it is permitted to enact a regulation which incidentally affects them.

In addition, HRDC argues that the *Simpson* opinion relied exclusively on the jail's asserted interests in reducing contraband. That it true, but it misses the mark. While the Court here finds those arguments to be just as compelling and agrees with the overall conclusion of the Eighth Circuit that "[t]he risk of contraband entering the facility *alone* is more than a *de minimis* cost," *id.*, the County has also gone one step further than in *Simpson* by demonstrating that reversion to a pre-postcard-only system (or a modified system where publications must be sent directly from a publisher) would significantly increase the burdens on prison staff and overall staff resources at this particular facility. Thus, Baxter County's position is stronger than Cape Girardeau's position was in *Simpson*. The Court does not find that there are ready alternatives that would accommodate HRDC's interests at *de minimis* costs and concludes that the enactment of the postcard-only policy was not an exaggerated response by prison officials. Therefore, this factor also favors the County.

On balance, the Court finds that all of the *Turner* factors favor the County. As such, it concludes that the postcard-only policy is reasonably related to the legitimate penological goals of the County. HRDC's challenge to the policy fails, and its claim for a violation of the First Amendment will be **DISMISSED WITH PREJUDICE**.

### C. Damages

Because the Court found no First Amendment violation, much of what HRDC seeks in damages is simply not applicable. Nevertheless, it is entitled to damages for the

technical due process violation the Court found at summary judgment. The question then becomes what amount of damages is appropriate.

The Court will follow the dictates of the Supreme Court in its decision in *Carey v. Piphus*, 435 U.S. 247 (1978). There, the Supreme Court indicated that, even in the absence of proof of actual injury flowing from the constitutional violation, a procedural due process claim "should be actionable for nominal damages without proof of actual injury." *Carey*, 435 U.S. at 266. In addition, "although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983, we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused." *Id.* at 264.

HRDC argues in its proposed conclusions of law that it has proven actual damages stemming from the identified constitutional violation. In short, it contends that the production, shipping and handling, and return fees costs of each item mailed to and returned from the Jail are compensable as actual injuries. The Court disagrees.

*Carey* is instructive here. There, in reviewing the Seventh Circuit's opinion, the Court made the following observation:

> In this case, the Court of Appeals held that if petitioners can prove on remand that '[respondents] would have been suspended even if a proper hearing had been held,' then respondents will not be entitled to recover damages to compensate them for injuries caused by the suspensions. The court thought that in such a case, the failure to accord procedural due process could not properly be viewed as the cause of the suspensions. . . We do not understand the parties to disagree with this conclusion. Nor do we.

*Carey*, 435 U.S. at 260 (internal citation omitted). In short, as the Seventh Circuit and the Supreme Court held, compensable injuries stemming from a procedural due process

violation require the claimant to prove that the claimed injury stemmed directly from the identified violation and would not have otherwise occurred. Therefore, if petitioners could prove that the students would have been suspended (the injury) even if they had been properly given the hearing that was initially denied (the violation), then the students would not have been entitled to compensatory damages.

In this case, the Court found that there had been a technical due process violation because although HRDC received notice that its publications were being rejected in August of 2016, it was never provided a reason for those rejections. But, the Court cannot find any evidence of, and HRDC has not pointed to, any injuries that stemmed directly from that technical violation. It certainly does not believe that HRDC has demonstrated that the costs of its publications and/or the return fees has been shown to be an actual injury caused by the rejection of its publications in August. For, even if HRDC had received *all* of the process it was due (*i.e.* notice of the reason for rejection), the rejections would still have occurred, and the materials would still have been shipped. After all, the items shipped in August (and at all times thereafter) were indisputably *not* postcards. Therefore, the costs of the postage cannot be fairly said to have been specifically caused by the identified violation (the failure of the County to inform HRDC of the reason for the rejection).[19] Following the logic of *Carey*, because these injuries (the costs of mailing and

---

[19] In making this determination, the Court specifically rejects any argument by HRDC that initial notice of the reason why its publications were being rejected would have caused it to stop sending its publications (thereby saving it the costs and expenses of future rounds of mailings). Any assertion to that effect would simply be belied by the record, which indicated that one of HRDC's primary purposes in sending these materials repeatedly to prisoners within particular jails was to establish a record of "censorship" which would then allow it to bring suit. More importantly, in its proposed findings of fact, HRDC intimated that "HRDC continues, and will continue, to communicate with prisoners confined at the Jail through its publications and other mailings." (Proposed Finding of Fact # 39,

return fees) would still have occurred even if HRDC had received the full notice it was due (the violation), these costs are not proper compensatory damages for the technical violation of HRDC's procedural due process rights.

For similar reasons, it also rejects any argument by HRDC that "frustration of its mission" is a compensable injury.[20] Not only would any "frustration" it experienced have been caused by the rejection itself rather than by the failure of the County to give the reason for its rejection, but HRDC also has not shown that these rejections actually frustrated its mission. Indeed, HRDC's Executive Director's testimony is that litigation accounts for the majority of the work HRDC does. In short, sending unsolicited mailings to institutions around the country, following up when its publications are rejected, and ultimately filing and prosecuting the lawsuits that follow are essential components of HRDC's mission. The instant lawsuit therefore furthers, not hinders, HRDC's mission. Thus, the Court finds that the staff time spent on preparing HRDC's materials, on handling the returns, and on the prosecution of this matter are not compensable injuries flowing directly from the technical violation the Court found here. Thus, they are not compensable.

Therefore, the Court finds that only an award of nominal damages is appropriate here. Usually, each instance of an award of nominal damages is $1. HRDC cites to other cases where courts have approved higher amounts of nominal damages. The Court declines the opportunity to award anything more than $1 for each violation, in particular

---

submitted via email to the Court). Therefore, by HRDC's own assertions, it would have continued to send mail to the Jail even after it learned of the specific reason why its publications were being rejected.

[20] Unlike in the First Amendment context, the Supreme Court has rejected the concept of "presumed" damages for violations of procedural due process rights. *Carey*, 435 U.S. at 262.

because of language from the Supreme Court's *Carey* decision. *Carey*, 435 U.S. at 266-67 ("We therefore hold that if, upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless will be entitled to recover nominal damages not to exceed one dollar. . . ."); *see also Corpus v. Bennett*, 430 F.3d 912, 916 (8th Cir. 2005) ("Finally, one dollar is recognized as an appropriate value for nominal damages.").

However, the Court must address whether a single award of $1 would be sufficient damages, or whether HRDC is entitled to a $1 nominal damage award for each rejection of one of its publications where the County gave it no notice of the reason why it was being rejected. Extant law supports the latter approach. *See, e.g.*, *Fegans v. Norris*, 537 F.3d 897, 908 (8th Cir. 2008) ("We conclude that an award of $1.44 for *each constitutional violation* is a sufficient nominal damage award. . . .") (emphasis added); *Williams v. Hobbs*, 662 F.3d 994, 1011 (8th Cir. 2008) ("Thus, based on this *'per-constitutional-violation' analysis* . . . .") (emphasis added).

Thus, the inquiry on damages reduces to identifying how many discrete procedural due process violations there were on August 5, 2016. The Court has already partially answered this question. For, at summary judgment, it relied on the opinions of the Fifth and Eleventh Circuits which held that a sender of a mailing was not entitled to "copy-by-copy" notice for each mailing so long as the mailings were all rejected for the same reason. *See, e.g.*, *Livingston*, 683 F.3d at 223 (holding that due process does not require copy-by-copy notice); *Prison Legal News*, 890 F.3d at 976 n. 20 ("Copy-by-copy notice is not necessary for PLN to learn the reason(s) for the impoundment as long as all copies are impounded for the same reason(s).").

As a result of that authority, the Court finds that HRDC is entitled to an award of $1 in nominal damages for each discrete type of mailing sent on August 5, 2016. The testimony reveals that the August 5, 2016 mailings consisted of the same items being sent to eleven different prisoners at the Jail. Each prisoner was sent a copy of *The Habeas Citebook*, a sample copy of *Prison Legal News*, an informational brochure containing a list of HRDC's publications and an order form, and a paper copy of the case *Clement v. California Department of Corrections*, 354 F.3d 1148 (9th Cir. 2004). Because HRDC has combined the informational brochure and an order form together when describing the items mailed to prisoners, the Court finds that four discrete types of mail were sent. Therefore, the Court finds that a nominal damages award of $4 is appropriate in this case.

## III. CONCLUSION

**IT IS THEREFORE ORDERED** that the County's Motion for Reconsideration (Doc. 99) is **DENIED**.

**IT IS FURTHER ORDERED** that HRDC's Motion in Limine (Doc. 84) is **MOOT**.

**IT IS FURTHER ORDERED** that HRDC's First Amendment claim is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that HRDC is awarded a total of $4.00 in nominal damages for the violation of its due process rights with respect to the August 5, 2016 mailings. HRDC's other claims pursuant to the Fourteenth Amendment are **DISMISSED WITH PREJUDICE**. The Court also **DECLARES** that mail rejected pursuant to the postcard-only policy must give the sender notice as to why the mailing has been rejected. However, duplicate notices are not required for the same publication where the publications are rejected for identical reasons.

Judgment will enter contemporaneously with this order.

**IT IS SO ORDERED** on this *25th* day of April, 2019.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE