**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**


**HUMAN RIGHTS DEFENSE CENTER**                                    **PLAINTIFF**


**V.**                              **CASE NO. 3:17-CV-3070**


**BAXTER COUNTY, ARKANSAS**                                    **DEFENDANT**


**<u>BENCH TRIAL OPINION AND ORDER</u>**

**Table of Contents**

I.   BACKGROUND ................................................................................................ 3

     A.   Procedural Posture ................................................................................ 5

     B.   Mandate ................................................................................................. 6

II.  PAST POLICY AND PRACTICES ................................................................. 10

     A.   Findings of Fact .................................................................................... 12

     B.   Conclusions of Law .............................................................................. 16

          1.   Factors .......................................................................................... 17

          2.   Balancing....................................................................................... 32

     C.   Relief .................................................................................................... 35

III. PRESENT POLICY AND PRACTICES ......................................................... 35

     A.   Findings of Fact .................................................................................... 36

     B.   Conclusions of Law .............................................................................. 38

     C.   Relief .................................................................................................... 42

IV.  MOTION FOR JUDGMENT AS A MATTER OF LAW .................................... 43

V.   CONCLUSION .............................................................................................. 43

Plaintiff Human Rights Defense Center ("HRDC") alleges Defendant Baxter County, Arkansas, violated its First Amendment and Due Process rights. *See* Doc. 1. This Court issued a Memorandum Opinion and Order (Doc. 104) on April 25, 2019, ruling against HRDC on Count One, the First Amendment claim, and in its favor on Count Two, the Due Process claim. The Eighth Circuit affirmed this Court's judgment on Due Process but vacated and remanded judgment on the First Amendment. *See* Doc. 133-1.

HRDC's First Amendment claim is now before the Court on remand. For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** HRDC's request for relief on Count One.

## I.     BACKGROUND[1]

HRDC is a 501(c)(3) non-profit organization that engages in litigation, advocacy, and public education around prisoner rights. *See* Doc. 1, p. 3. As part of that mission, HRDC publishes and distributes *Prison Legal News*, a monthly legal magazine, as well as *The Habeas Citebook*, other books about the criminal justice system, self-help books for prisoners, and informational packets that contain subscription order forms and a book list. *Id.* at pp. 5–6.

Baxter County operates the Baxter County Detention Center ("BCDC" or "Jail"), which houses pretrial detainees, convicted misdemeanants, convicted felons awaiting transport to the Arkansas Department of Corrections, and up to eight Act 309 trustees. *See* 2019 Trial Tr. vol. 1, Doc. 127, pp. 99–100. HRDC alleges the County implemented and adheres to a mail policy that limits all non-privileged, non-legal incoming mail to

---

[1] The Court limits its discussion to the First Amendment claim. For the Court's analysis of HRDC's Due Process claim, later affirmed on appeal, see the Court's Memorandum Opinion and Order (Doc. 104).

postcards. According to HRDC, the County refused to deliver issues of *Prison Legal News*, *The Habeas Citebook*, informational packets, order forms, court opinions, and legal letters sent by HRDC to inmates held in the Jail. HRDC argues the County's refusal to deliver these materials is unconstitutional.

Prisoners retain a right to freedom of speech under the First and Fourteenth Amendment to the U.S. Constitution, *see Bell v. Wolfish*, 441 U.S. 520, 545 (1979), that extends to communication with those beyond the prison walls, *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Likewise, free citizens, including publishers, may "exercis[e] their own constitutional rights [to] reach[] out to those on the 'inside.'" *Id.*

At the same time, Supreme Court jurisprudence recognizes prison administrators "must strike [a delicate balance] between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment, in person or through the written word." *Id.* Accordingly, "the Constitution sometimes permits greater restriction of such rights in . . . [the context of] prison than it would allow elsewhere." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (upholding ban on newspapers, magazines, and photographs for inmates placed in most restrictive level of prison's long-term segregation unit). "[D]ue regard for the 'inordinately difficult undertaking'" of operating a modern prison, *Thornburgh*, 490 U.S. at 407, and "substantial deference to the professional judgment of prison administrators," *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), necessarily tempers judicial scrutiny of prison policy.

The applicable standard reflects this dynamic: Regulation that impedes inmates' constitutional rights is nevertheless valid so long as the prison's policy is reasonably related to legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). To evaluate reasonableness, the Court considers: (1) whether a "valid rational

connection" exists "between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" to the policy. *Id.* at 90–91. The same standard governs outsiders' rights in this context. *See Thornburgh*, 490 U.S. at 407; Doc. 133-1, p. 7 n.3.

HRDC contends that, under the *Turner* factors, the County's policy was—and is—unreasonable.

## A.      Procedural Posture

In 2017, HRDC sued the County and individual officers in pursuit of both monetary and injunctive relief. Defendants promptly filed a motion to dismiss (Doc. 18), and, shortly thereafter, HRDC sought a preliminary injunction (Doc. 26) to enjoin continued enforcement of the policy. In its December 5, 2017 ruling, the Court dismissed the individual capacity damage claims based on qualified immunity. *See* Doc. 49. It concluded the law governing HRDC's First and Fourteenth Amendment claims was insufficiently clear to put these officials on notice that their actions were unconstitutional. The Court also concluded HRDC did not meet its burden to show likelihood of success on the merits and denied HRDC's motion for a preliminary injunction. *Id.* That left the constitutional claims against the County remaining to be litigated.

A little less than a month later, the Eighth Circuit upheld a postcard-only policy against a First Amendment challenge in *Simpson v. County of Cape Girardeau*, 879 F.3d 273 (8th Cir. 2018). Defendants renewed their motion to dismiss, arguing that the *Simpson* decision sufficiently clarified the law and entitled them to dismissal. *See* Doc.

50. The Court construed Defendants' renewed motion as one for judgment on the pleadings, denied the request on the merits, and dismissed the remaining official capacity claims as duplicative of the claim against the County. *See* Doc. 53. The individual officers were dismissed from the action.

On November 2, 2018, the parties filed cross-motions for summary judgment (Docs. 67 & 70). HRDC argued the County's adoption and enforcement of the postcard-only policy violated its First Amendment rights—and *Simpson* was readily distinguishable. The County, relying principally on *Simpson*, contended that its policy was constitutionally permissible under the First Amendment.

On January 22, 2019, the Court denied the cross-motions for summary judgment as to the First Amendment claims (Doc. 89). Relying on language in *Simpson* that characterized the holding as "narrow" and cautioned that each policy should be evaluated on the unique facts of each case, the Court concluded that a genuine dispute of material fact prevented it from ruling on the policy's constitutionality at the summary judgment stage.

The Court held a three-day bench trial, beginning on January 30, 2019, to resolve the First Amendment claim. In a Memorandum Opinion and Order (Doc. 104) issued on April 25, 2019, the Court set out findings of fact and conclusions of law. It held that the postcard-only policy was reasonably related to legitimate penological goals and did not violate HRDC's First Amendment rights. The Court dismissed HRDC's First Amendment claim with prejudice. HRDC appealed that decision to the Eighth Circuit.

### B.     Mandate

On appeal, a three-judge panel considered whether this Court erred in holding the County's postcard-only policy did not violate HRDC's First Amendment rights. The Eighth

Circuit vacated the dismissal of HRDC's First Amendment claim and remanded for further proceedings not inconsistent with its opinion. *See* Doc. 133-1, p. 9.

Substantively, the Eighth Circuit focused on the second *Turner* factor. This Court determined that it favored Baxter County because the postcard-only policy left intact viable alternatives by which HRDC may communicate its message to inmates, including correspondence by postcard and the possibility of donating materials to the Jail's law library. On review, however, the Eighth Circuit emphasized the Supreme Court's admonishment in *Overton* that "while alternative means of communication do not have to be 'ideal,' they do have to be 'available.'" (Doc. 133-1, p. 6 (citing 539 U.S. at 135)).

According to the Eighth Circuit, proper evaluation of the second *Turner* factor— and, as an extension, the *Turner* analysis more broadly—required the district court to first determine "whether HRDC proved its assertion that the postcard-only policy results in 'a *de facto* total ban' on Jail inmates accessing HRDC's materials." *Id.* at p. 7. The Eighth Circuit concluded "[t]he district court made no finding of fact on this issue." *Id.* at p. 8

"On remand, a district court is bound to obey strictly an appellate mandate." *Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 456 (8th Cir. 1990). This is the "mandate rule." *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 407–08 (7th Cir. 2018) ("The mandate rule requires a lower court to adhere to the commands of a higher court on remand." (quoting *United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995))). "The law of the case doctrine is a corollary to the mandate rule and prohibits a lower court from reconsidering on remand an issue expressly or impliedly decided by a higher court absent certain circumstances." *Id.* (quoting *United States v. Adams*, 746 F.3d 734, 744 (7th Cir. 2014)); *see also Marshall v. Anderson Excavating & Wrecking Co.*, 8 F.4th 700, 711 (8th Cir. 2021) ("When an appellate court remands a case to the district court for further

proceedings consistent with the appellate decision, all issues the appellate court decides become the law of the case." (quoting *Bethea*, 916 F.2d at 456)). However, while "[a] mandate is completely controlling as to all matters within its compass . . . on remand the trial court is free to pass upon any issue which was not expressly or impliedly disposed of on appeal." *Paull v. Archer-Daniels-Midland Co.*, 313 F.2d 612, 617 (8th Cir. 1963).

Pursuant to the law of the case doctrine, this Court determined—and the parties agreed—that it must decide whether the postcard-only policy results in a *de facto* total ban on inmates accessing HRDC's materials. Then, the Court must analyze the *Turner* factors—this time, with the total ban finding in the mix—to determine whether the County's policy was reasonably related to legitimate penological objectives. *See* Docs. 134 & 135.

The Court decided to reopen the record on a limited basis. Where, as here, "the remanding court does not give specific instructions, the trial court on remand . . . [must] examine the appellate court's decision and determine what further proceedings would be proper and consistent with the opinion." 5 Am. Jur. 2d Appellate Review § 688. Absent some indication to the contrary, the district court maintains discretion to determine the steps necessary to satisfy the appellate court's mandate, including "whether additional evidence must be taken." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 572 (1943); 36 C.J.S. Federal Courts § 764 ("An appellate court's failure to specify that further evidence should be taken on remand can, at most, be construed as leaving a decision on the need to reopen the record to the sound discretion of the trial court."). In such circumstances, the district court may reopen trial proceedings for a limited purpose, hold additional evidentiary hearings—or change its former findings of fact (when made without a jury) without the admission of new evidence. *See* Lewter, V.G., Annotation, *Power of Trial Court, on Remand for Further Proceedings, to Change Fact Findings as to Matter*

8

*Not Passed upon by Appellate Court, Without Receiving Further Evidence*, 19 A.L.R.3d 502.

The Court believes the existing 2019 trial record contains sufficient evidence for the Court to analyze the *Turner* factors, including whether the postcard-only policy causes a *de facto* total ban on inmate access to HRDC's materials. But the appellate panel strongly implied that some further fact finding—in addition to making a formal finding of fact on the record—is appropriate. While the majority stopped short of expressly requiring the district court to conduct an evidentiary hearing or new trial, it responded to and rejected the dissent's suggestion that the existing evidentiary record was sufficient to assess whether a total ban exists:

> The dissent believes donation to the Jail's "small law library" is an "obvious viable alternative," and asserts the policy does not facially "preclude inmates from accessing communal copies of HRDC's publications permitted by the Sheriff." But we do not see donation to the so-called "law library," which consists of six or seven worn books in a milk crate, as such an obvious solution. For one, the record is unclear whether HRDC's materials would be permitted by the Sheriff. The unrebutted testimony at trial was that no publisher can send books into the Jail; that no magazines of any type are allowed in the Jail; and that the Jail does not accept books. And it is unclear what avenue is available to HRDC to get permission from the Sheriff under the policy. . . . This further highlights the absence of a factual finding by the district court that enables this court to determine whether the postcard-only policy is a *de facto* ban on HRDC's publications.

(Doc. 133-1, p. 7 n.4 (internal citations omitted)).

Accordingly, the Court held a contested evidentiary hearing on September 19, 2022. The parties stipulated to the admission of all evidence received during the 2019 trial. The Court also received three additional exhibits from HRDC and one from the County; heard testimony from Lieutenant Sebastian Dennis, current acting jail administrator, Tabatha King, a previous jail employee, and Baxter County Sheriff John Montgomery; and admitted one page of deposition testimony as Court's Exhibit 1.

9

The Court now analyzes the record to make a total ban finding and determine whether, considering that finding, the Jail's policy was reasonably related to legitimate penological objectives. It must do so twice. To determine whether the County is liable for damages, the Court examines the policies and practices in place in 2017, which is when HRDC's materials were rejected and this lawsuit was filed.[2] Injunctive relief, however, must address the conditions in place now.

## II.    PAST POLICY AND PRACTICES

HRDC's First Amendment claim for monetary relief turns on the policies and practices in the Baxter County Detention Center in 2017. Per Federal Rule of Civil Procedure 52, the Court now issues the following findings of fact and conclusions of law relevant to that claim.[3]

Upon review, the Court determines that the findings of fact articulated in its April 2019 Opinion, *see* Doc. 104, pp. 15–19, accurately reflected BCDC conditions in 2017. These findings described HRDC and its mailings, the postcard-only policy, and the Jail and its resources. The Court now ratifies and incorporates that portion of the Opinion. *See id.* Per the Eighth Circuit's mandate, the Court now  makes additional findings of fact related to whether there existed a *de facto* total ban on HRDC's publications in 2017.

The Court's findings and conclusions reflect this more fulsome record. The Court is not bound by its prior analysis. "Upon a reversal and remand for further consistent

---

[2] HRDC began mailing its publications to BCDC in August 2016. It continued to do so through May 2017. For shorthand, the Court refers to the relevant time period simply as "2017." There is no evidence the County's policies and practices differed between 2016 and 2017—or, for that matter, in the period leading up to trial in 2019.

[3] To the extent that any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

proceedings, the case goes back for a new determination of the issues presented as though they had not been determined before, pursuant to the legal principles enunciated in the appellate court's opinion." *Republican Party of Minn. v. White*, 416 F.3d 738, 745 (8th Cir. 2005) (cleaned up). Furthermore, the Court may "pass upon any issue that was not expressly or impliedly disposed of on appeal." *In re Usery*, 242 B.R. 450, 457 (B.A.P. 8th Cir. 1999), *aff'd*, 242 F.3d 378 (8th Cir. 2000); *see also In re Tri-State Fin., LLC*, 885 F.3d 528, 533 (8th Cir. 2018) ("[O]n remand from an appellate court, a trial court is bound by its own prior rulings only to the extent the appellate court explicitly or implicitly adopted those findings in resolving the appeal.").

Here, the Eighth Circuit vacated the First Amendment judgment in its entirety—returning it, then, in its entirety to this Court. The panel instructed this Court to make a factual inquiry, which it held critical to analyzing the second *Turner* factor. But its mandate went no further, and it is within this Court's discretion to reexamine each of the *Turner* factors. It is also necessary as a doctrinal matter. The *Turner* factors represent component parts of a single inquiry into reasonableness. All parts of that analysis should rely on the same evidentiary record.[4]

---

[4] Moreover, the record cannot be sliced and diced to categorize evidence as relevant to one factor or the other. While each factor poses a different substantive question, the point of reference is the same: the policies and practices of a particular prison. Consider, for example, evidence about the commissary. The Court heard testimony about the items that inmates may purchase. Inventory includes writing paper, postcards, playing cards, and dominos—but not HRDC's publications. While this testimony is directly relevant to the second factor, it may also bear on the third. If, let's say, the County allows playing cards because inmates rarely misuse them, that may provide some circumstantial insight into how inmates would treat HRDC's publications.

## A.      Findings of Fact[5]

As a matter of policy in 2017, the County prohibited almost all outside entities and individuals from providing inmates with books, magazines, or newspapers. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 121. The County prohibited inmates from accessing publications whether sent by mail, delivered in person, or provided electronically. *See id.* at pp. 121, 169–70. It did not provide inmates with internet access or make use of kiosks or tablet technology. *Id.* at pp. 122–23, 165.

There were three exceptions to this policy in 2017. First, the County allowed each inmate to keep a soft-bound Bible, Koran, or other holy book in his or her cell. *Id.* at pp. 169–70; 2019 Trial Tr. vol. 2, Doc. 128, pp. 32–34. The County permitted only those religious texts provided in person by clergy or a friend or family member during visitation. *Id.* It did not allow visitors to give inmates any other type of publication, *see* 2019 Trial Tr. vol. 1, Doc. 127, pp. 147 & 169, and there is no evidence that the County allowed inmates to receive a religious text by mail.

Second, the Jail provided a local paper, the *Baxter Bulletin*, to inmates in the five isolation and holding cells. These inmates received a single copy to share amongst themselves. *Id.* at pp. 123–24. General-population inmates did not receive the *Bulletin*—or any other newspaper. These inmates accessed local news by way of a local radio station, which the Jail piped through the speakers for 25–30 minutes a day. *Id.* at pp. 26, 44.

---

[5] The County's policies and practices remained consistent through the 2019 trial, and evidence adduced during that proceeding is wholly relevant to the total ban inquiry. Some testimony and evidence produced during the 2022 evidentiary hearing is also relevant. However, in this section of the Opinion, the Court is careful to rely only on those facts related to the 2017 period. The Court disregards, for example, the 2022 testimony of those individuals not employed at the BCDC or Sheriff's Office in 2017.

Third, the Jail maintained a "law library," which consisted of six books stored in a milk crate. *See* 2019 Joint Ex. 1. It contained two copies of the Arkansas Code of 1987 Annotated Court Rules Volume 1, two copies of Volume 2, the Federal Rules of Court 2014 edition, and the Arkansas Criminal Code Annotated 1991 Edition. *Id.* Association of Arkansas Counties risk management attorneys selected the books. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 177. When an inmate requested access, a jailer would bring the inmate and milkcrate to the "multiuse room." 2019 Trial Tr. vol. 2, Doc. 128, p. 23. The condition of the books varied. Some books were missing pages; some were "wrinkled up." *Id.* at pp. 23, 42–43. Inmates—no more than one at a time—were given an hour or so to spend with the milk crate. Upon request, jail staff would provide the inmate with a piece of paper to use while reviewing the materials. *Id.* at pp. 23–24.

The County did not accept donations to the law library in 2017. This was a contested issue, and the record contains conflicting accounts. The Court's conclusion rests, in part, on witness credibility.

In September 2022, the County attempted to introduce an HRDC paralegal Kathy Moses's affidavit into evidence.  On June 16, 2016, Ms. Moses called the Baxter County Detention Center to ask about its publication policy. She recorded her impressions in an affidavit, which HRDC submitted to the docket in support of its summary judgment motion. *See* Doc. 69-16. According to Ms. Moses, Sergeant Eric Neal told her the following: All publications must be sent to himself or Lieutenant Brad Lewis for review and approval before the book will be given to the intended recipient; the Jail would "appreciate any law books donated to the jail"; the Jail allowed "free or purchased books, of any size or weight, as long as they are softcover and free of contraband, and are of approved content"; and, under the mail policy, only legal mail may be sent by enveloped letter and everything else

was limited to a postcard.[6] *Id.* The Court accepted the affidavit for the purpose of establishing the phone conversation's effect on HRDC (i.e., that HRDC likely believed the County accepted donations of reading material) but would not accept it for the truth of the matter asserted (i.e., that the County did in fact accept donations).

The Court considered Ms. Moses's affidavit for this limited purpose alongside the testimony of other witnesses. During the 2019 trial, Sergeant Beck testified that should an inmate request a particular book, he would tell them, "we don't pass out books." (2019 Trial Tr. vol. 2, Doc. 128, pp. 29–30). The same goes for books offered by family members, according to Sergeant Beck. *Id.* He was unaware of any exceptions to this policy. *Id.* at pp. 30–31. Sheriff Montgomery testified in 2019 that "no publisher, Amazon or otherwise, can send books, leisure books, into the Baxter County jail," and no magazines or newspapers of any type (other than the *Baxter Bulletin*) were allowed in the Jail. 2019 Trial Tr. vol. 1, Doc. 127, p. 121, 123–24.

Now, Sheriff Montgomery claims that the County has always accepted book donations—including in 2017. *See* 2022 Evidentiary Hr'g, Doc. 155, p. 134. He explains that, in his 2019 testimony, he was referring to either leisure books or books sent directly to inmates, neither of which he would have accepted. That might be so. Regardless, Sheriff Montgomery testified extensively about the law library in 2019 and made no mention of donations. Furthermore, it is difficult to reconcile Sheriff Montgomery's more recent testimony that HRDC could have donated its materials with his 2019 statements that no magazines or newspapers were allowed in the BCDC.

---

[6] Neither Ms. Moses nor Sergeant Neal testified in 2019 or 2022. Neither party called Ms. Moses as a witness, and Sergeant Neal, who previously served as the Jail Administrator, died sometime before the 2019 trial. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 88.

Based on this record and the Court's assessment of witness credibility, the Court concludes that as a matter of practice and policy, the Jail did not accept donations in 2017. It is undisputed that donations directed to individual inmates were barred, and no witness cited any instance of publications donated for shared use in the law library.

In the past, the Jail periodically provided inmates with access to a "light-reading," fiction-only book cart. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 145. Many of the books were in poor condition. 2019 Trial Tr. vol. 2, Doc. 128, p. 28 ("Some of them had the pages ripped out, and some of them wasn't even whole books. Some of them were just a half a book."). As of 2019, the book cart had not been in use for several years. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 134.[7] The Court concludes it was not in service in 2017.

Finally, inmates with sufficient funds were allowed to purchase certain items from the commissary, including postcards, writing paper, playing cards, and dominos. The County allowed inmates to store these items in their cells. It did not limit the number of

---

[7] The Court disregards Sheriff Montgomery's testimony on this issue. In 2019, he stated that the book cart had been in regular use up until the last month or so. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 146. In contrast, Baxter County Sergeant Anthony Beck and Corporal Clay Eugene Maple testified that the book cart had not been in use for several years. *See* 2019 Trial Tr. vol. 2, Doc. 128, p. 27 (Beck testimony), p. 42 (Maple testimony).

The Court does not ascribe malintent to the Sheriff. It's possible that, because the Jail Administrator handles much of the day-to-day operations, Sheriff Montgomery was simply mistaken in some of his statements. But as factfinder in this case, the Court must assess the credibility of each witness.

The Court credits the testimony of Sergeant Beck and Corporal Maple on this issue. Both men worked in the Jail itself, while Sheriff Montgomery's office was across the street from the Baxter County Detention Center. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 174. Furthermore, during the 2022 hearing, Sheriff Montgomery admitted he could only speculate as to book cart use, further undermining the Court's trust in his knowledge about the Jail's day-to-day practices. *See id.* at pp. 149–50.

postcards or amount of writing paper an inmate purchased or stored in his or her cell. *See id.* at pp. 112–13, 142; 2019 Trial Tr. vol. 2, Doc. 128, pp. 19, 25–26.

The Court finds that the County's 2017 policies and practices *de facto* barred HRDC's publications in the Jail. In fact, except for softbound, hand-delivered Bibles and court rules contained in the Jail's milk crate, the County's policies prohibited inmate access to *all* publications at that time.

### B.    Conclusions of Law

The Court now analyzes each *Turner* factor—this time, with the total ban finding in the mix—to determine the postcard-only policy's reasonableness. These conclusions of law reflect the BCDC policies and practices in place in 2017.

The analysis that follows differs from the Court's April 2019 Opinion (Doc. 104). In 2019, the Court treated all of HRDC's materials in the same manner. Upon further review, the Court differentiates between letter mail and publications.

In *Simpson*, the Eighth Circuit held that a correctional policy restricting letter mail to postcards did not violate the plaintiff's First Amendment rights. 879 F.3d at 282. *Simpson* involved a parent, Cheryl Simpson, who regularly wrote long letters to her son while he was incarcerated at Cape Girardeau County Jail in Missouri. *Id.* at 276. This changed in 2014 when Cape Girardeau limited incoming mail to postcards to reduce contraband in the jail and the time allocated to searching the mail. *Id.* Ms. Simpson challenged the policy as a violation of her First Amendment rights. The Eighth Circuit rejected Ms. Simpson's challenge, holding that each *Turner* factor weighed in favor of the county defendant.

*Simpson* controls—in part. *Simpson* analyzed the postcard-only policy's application to letter mail. The Eighth Circuit held that alternatives to letter writing, such as

postcards, phone calls, and visitation, provided adequate means of exercising the right to personally correspond with inmates. Accordingly, the Court finds Baxter County's rejection of HRDC's letter mail in 2017 did not violate its constitutional right to personally correspond with inmates. Under *Simpson*, HRDC's ability to send postcards and speak by telephone or during visitation provided adequate alternatives to letter writing.

The Court focuses the below analysis on publications—defined as books, magazines, and newspapers—and Baxter County's policy of rejecting publications for failure to be placed on postcards. *Simpson* did not analyze or discuss the reasonableness of a postcard-only policy in this context, and case law and common sense suggest that letter mail and publications differ in important ways.

For the reasons explained below, the Court ultimately concludes that the County implemented a *de facto* total ban on all publications sent by mail, even when sent directly by the publisher or distributor. Pursuant to this policy, the Jail refused to deliver publications mailed by HRDC in 2017. *See* 2019 Joint Ex. 1. Such a policy restricted far more First Amendment-protected activity than necessary to achieve the County's stated objectives. While the County need not implement the least restrictive means of achieving its interests, the postcard-only policy proves arbitrary in its scope. As a result, the Court concludes that the County's prohibition against books, newspapers, and magazines sent by mail, regardless of sender, was not reasonably related to legitimate penological interests.

## 1.     Factors

To evaluate reasonableness, the Court considers: (1) whether a "valid rational connection" existed "between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there [were] alternative means of exercising

the right that remain open"; (3) "the impact accommodation of the asserted constitutional right [would have had] on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there were "ready alternatives" to the policy. *Turner*, 482 U.S. at 90–91.

### *Rational Connection to a Legitimate Penological Objective*

The first *Turner* factor requires the Court to determine whether a rational relationship existed between the Jail's policy and legitimate penological objectives.

Courts afford considerable deference to prison officials, *Wolfish*, 441 U.S. at 547, but there must still be a legitimate government objective underlying the policy, *Beard*, 548 U.S. at 535 ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."). As the Supreme Court noted in *Turner*, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." 482 U.S. at 89–90. A policy that lacks a rational connection to legitimate penological objectives will not be upheld under the *Turner* factors.

The County contends the postcard-only policy serves as a proactive security measure and promotes efficient jail operations. *See* Doc. 104, p. 21. According to the County, the policy reduces the likelihood of contraband entering the facility, the amount of paper available for misuse by inmates, and the amount of time staff must dedicate to screening mail.[8]

---

[8] The County also asserts an interest in cost savings. There exists an objectively rational connection between this goal and limiting *outgoing* correspondence to postcards. Implementation of the postcard-only policy has in fact saved the County money; it is cheaper to provide postcards and a postcard stamp instead of paper for letters, envelopes, and stamps for regular letter mail. But these savings do not accrue with

Security and efficiency represent legitimate penological objectives. The Supreme Court has characterized internal security as "perhaps the most legitimate of penological goals," *Overton*, 539 U.S. at 133, and the Eighth Circuit likewise considers "security [to be] the most compelling government interest in a prison setting," *Simpson*, 879 F.3d at 279 (citing *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004)). "[I]nstitutional efficiency is also a legitimate penological objective." *Id.; see also Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1082 (D. Or. 2013) (recognizing institutional efficiency as a legitimate penological objective); *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 861 (5th Cir. 2004) (finding "staff and space limitations, as well as financial burdens, are valid penological interests"); *Davidson v. Mann*, 129 F.3d 700, 702 (2d Cir. 1997) (finding a "valid and rational connection between the regulation and DOCS's interests in avoiding a backlog of mail and in allocating prison personnel efficiently").

The County must also demonstrate a "logical connection between its goals and the regulation." *Simpson*, 879 F.3d at 279. "*Turner* does not require 'actual proof that a legitimate interest will be furthered by the challenged policy. The connection between the two need only be objectively rational.'" *Id.* (quoting *Herlein v. Higgins*, 172 F.3d 1089, 1091 (8th Cir. 1999)). Still, many facilities have adopted—and courts have upheld— "publishers only" policies on the premise that publications sent directly by a publisher or distributor are unlikely to contain contraband. *See, e.g., Wolfish*, 441 U.S. at 550 (holding that prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores does not violate inmates' First Amendment rights); *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1158 (10th Cir. 2007) (holding "County Jail's paperback

---

respect to *incoming* mail. Accordingly, even if the Court assumes cost savings represent a legitimate objective, it bears no rational relationship to restricting incoming mail.

book policy, which allows inmates to obtain paperback books from the jail library and, with permission, the publisher" constitutional); *Ward v. Washtenaw Cnty. Sheriff's Dep't*, 881 F.2d 325, 329 (6th Cir. 1989) ("[T]he district court correctly granted summary judgment for [county-defendants] on the issue of whether [their] 'publishers only' rule violated plaintiff's first amendment rights."); *Cotton v. Lockhart*, 620 F.2d 670, 671 (8th Cir.1980) (upholding publishers-only rule as applied to hardback and paperback books, magazines and newspapers); *Minton v. Childers*, 113 F. Supp. 3d 796, 803 (D. Md. 2015) ("[T]he prison's ban on incoming used books sent from non-publishing companies passes constitutional muster."). As one court noted, publications sent directly by a publisher or distributor "pose little risk of drug smuggling." *Hum. Rts. Def. Ctr. v. Sw. Va. Reg'l Jail Auth.*, 396 F. Supp. 3d 607, 620 (W.D. Va. 2019).

The County seems to agree. At least one Jail employee testified that he didn't bother to check the *Baxter Bulletin* before providing it to inmates in segregation and holding cells, some of whom were placed there due to disciplinary issues. *See* 2019 Trial Tr. vol. 2, Doc. 128, p. 27. Nor did he check the newspaper before it was passed to the next inmate. *Id.*

If HRDC were to do as the County suggests—place the text of its publications on postcards—the Jail would experience an enormous influx in postcards.[9] This increased volume would undermine the purpose of the postcard-only policy. Rather than examine one stamp attached to a single package, for example, staff would need to check the stamp on hundreds or thousands of postcards. It would force Jail employees to spend more time sorting mail, making it more likely that contraband will slip through and preventing

---

[9] The Jail currently receives somewhere between 10 and 30 postcards a day. *See* 2019 Trial Tr. vol. 2, Doc. 128, p. 18.

employees from completing other tasks. Even Sheriff Montgomery agreed that this makes little sense. When asked whether he would rather inspect 100 or more postcards or one monthly periodical, he replied, "Well, the answer would be, obviously, I would prefer to just look at one monthly periodical." (2022 Evidentiary Hr'g, Doc. 155, p. 153).

The Court concludes the 2017 prohibition against publications mailed directly by publishers and distributors lacks a rational relationship to legitimate penological objectives. Under *Turner*, "If there is no logical connection [between the County's goals and the regulation], then the regulation is arbitrary and unreasonable and cannot be sustained." *Simpson*, 879 F.3d at 279.

But even if the Court concluded a rational relationship existed between the County's prohibition against publications mailed directly by publishers and distributors and its valid interest in security and efficiency, that would not save the policy. A finding of rationality would not be "the end of the inquiry" because the other "factors must also be evaluated before a court can decide whether the prison regulation or policy is permissible." *Hrdlicka v. Reniff*, 631 F.3d 1044, 1051 (9th Cir. 2011). Here, as explained below, the remaining *Turner* factors weigh in favor of HRDC. In this context, even if the postcard-only policy as applied to publications was held rational, the Court would nevertheless conclude it remained unreasonable.

### *Alternatives Available to HRDC*

The second *Turner* factor requires the Court to examine "whether there [were] alternative means of exercising the right that remain open." *Turner*, 482 U.S. at 90. Where "other avenues" remain available for the exercise of the asserted right, courts should be particularly conscious of the "measure of judicial deference owed to corrections officials in . . . gauging the validity of the regulation." *Id.* (alteration in original) (citations omitted).

21

In analyzing this factor, "'the right' in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417. "[P]rison officials need not provide alternative means of expression that are identical in nature to the banned modes of expression to withstand a constitutional challenge; rather, courts look to see whether the prison officials allow similar alternative forms of expression that are consistent with the penological interests at stake." *Reynolds v. Quiros*, 25 F.4th 72, 92 (2d Cir. 2022). But, as the Eighth Circuit noted in remanding this case, "If the alternative means are illusory, impractical, or otherwise unavailable, this would weigh in favor of HRDC under the second factor." (Doc. 133-1, p. 6).

The County contends HRDC possessed plenty of alternatives to mailing publications directly to inmates in 2017. The County points to postcards, phone calls, and visitation, as well as the possibility of donating books to the law library or book cart. The Court disagrees. Suitable replacements for letter writing do not provide an adequate substitute for publications, and, as a matter of fact, Baxter County Jail neither accepted donations nor operated a book cart in 2017.

Per *Simpson*, the ability of third-parties to personally correspond with an inmate via a postcard, phone call, or visitation, represented an available alternative to letter writing. The question, then, is whether the ability of third-party publishers to communicate by postcard, phone call, or visitation provided an adequate alternative to books, magazines, and newspapers. The Court finds it did not. This conclusion rests on several principles derived from case law. First, a blanket ban on a particular form of communication may raise serious constitutional issues. Second, in the context of corrections policy, even severe restrictions on First Amendment rights—when tailored to specific populations and paired with opportunities for inmates to earn privileges back—

do not constitute a blanket ban. Third, in assessing whether a blanket ban exists, courts distinguish between access to publications and letter writing and other means of personal communication.

In *Overton v. Bazzetta*, the Supreme Court held that the "restriction on visitation for inmates with two substance-abuse violations, a bar which may be removed after two years, serves the legitimate goal of deterring the use of drugs and alcohol within the prisons." 539 U.S. at 134. The Court acknowledged that the policy was severe, especially because the reinstatement of visitation was not automatic at the end of the two years, but nevertheless upheld the regulation. The Court explained it might have reached a different conclusion "if faced with evidence that MDOC's regulation is treated as a *de facto* permanent ban on all visitation for certain inmates." *Id.* Likewise, in *Beard v. Banks*, the Supreme Court confronted a regulation restricting prisoners housed in a special unit due to "behavior that is continually disruptive, violent, dangerous or a threat to the orderly operation of their assigned facility" from accessing newspapers, magazines, or personal photographs. 548 U.S. at 535. Such inmates were, however, allowed legal and personal correspondence, religious and legal materials, two library books, and writing paper. An inmate could advance to less restrictive housing by improving his behavior and complying with prison rules. The Supreme Court upheld the regulation, repeating its statement in *Overton*: "[W]e agree that "the restriction is severe," and "if faced with evidence that [it were] a *de facto* permanent ban . . . we might reach a different conclusion in a challenge to a particular application of the regulation." *Id.* (quoting *Overton*, 539 U.S. at 134).

In *Koger v. Dart*, the Northern District of Illinois construed these comments about a *de facto* total ban to suggest "that the Supreme Court may be poised to strike down an absolute ban on newspapers in prisons," explaining that "[i]f the [Supreme] Court were

23

prepared to find unconstitutional a *de facto* permanent ban limited to difficult inmates, then a permanent ban applicable to all inmates necessarily would fall." 114 F. Supp. 3d 572, 578–79 (N.D. Ill. 2015). This Court agrees: A *de facto* total ban raises serious constitutional issues.[10]

*Overton* and *Beard* also provide insight into the meaning of a *de facto* total ban, primarily by defining what fails to earn that moniker. While severe, the restrictions analyzed in *Overton* and *Beard* were not necessarily permanent and applied only to inmates who committed certain infractions or engaged in a pattern of misconduct. Prison officials intended the restrictions to act as a deterrent, and, with good behavior, these inmates could earn back their privileges. The Court determined neither policy amounted to a *de facto* total ban, which suggests that even minimal tailoring and the possibility of non-permanence may suffice to protect against a constitutional challenge. Baxter County's 2017 postcard-only policy, in contrast, applied to all inmates—and all third-party publishers. Aside from a softbound Bible or outdated set of court rules, BCDC inmates were unlikely to see a single magazine, newspaper, or book while incarcerated in the Jail during this period. In sum, Baxter County enforced a blanket ban on publications.

The County disagrees. It contends HRDC could have communicated with inmates by postcard, phone, and visitation. This argument assumes that the postcard-only policy implicates the First Amendment right to communicate writ large. If so, then these

---

[10] *Overton* and *Beard* address claims brought by inmates, and the Supreme Court "has not considered the extent to which a ban on access to inmates may violate the separate First Amendment rights of outsiders, including publishers." (Doc. 133-1, p. 7). However, the Court finds the Supreme Court's reasoning applicable here. It has held that free citizens, including publishers, may "exercis[e] their own constitutional rights [to] reach[] out to those on the 'inside,'" *Thornburgh*, 490 U.S. at 407, and the same framework governs the analysis regardless of whether an inmate or a publisher brings the claim.

mechanisms provide adequate alternatives. However, Supreme Court precedent and lower court decisions suggest that the existence of a so-called blanket ban turns on a prison's publication policy, not whether a publisher may engage in personal communication with an inmate. These cases imply that replacements to letter writing, such as postcards, phone calls, and visitation do not provide constitutionally acceptable alternatives to distributing published materials.

For example, in *Murchison v. Rogers*, an inmate at South Central Correctional Center ("SCCC") and subscriber to *Newsweek*, received most of the issues without incident during his incarceration. 779 F.3d 882 (8th Cir. 2015). A particular issue, however, was withheld because it "promote[d] violence, disorder or the violation of state or federal law including inflammatory material" in violation of SCCC policy.[11] *Id.* at 888. The Eighth Circuit affirmed the district court's dismissal of the case on summary judgment, explaining that prison officials adequately justified the decision with respect to the specific content at issue and "[t]here [was] no suggestion the prison has a blanket ban on this specific publication or on any material which includes some type of violent content." *Id.* at 889.[12] That conclusion required no consideration of SCCC inmates' ability to write letters, make phone calls, or have visitors.

---

[11] This finding stemmed from an article about drug cartels and related violence in Mexico, accompanied by graphic images. *Id.* at 888.

[12] The Eighth Circuit's decision on remand in this case also impliedly recognized a distinction between individualized, interpersonal communication and publications. It stated, "A key consideration in this case is that, even if HRDC could be required to use only postcards to solicit inmate subscribers, the postcard-only policy appears to prohibit Jail inmates from receiving any of HRDC's publications, as subscribers or otherwise." (Doc. 133-1, p. 6).

Other courts similarly define "blanket ban" solely in reference to publications. *See, e.g., Khan v. Barela*, 808 F. App'x 602, 608 (10th Cir. 2020) ("The implication of *Wolfish* and *Jones* is that a complete ban on hardcover books or newspapers would likely violate the First Amendment."); *Pepperling v. Crist*, 678 F.2d 787, 791 (9th Cir. 1982) (holding a blanket ban on magazines "carries a heavy presumption of unconstitutionality"); *Sw. Va. Reg'l Jail Auth.*, 396 F. Supp. 3d at  624 (finding "HRDC has established that the undisputed facts show that the blanket magazine ban fails to satisfy the *Turner* test, and HRDC is entitled to judgment as a matter of law"); *Wilson v. Owens*, 2015 WL 13630759, at *6 (W.D. Mo. Feb. 18, 2015) ("Unlike other policies struck down by the courts for banning all newspapers and magazines, the PCDC policy is curtailed to prohibit only magazines printed on glossy paper."). This makes practical sense too. As the district court explained in *Human Rights Defense Center v. Southwest Virginia Regional Jail Authority*, "[w]hile in theory HRDC could call an inmate on the phone to convey information contained in the books or" transpose each book page on a postcard, "these are not adequate alternatives to communicating the books' valuable and time-sensitive legal, health-related, and educational information to inmates." 396 F. Supp. 3d at 621.

Aside from postcards, phone calls, and visitation, Baxter County also points to the book cart and donations as alternatives available to HRDC in 2017. The Court disagrees as a matter of fact. Testimony establishes the book cart was not in use and the Jail did not accept donations.

It is undisputed that the County lacked a formal policy allowing book donations, and there is no evidence of the Jail ever accepting donations. In *Ware v. Jackson County*, the Eighth Circuit held that "the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." 150

F.3d 873, 882 (8th Cir. 1998) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) ("Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced.")).

Even if the Court were to fully credit Sheriff Montgomery's testimony,[13] that would only establish that, in 2017, the Jail accepted publisher-donated books on an ad hoc, informal basis subject to the personal discretion of individual employees. Absent an articulation of the criteria used to evaluate a given publication—or any evidence suggesting the Jail did, in fact, accept donated material at this point in time—the Court cannot find donations represented a viable alternative in 2017.[14]

The Court concludes the policies and practices in the BCDC in 2017 effectively barred inmate access to all publications. Neutral third-party publishers possessed no mechanism by which to distribute publications to inmates. This factor weighs in favor of HRDC.

### *Impact of Accommodation*

Next, the Court "examine[s] the impact accommodation of the asserted constitutional right would have on guards, other inmates, and prison resources." *Jones*, 503 F.3d at 1153–54 (citing *Turner*, 482 U.S. at 90).

---

[13] This is a big "if." As noted, Sheriff Montgomery's testimony about the day-to-day operations was often contradicted by the testimony of other employees working directly with inmates.

[14] HRDC argues that, even if available, donations are not an acceptable alternative under *Turner*. There is some support for that. *See e.g., Sw. Va. Reg'l Jail Auth.*, 396 F. Supp. 3d at 621 ("It is further undisputed that donated books are unlikely to reach their intended recipients in a timely fashion and may not reach them at all."). However, because HRDC could not have donated its materials in 2017, the Court need not reach this legal question.

"In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* "The third factor often weighs heavily when courts consider mail policies that restrict potentially disruptive content, such as depictions or descriptions of violence, escape, or criminal activity, sexually explicit materials, and role-playing games, or where the challenged regulation saves the prison substantial resources." *Cox v. Denning*, 2014 WL 4843951, at *22 (D. Kan. Sept. 29, 2014), *aff'd*, 652 F. App'x 687 (10th Cir. 2016).

The Court finds that exempting publications sent directly by publishers or distributors from the postcard-only policy would have had a *de minimis* impact on the Baxter County Detention Center in 2017.

The County argues that returning to a letter mail policy would increase the risk of contraband and impair efficiency. This argument makes two false assumptions. First, the County assumes a binary choice: letter mail policy or postcard-only policy. But, as noted, many correctional institutions have successfully implemented a publishers-only rule. Second, the County's concerns assume a significant increase in the volume of mail received by the Jail. As a factual matter, the Court finds that unlikely.

The volume of publications sent to the Jail has implications for both security and efficiency. Fewer items to review makes it more likely contraband will be discovered. Furthermore, as the parties stipulated, "It is faster to process postcards than to open envelopes," and "faster processing of mail allows staff to return more quickly to their

primary safety and security duties." *See* 2019 Joint Ex. 1. "Serious incidents in a jail setting – [such as] fights [and] medical emergencies – can and do occur . . . in a matter of only a few moments," *id.*, making efficiency that much more important.

These represent significant and serious potential ramifications should mail drastically increase at the BCDC. But the County stated multiple times that, aside from HRDC, no other entity or individual had attempted to send publications directly to inmates. *See* 2019 Trial Tr. vol. 1, Doc. 127, p. 144; *see also* Def. Suppl. Br., Doc. 140, p. 2 ("Since enacting the BCDC mail policy nearly 7 years ago, no individual or entity other the Plaintiff (in and after filing this lawsuit) has complained about, or sought an exception to, this policy."). In *Crime Justice & America, Inc. v. Honea*, the defendant sheriff argued that "overturning the mail policy [which prohibits delivery of unsolicited commercial mail to inmates] would result in a flood of unsolicited mail." 876 F.3d 966, 977 (9th Cir. 2017). Aside from one employee's testimony that he was aware of only three instances in 26 years in which someone had asked to distribute unsolicited mail, the County presented no evidence to substantiate its concern. The Ninth Circuit wrote: "Thus, the virtual absence of requests to distribute such mail more likely reflects a lack of interest in reaching the jail's population than a reaction to the jail's mail policy." *Id.* The same holds true here. There is no reason to believe a publishers-only policy would have significantly increased publications mailed to the Jail in 2017.

Still, an increase is an increase; inspecting a single book takes longer than inspecting no book at all. However, the Jail's other policies and practices demonstrate that implementing a broader publishers-only policy would have had, at most, a de minimis impact on the Jail's efficiency and security. As noted, the increase in volume of mail itself was likely to have been limited. In addition, the County allowed access to Bibles and, for

a select few, the *Baxter Bulletin*. There is no reason to believe that third-party provided publications will have a different impact on Jail operations.

Given evidence demonstrating the BCDC is unlikely to experience a meaningful change in the volume of mail received and the BCDC's existing ability to process publications, the Court finds this factor weighs in favor of HRDC.

### Alternatives Available to the County

Finally, the Court considers whether obvious, easy alternatives existed that would have fully accommodated HRDC's rights at a *de minimis* cost to County's valid penological interests. *Turner*, 482 U.S. at 90. "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91. But if there existed alternatives capable of accommodating HRDC's rights at *de minimis* cost to valid penological interests, that may indicate the policy was not reasonable but instead an "exaggerated response." *Id.* at 91.

The Court concludes that implementing a publishers-only rule would have minimally affected the Jail's legitimate interest in security and efficiency.

As noted, *supra*, such a policy was unlikely to cause a meaningful increase in mail received. Inspecting one of HRDC's publications required no more than a minute or two per item. When examining a Bible brought in by a family member, Jail employees thumb through the pages and shake the book upside down. *See* 2019 Trial Tr. vol. 2, Doc. 128, pp. 27, 34. It takes no more than a few minutes, *id.* at pp. 34–35, and even that seems exaggerated, *see id.* at p. 13 (Sergeant Beck testifying that, prior to the postcard-only policy's implementation, when the Jail received a book or magazine, staff "just kind of

looked through it, you know, shook the book around a little bit, you know, flip the page, make sure there's nothing there").

Furthermore, there is no rational basis to believe that publications sent by mail were more likely than hand-delivered items to contain contraband.[15] The County's own experience bears that out: The sole incident involving contraband smuggled in by publication occurred in the context of a visitor seeking to provide an inmate with a Bible that had contraband stored in its binding. *See* 2019 Trial Tr. vol. 1, Doc. 127, pp. 111 & 147. Moreover, as evidenced by this incident, the County's methods of inspection were sufficient to discover contraband.

The County argues that inmates may use books, magazines, and newspapers to clog toilets or jam doors. But the County already allowed inmates to keep hand-delivered Bibles in their cells. *See id.* at p. 33. Whatever security risk existed in allowing inmates to possess one book in their cell, it remained the same whether that book was a Bible, or— should an inmate so choose—one of HRDC's publications.[16]

To the extent the Jail believed a publishers-only rule would still impair security or efficiency, there were a number of low- to no-cost regulations that would have mitigated these concerns. For instance, the Jail might have limited the number of books an inmate

---

[15] *See Morrison v. Hall*, 261 F.3d 896, 902 (9th Cir. 2001) (holding a regulation requiring inmate mail be sent by first or second class postage—and prohibiting bulk rate, third class, and fourth class mail—was unconstitutional as applied to pre-paid, for-profit, subscription publications in part because "although the defendants presented evidence that contraband is sometimes included in bulk rate, third, and fourth class mail, the defendants have failed to present any evidence that the risk of contraband in first or second class mail is any lower than the risk of contraband in mail that is sent bulk rate, third, or fourth class").

[16] Moreover, given that the County allows inmates to store the Bible—and unlimited paper and postcards—in their cells, prohibiting publications would seem to have little effect on the volume of paper floating around the Jail.

may keep in his or her cell—or the amount of paper that may be purchased through the commissary.[17] Or, for those inmates that misused paper, the Jail might have imposed a temporary bar on access to paper products. Other minor changes would have reduced the burden on staff. For instance, day-shift employees sort the mail. *See id.* at p. 52; 2019 Trial Tr. vol. 3, Doc. 129, p. 57. There is no reason this task could not have been reassigned to the night shift when fewer issues compete for the staff's attention.[18]

### 2.      Balancing

Upon reexamination, the Court finds the County's 2017 postcard-only policy was not reasonably related to legitimate penological objectives. Ultimately, Baxter County barred publishers from providing any publications to any inmate. Such a far-reaching, indiscriminate, permanent prohibition constituted an exaggerated response to the County's legitimate interest in security and efficiency. No circumstance in this particular jail even arguably necessitated a *de facto* total ban on all books, magazines, and newspapers provided directly by publishers or distributors, and the intrusion into publishers' First Amendment rights was not justified or reasonable in this context.

---

[17] The Court is compelled to note that the County receives a percentage of commissary sales. In 2017, the profit to the County from commissary sales was $40,181.51. 2019 Pl. Ex. 18. The Court does not rely on this fact but simply notes that it certainly provides one explanation for the County's decision to allow unlimited commissary purchases, despite the allegedly critical need to reduce paper in the Jail to ensure security.

[18] During the trial, the County's correctional expert testified that Jail employees must still do rounds while inmates are sleeping. But, he also acknowledged, the fact that they are sleeping may "potentially" lower the number of issues that arise and require an emergency response by staff. While the Court does not doubt that issues arise at night in the Jail, it seems uncontroversial to infer the number of such incidents is likely lower than those that arise during the day. No testimony or evidence refuted this common sense point.

Correctional facilities across the United States have identified ways to balance legitimate penological objectives with the First Amendment's obligations. Courts have evaluated—and upheld—a multitude of these policies, including content-based, population-specific, and format-specific restrictions on publications.[19] Precise tailoring is unnecessary. So long as federal, state, or local officials articulate a reasonable relationship between policy and valid penological interests, courts will defer to their

---

[19] For content-based restrictions, see, e.g., *Jones v. Salt Lake Cnty.*, 503 F.3d at 1154–56 (upholding a prison ban on "sexually explicit" publications, meaning publications featuring pictures of "breasts and genitals"); *Mauro v. Arpaio*, 188 F.3d 1054, 1057–63 (9th Cir.1999) (en banc) (upholding a prison ban on "sexually explicit materials"); *Lyon v. Grossheim*, 803 F. Supp. 1538, 1548–49 (S.D. Iowa 1992) (upholding regulations that allowed officials to deny inmates access to a publication found likely to be disruptive or produce violence).

For population-specific restrictions, see, e.g., *Beard*, 548 U.S. at 524–25, 530 (upholding a prison policy that prevented especially "dangerous and recalcitrant inmates" from receiving "newspapers, magazines, and photographs" as a means of incentivizing "better behavior on the part of particularly difficult prisoners"); *Stauffer v. Gearhart*, 741 F.3d 574, 586 (5th Cir. 2014) (differentiating between a policy that limited inmates participating in sex offender treatment program from accessing certain publications and policies previously evaluated and struck down by the Fifth Circuit, and finding the former "much more carefully tailored to meet the Program's goal of rehabilitation" than the latter, which "denied prisoners access to *all* magazines and/or newspapers" (emphasis in original)).

For format-specific restrictions, see, e.g., *Honea*, 876 F.3d at 976 (finding *Turner* satisfied where jail provided hard copies of publisher's magazine in its library and made a digital copy available on its 31 electronic kiosks—1 kiosk for every 18 inmates); *Hum. Rts. Def. Ctr. v. Bd of Cnty Comm'ers for Strafford Cnty.*, 2023 WL 1473863, at *2 (D.N.H. Feb. 2, 2023) (refusing to preliminarily enjoin a policy that prohibited inmates from receiving any non-legal mail where inmates received a tablet (free of charge) that allowed electronic access to nearly 6,000 books and 2,000 magazines, hard copies of HRDC's books and two-year subscriptions to both *Prison Legal News* and *Criminal Legal News* were purchased and made available in the library, and officials offered to make electronic versions of *Prison Legal News*, *Criminal Legal News*, and HRDC's books available on the prisoners' tablets); *Hum. Rts. Def. Ctr. v. Henderson Cnty.*, 2022 WL 14740236, at *8 (W.D. Ky. Oct. 25, 2022) (finding *Turner* satisfied where jail provided hard copies and electronic access to HRDC's publications); *Minton v. Childers*, 113 F. Supp. 3d 796, 803 (D. Md. 2015) (finding "prison's ban on incoming used books sent from non-publishing companies passes constitutional muster" where inmate was allowed to receive new books sent directly by a publisher).

expertise. Despite this striking deference to prison officials, the Court has yet to identify a single decision upholding a blanket ban on publications, applied indiscriminately to all inmates in perpetuity and without allowing access to publications in any other format.

Prison law doctrine reflects two fundamental premises. First, "prison walls do not form a barrier separating prison inmates from the protections of the Constitution, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh*, 490 U.S. at 407 (quotations and brackets omitted). Second, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Wolfish*, 441 U.S. at 545. Caselaw emphasizes the latter, and a policy even minimally tailored may be held consistent with these principles. A "blanket ban," however, makes both tenants false. It may also mark the outer limits of deference owed to prison administrators. In *Bell v. Wolfish*, the Supreme Court wrote:

> There is simply no evidence in the record to indicate that MCC officials have exaggerated their response to this security problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources. Therefore, the considered judgment of these experts must control in the absence of prohibitions far more sweeping than those involved here.

441 U.S. at 551. In *Overton*, the Court noted that, absent "evidence that MDOC's regulation is treated as a *de facto* permanent ban on all visitation for certain inmates," the Court would not "substitute [its] judgment for the conclusions of prison officials." 539 U.S. 134.

Here, the County's 2017 postcard-only policy simply went too far. By barring all publications in the Baxter County Jail—and preventing all publishers from distributing any publication to inmates—the County's policy proves to have been an exaggerated

response to legitimate objectives. While some elements of the policy may have been justified, its scope was not. Deference to prison administrators cannot overcome this defect. The Court finds the County's 2017 policy of rejecting HRDC's publications mailed to specific inmates violated HRDC's constitutional rights.

### C.      Relief

A "plaintiff seeking compensatory damages in a § 1983 suit must prove more than just a deprivation of his rights; he must also establish that the 'deprivation caused him some actual injury.'" *Vincent v. Annucci*, 2023 WL 2604235, at *5 (2d Cir. Mar. 23, 2023) (quoting *McCann v. Coughlin*, 698 F.2d 112, 126 (2d Cir. 1983)). Because HRDC did not present evidence regarding such injuries, the Court cannot grant compensatory damages.

However, "[w]here a party's constitutional rights have been violated, an award of nominal damages is mandatory." *Prison Legal News v. Babeu*, 933 F. Supp. 2d 1188, 1214 (D. Ariz. 2013) (citing *Floyd v. Laws*, 929 F.2d 1390, 1402 (9th Cir.1991)); *see also Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that nominal damages may be awarded without proof of actual injury).   Accordingly, the Court awards HRDC $1.00 in recognition of the violation of its constitutional rights.

### III.      PRESENT POLICY AND PRACTICES

The Court now turns to HRDC's plea for injunctive relief. The Court evaluates this claim based on the County's present policy. It now issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[20]

---

[20] To the extent that any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

### A.      Findings of Fact

Formally, the postcard-only policy remains in place today. There is one written exception: legal mail. However, all Jail policies are under internal review by Jail officials. The process, which involves Sheriff Montgomery, Captain Jeff Lewis, and Acting Jail Administrator Lieutenant Sebastian Dennis, began in February 2022. It has not concluded, *see* 2022 Evidentiary Hr'g, Doc. 155, p. 55, although Lieutenant Dennis anticipates the revised mail policy will also include a written exception for religious mail, *see id.*

Presently, the Jail recognizes several unwritten exceptions, including one for Bibles. *Id.* at p. 15. Previously, the Jail allowed family members and clergy, limited to those visiting in person, to provide a specific inmate with a Bible. Now, an inmate may receive a Bible in the mail if the inmate provides Jail employees with advance notice of its arrival. *Id.* at p. 17. Absent advance notice—for instance, if an organization seeks to send an unsolicited religious text to a specific inmate, or if an inmate simply fails to alert staff—the Bible will not be given to the inmate. Rather than returning the Bible to the sender, however, the Jail will place it in the inmate's "property." *Id.* While the County bars unsolicited Bibles sent by mail, it allows religious organizations to make *in-person* deliveries of unsolicited Bibles. *Id.* at p. 16.

General population inmates continue to access local news by way of a local radio station, which the Jail pipes through the speakers twice a day. *Id.* at 133. But these inmates also now have some access to newspapers. *Id.* at 56–57. The County subscribes to the *Baxter Bulletin*, a daily paper. *Id.* at 57. If an inmate would like to read the paper, he or she may ask the jailer for it. Then, the inmate may read it in their cell and give it back to the jailer when they finish. *Id.* Since Lieutenant Dennis came on board in October

2021, the Jail has not experienced any problems with inmates flushing the newspaper down the toilet or causing other damage. *Id.*

The Jail also maintains its milk crate law library. It remains unchanged with two exceptions: First, following depositions in this matter in July 2022, the books were replaced with new copies in better condition, *id.* at p. 82; second, at some point, the Sheriff also printed out two issues of *Prison Legal News*, redacted the advertisements, and placed them in the milk crate, *id.* at pp. 143-144. Both issues of *Prison Legal News* are now outdated; they were filed to the docket as part of this case, and, in summer 2022, Sheriff Montgomery printed them out and stuck them in the milk crate, *id.* at p. 119.

The Jail's commissary continues to operate. The Jail decides what items it carries. *See* 2019 Pl. Ex. 27; 2022 Evidentiary Hr'g, Doc. 155, p. 30. The Jail allows inmates to purchase, for example, sudoku books, sketch pads, legal pads, card decks, and clothes (including shoes, undergarments, and undershirts). *Id.* at pp. 30–32. The Jail receives 25 percent of the profits from items sold in the commissary. *Id.* at pp. 28–29, 32. The only limit on inmate purchases is the amount of money an inmate has in his or her commissary account. *Id.*

In November 2021, Lieutenant Dennis reinstated the book cart. However, it was shut down in less than a month. *Id.* at p. 19. According to Lieutenant Dennis, inmates were misusing the books to cause damage to the Jail. *Id.* at p. 28. Lieutenant Dennis, however, did not remove the other books from inmates' possession, which included Bibles and books purchased through the Jail's commissary, although they could have been used for the same purpose. *Id.*

Lieutenant Dennis reintroduced the book cart a second time at the end of July 2022—and it remains in service. *Id.* at p. 27. According to Lieutenant Dennis, "The

inmates all decided that they wanted books and were going to stop using the books for nefarious reasons." *Id*. The jail has not experienced any disciplinary issues related to books or the book cart since its reintroduction. *Id*. at p. 28. The Jail now maintains seven carts, allowing inmates in different pods to borrow books on a weekly basis. The books themselves were donated, either by the Arkansas Department of Corrections or the local library. Pursuant to policy (albeit, an unwritten one), the book cart is limited to "uplifting" fiction. Sheriff Montgomery testified that he would not allow copies of Prison Legal News to be placed on the book cart because they are not uplifting fiction. However, employees have carte blanche authority to make exceptions, subject to approval by the Sheriff. Lieutenant Dennis admitted a non-fiction book might be included on the book cart if the Sheriff says it's okay. When asked whether the censoring policy is on an ad hoc, subjective, case-by-case determination by the Sheriff, Lieutenant Dennis replied in the affirmative. *Id*. at p. 65.

## B.      Conclusions of Law

The Court begins its analysis with the first *Turner* factor: whether the Jail's present policy rationally relates to legitimate, neutral penological objectives.

Formally, the County maintains the same policy as it did in 2017, which it justifies on the same grounds—security and efficiency. While these constitute legitimate penological objectives, the policy is not neutrally applied.

In this context, "neutral" means that the "regulation or practice in question must further an important or substantial government interest unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415–16 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974), *overruled by Thornburgh*, 490 U.S. 401). For example, when "prison

administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral.'" *Id.*

Here, the Jail accepts Bibles sent to individual inmates through the mail yet refuses all other publications sent in the same manner. The County made no attempt to justify or explain this differential treatment. This lack of neutrality renders the relationship between the postcard-only policy and legitimate penological objectives irrational. There is no reason to believe that publications sent directly by a publisher are more likely to contain contraband than Bibles sent directly by a religious organization. Nor is there any reason to believe that one of HRDC's publications requires a more onerous inspection than a Bible.

Baxter County itself provides inmates with an enormous amount of paper. Inmates may keep a Bible, unlimited paper, books purchased from the commissary, and books borrowed from the book cart in their cells. The Jail has also begun allowing inmates to read the newspaper in their cells. *Id.* at p. 115. To rationalize the postcard-only policy in the context of the Jail's other practices, one must believe that a publication sent by mail will impact security and efficiency differently than the same publication provided by another mechanism, such as the book cart or commissary. Yet the County offers no factual basis for this distinction. The book cart, for example, contains books donated by the local library, and each one must be checked for contraband, just as each book received by mail must be examined.

The complete inability to reconcile policies and practices undermines the deference typically afforded to prison officials. *Prison Legal News v. County of Ventura*, for example, examined a policy that allowed "publishers to send inmates publications, even when the publications are sent in envelopes, while disallowing these same

publishers from sending letters." 2014 WL 2736103, at *5 n.1 (C.D. Cal. June 16, 2014). Noting that defense counsel was unable to "articulate any rational basis for this distinction," *id.*, the district court held the policy "smack[ed] of arbitrariness and irrationality," *id.* at *5. It is worth noting that other courts have held that such incongruence renders the policy arbitrary. In *Thomas v. Leslie*, the Tenth Circuit expressed a similar sentiment. 176 F.3d 489 (10th Cir. 1999). It wrote: "We agree with the district court that the absolute ban on newspapers does not constitute a valid, rational connection between the prison regulation and the legitimate governmental interest put forth to justify it, particularly where the hazards concerning Sheriff Leslie could as well be caused by the permitted reading materials." *Id.* (quotations and citations omitted). Here, the County jumps through hoops to avoid an adverse judgment but succeeds only in demonstrating the arbitrary nature of its policies and practices.

The policy appears to change on a whim. Lieutenant Dennis acknowledged that exceptions are created on a case-by-case basis and according to some unknown criteria. Consider the below exchange between the Court and Lieutenant Dennis:

> Court: So despite the written policy that was in effect in July of 2022, the sheriff and management of the jail have subjective personal discretion about the types of mail that an inmate can receive?
>
> Lieutenant Dennis: Yes.
>
> Court: And that can change from day-to-day?
>
> Lieutenant Dennis: Yes, sir.
>
> Court: The sheriff could get up one morning and decide that one publication can be received and get up the other day and decide that it can't?
>
> Lieutenant Dennis: Yes, sir.

*Id.* at pp. 55–56. In such circumstances, employees "essentially have unfettered discretion to approve or reject books as they wish, for any reason." *Sw. Virginia Reg'l Jail Auth.*, 396 F. Supp. 3d at 620–21. "Such a policy invites arbitrary decisions driven by individual officials' biases and do[es] not bear a rational relationship to legitimate penological interests." *Id.* at 621.

Baxter County need not adopt policies capable of resolving every possible eventuality that may arise in the prison environment. *See Borzych v. Frank*, 439 F.3d 388, 392 (7th Cir. 2006) ("Some open-ended quality is essential if a prison is to have any guidelines."). Nor must it make written policies and enforce them with perfect consistency. *See Koger v. Dart*, 950 F.3d 971, 973–74 (7th Cir. 2020) ("Stringent enforcement is not essential to establishing that given rules are reasonable."). Running a prison requires officials to maintain a fragile balance of competing objectives, and the ability to exercise discretion is essential. In deference to that reality, courts merely require officials to articulate a conceivably rational basis for a given policy or decision. This is a low bar. But one that Baxter County fails to clear.

Because the County fails to establish a rational relationship between its policy and legitimate, neutral penological objectives, the Court may conclude its analysis. *See Hrdlicka*, 631 F.3d at 1051 ("The first *Turner* factor is a *sine qua non*: If the prison fails to show that the regulation is rationally related to a legitimate penological objective, we do not consider the other factors." (omitting quotation marks)). The County's refusal to accept publications mailed directly by a neutral third-party publisher or distributor—with the exception of Bibles mailed by religious organizations—is not reasonable. The County's policy, as a result, violates HRDC's constitutional rights under the First Amendment.

### C.      Relief

"A permanent injunction requires the moving party to show actual success on the merits." *SD Voice v. Noem*, 60 F.4th 1071, 1077 (8th Cir. 2023) (quoting *Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020)). If actual success is found, the Court "then considers the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Here, actual success on the merits turns on whether the postcard-only policy's prohibition against most neutral third-party publishers and distributors violates the constitution. The analysis above demonstrates it does.

HRDC demonstrates irreparable harm because "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008). With respect to balancing the harms, HRDC proves the BCDC mail policy burdens its First Amendment rights. The County, if enjoined, will spend minimal additional time inspecting publications prior to distributing them to inmates. In these circumstances, "[t]he constitutional hardship is far greater than the insignificant impact on Defendants' time and resources. *Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1091 (D. Or. 2013). Finally, "it is always in the public interest

to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

The Court finds HRDC is entitled to a permanent injunction barring the BCDC from continuing to refuse publications mailed to inmates by neutral third-party publishers and distributors.

## IV.        MOTION FOR JUDGMENT AS A MATTER OF LAW

During the September 2022 evidentiary hearing, after HRDC rested, the County moved for judgment as a matter of law. The Court took the motion under advisement.

Where the district court acts as finder of fact, the applicable rule is Federal Rule of Civil Procedure 52(c), "which allows the trial court to enter judgment on an issue upon which 'a party has been fully heard.'" *Geddes v. Nw. Mo. State Univ.*, 49 F.3d 426, 429 (8th Cir. 1995). However, the court also may "decline to render any judgment until the close of the evidence." Fed. R. Civ. P. 52(c). To the extent a ruling is required, the Court **DENIES** the County's motion.

## V.        CONCLUSION

For the reasons stated above, the Court hereby finds and directs that Plaintiff Human Rights Defense Center is entitled to a judgment in its favor against Defendant Baxter County, Arkansas.

The Court **GRANTS IN PART AND DENIES IN PART** HRDC's request for monetary and injunctive relief under Count One.

Baxter County's postcard-only policy, as practiced in 2017, is **DECLARED** to be unconstitutionally overbroad. Baxter County's rejection of the *Prison Legal News* and the *Habeas Citebook*, two publications mailed to inmates in the Baxter County Detention Center in 2017, is **DECLARED** to be unconstitutional. Baxter County's continued refusal

to allow HRDC, a neutral third-party publisher, to mail publications to BCDC inmates is **DECLARED** to be unconstitutional.

The Court hereby **PERMANENTLY ENJOINS** the County, as well as its officers, directors, employees, agents, and those in privity with them, from enforcing any incoming mail policy that prohibits publications mailed by HRDC because the publication was not placed on postcards. **IT IS ORDERED** that the County, as well as its directors, employees, agents, and those in privity with them, **SHALL NOT** refuse to deliver publications mailed to BCDC inmates by HRDC on the ground that the publication is not transposed on a postcard. **IT IS FURTHER ORDERED** that the County make public notice of the outcome in this lawsuit and ramifications for the ability of HRDC, a neutral third-party publisher, to distribute publications to inmates in the Baxter County Detention Center within 30 days of issuance of this Opinion. Such notice must be made on the Sheriff's website and any other mechanism used by the County to communicate with the public about Jail policies.

**IT IS FURTHER ORDERED** that HRDC is awarded a total of $1.00 in nominal damages for the violation of its First Amendment rights in 2017.

**IT IS FURTHER ORDERED** that the County's motion for judgment as a matter of law is **DENIED.**

**IT IS SO ORDERED** on this 31st day of March, 2023.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE